Arron Bossardet #197100 *pro-se*
ASPC Tucson, Manzanita Unit
PO Box 24401
Tucson, AZ 85734

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Arron Shawn Bossardet, | Case No.: |
|---|---|
| Plaintiff, | CV-21-00179-TUC-RM(PSOT) |
| v. | **CIVIL RIGHTS COMPLAINT** |
| Centurion Healthcare, et.al., | |
| Defendants | |

A. JURISDICTION

The Court has jurisdiction to hear this matter pursuant to: 28 U.S.C. § 1983

B. DEFENDANTS

1. Name of first Defendant: Centurion Healthcare Inc. The first Defendant is employed as: Healthcare Provider for ADC Prisoners.

2. Name of second Defendant: Vanessa Headstream. The second Defendant is employed as: Health Services Contract Monitor at Central Office.

3. Unknown Elliott. Corizon registered nurse practitioner at Corizon Health at ASPC-Tucson.

4. NP Riley: Nurse Practitioner responsible for Plaintiff's care.

5. RN Hodge: Registered Nurse responsible for Plaintiff's care.

1

# FACTS

1. Plaintiff is a prisoner, currently incarcerated at the Arizona State Prison Complex ("ASPC").

2. Plaintiff has exhausted all available administrative remedies.

3. On or about 12/03/2019, Plaintiff's right foot was physically examined by Nurse Practitioner ("NP") Riley.

4. At that encounter, Plaintiff explained to NP Riley that his right foot would not plant flat on the floor, and standing on the right foot caused Plaintiff severe pain.

5. NP Riley determined that Plaintiff's right foot was deformed.

6. NP Riley requested a surgical consultation with an orthopedic surgeon.

7. On 1/6/2020, Plaintiff saw Dr. L. Daniel Latt at Banner University Medicine Orthopedics Clinic in Tucson, Arizona for the first time.

8. Dr. Latt stated in his report, 1) "When the patient stands he is in hindfoot driven cavus with his first ray slightly elevated."; 2) "For the hindfoot contracture we prescribed him lateral heel wedge to wear in the shoe"; 3) "The goal for him is to weight-bear and potentially improve the contracture over time."; and 4) "If his hindfoot varus is not improving surgical option is a lateralizing calcaneus osteotomy"

9. Dr. Latt recommended a lateral heel wedge, that Plaintiff finish physical therapy, and to follow up with Dr. Latt.

10. NP Riley ordered the lateral heel wedge based on Dr. Latt's recommendation.

11. On 2/17/2020, Plaintiff had his first follow-up with Dr. Latt.

12. Dr. Latt reported that Plaintiff was not doing well with non-operative treatment.

13. Dr. Latt stated that injections have been helping Plaintiff with his "first TMT arthritis".

14. Dr. Latt requested a CT scan of Plaintiff's right foot and ankle "to evaluate for subtalar arthritis which are [sic] change surgical management plan."

15. Dr. Latt's report stated, "If he has septic arthritis, the plan will be for subtalar athrodesis of first TMT arthodesis with gastroc recession for definitive management of <u>his foot pain to allow him to walk</u>" (emphasis added).

16. NP Riley reviewed and acted on Dr. Latt's 02/17/2020 report by ordering the requested CT Scan.

17. On 3/12/2020, the CT Scan was obtained.

18. On 3/21/2020, Plaintiff submitted a Health Needs Request ("HNR") to alert Centurion staff that his prescription of Ranitidine was discontinued, and Plaintiff was suffering with increased heartburn, painful indigestion, and stomach acid in the lungs.

19. Plaintiff also alerted Centurion staff that he had bone density issues.

20. Plaintiff requested: 1) a Health Service Encounter ("HSE") with the provider (NP Riley); 2) A follow-up with a gastroenterologist; and 3) a bed wedge to elevate Plaintiff's head and keep his stomach acid out of his lungs.

21. On 03/23/2020, NP Riley responded to Plaintiff's 03/21/2020 HNR by discontinuing Plaintiff's prescription of Protonix, effectively eliminating all medications recommended by Dr. Verma.

22. Plaintiff never had an HSE with a Centurion employee prior to the discontinuation of his medication (Protonix), including NP Riley.

23. On 03/24/2020, Plaintiff submitted an emergency Inmate Informal Complaint Resolution ("IICR") form, in which he complained that all medications recommended by Dr. Verma had been discontinued, causing Plaintiff unnecessary pain.

24. Plaintiff also complained that he was denied access to a provider (NP or MD).

25. Plaintiff requested to speak to the Site Medical Director ("SMD"), Dr. Abel Salazar.

26. The request was denied.

27. Later that day (03/24/2020), Plaintiff was called tot he medical clinic by the Assistant Director of Nursing ("ADON"), RN Hodge.

28. RN Hodge called Plaintiff to the clinic to discuss the condition of Plaintiff's right foot, and give him a copy of the report of the completed CT scan

4

ordered by Dr. Latt.

**29.** Plaintiff explained to RN Hodge that his foot was still deformed, and the deformity was causing severe pain, disability, and bone loss (osteopenia). RN Hodge assured Plaintiff that he would be sent back to Dr. Latt (orthopedic surgeon) with the results of the CT scan, but did not take steps to have Plaintiff's pain treated.

**30.** At the 03/24/2020 encounter, RN Hodge and Plaintiff also discussed the fact that Plaintiff filed an emergency IICR due to the fact that all of his gastroesophageal reflux disease ("GERD") medication that had been ordered by Dr. Verma, had been discontinued.

**31.** RN Hodge explained that all IICR's are sent to her first for investigation.

**32.** RN Hodge decided that Plaintiff would be prescribed Sucralfate – a medication _not_ prescribed by Dr. Verma.

**33.** Because RN Hodge was an RN, without the education or license to prescribe medication, Plaintiff requested to speak to SMD Salazar.

**34.** The request was denied.

**35.** On 03/25/2020, Plaintiff was prescribed Sucralfate.

**36.** Plaintiff did not have an HSE with a provider prior to being prescribed Sucralfate.

**37.** On 04/05/2020, Plaintiff submitted another HNR in which he explained that Sucralfate was ineffective at treating his GERD.

5

**38.** Plaintiff also complained of acute symptoms of GERD, to include pain in the esophagus. Plaintiff requested that Centurion seek guidance from a gastroenterologist.

**39.** Plaintiff also requested a bed wedge.

**40.** On 04/08/2020, Plaintiff was prescribed Omeprazole for the treatment of GERD, without an HSE with a Centurion staff member.

**41.** Omeprazole is not on Dr. Verma's list of recommended medications because Dr. Verma was aware that Plaintiff had adverse reactions to Omeprazole in the past.

**42.** Later that day (04/08/2020), Plaintiff submitted another HNR, in which he explained that Omeprazole was not on Dr. Verma's list of recommended medications, and that Dr. Verma advised Plaintiff not to take Omeprazole due to the adverse reactions.

**43.** On 04/10/2020, Plaintiff resided in Housing Unit ("HU") 5 of the Manzanita Unit. At approximately 10:00 AM, NP Riley and RN Hodge entered HU-5 and summoned Plaintiff to the day room for an HSE. Correctional Officer ("CO") II Pierce was present.

**44.** Plaintiff made his way to the day room in his wheelchair ("WC").

**45.** When Plaintiff arrived, NP Riley and RN Hodge accused Plaintiff of "complaining".

**46.** After being accused of complaining, Plaintiff produced a copy of the

recommendations of Dr. Verma.

**47.** NP Riley and RN Hodge had access to the information that Plaintiff provided via Centurion's electronic database.

**48.** Plaintiff told NP Riley and RN Hodge that Plaintiff's suffering could have been avoided if Dr. Verma's recommendations had been followed.

**49.** NP Riley and RN Hodge reinstated Plaintiff's Protonix.

**50.** Plaintiff requested an explanation as to why he had advanced osteopenia in his right foot.

**51.** NP Riley responded that the right foot has advanced osteopenia because it is deformed and will not plant flat on the floor. This severely limits Plaintiff's use of the foot and ability to bear weight. Riley further responded that the issue was being addressed by an orthopedic surgeon.

**52.** Plaintiff then pointed out that a lot of his suffering was due to a pattern of denials of access to a provider – either NP or MD – for a discussion about medication for GERD, medication for ongoing pain (right foot/knee/leg), and concerns with osteopenia in several joints.

**53.** Plaintiff stated that it was inappropriate for RN Hodge to prescribe and/or deny him medications using a provider's license, and also deny Plaintiff access to a provider.

**54.** NP Riley responded, "don't take it personally."

**55.** Plaintiff explained that he does take needless suffering personally, and that

he was in a wheelchair due to the deliberate indifference of medical staff.

**56.** NP Riley replied, "do what you gotta do."

**57.** Plaintiff requested clarification for that statement.

**58.** NP Riley refused to clarify. The HSE was terminated soon after.

**59.** On 4/10/2020, neither NP Riley nor RN Hodge performed a physical examination of Plaintiff's deformed right foot.

**60.** On information and belief, NP Riley and RN Hodge did not document the HSE in violation of Department Order ("DO") 1104 (05.1.5.2)

**61.** Approximately one hour after the 04/10/2020 HSE, NP Riley and/or RN Hodge called the officer in the control room (CO Pierce) and asked her to take Plaintiff's wheelchair away from him.

**62.** Plaintiff explained to CO II Pierce that he would be unable to make his way around the unit without intense pain, and the risk of further injury without his wheelchair.

**63.** Plaintiff refused to relinquish his wheelchair.

**64.** CO II Pierce returned to the control room, called NP Riley and RN Hodge, and told them that Plaintiff refused to give up his wheelchair.

**65.** Plaintiff overheard this conversation.

**66.** On information and belief, NP Riley and RN Hodge asked CO II Pierce to take Plaintiff's wheelchair by force.

**67.** CO II Pierce refused to throw Plaintiff out of his wheelchair, and instead

hung up the phone and called her supervisor, Sgt. F. Gonzalez.

**68.** Shortly thereafter, Sgt. Gonzalez arrived at HU-5 and ordered Plaintiff to relinquish his wheelchair per the instructions of "medical".

**69.** Sgt. Gonzalez explained that Plaintiff's wheelchair waiver expired in September of 2019 (7 months prior), according to "medical".

**70.** Plaintiff explained the following to Sgt. Gonzalez: 1) A surgeon has decided that Plaintiff's right foot requires surgery; 2) Plaintiff would be unable to make his way around the unit without intense pain and the risk of further injury without the use of his wheelchair; and 3) NP Riley was retaliating against Plaintiff.

**71.** Plaintiff suggested that Sgt. Gonzalez contact Dr. Salazar, SMD and NP Riley's direct supervisor.

**72.** Sgt. Gonzalez placed Plaintiff on disciplinary report for disobeying a verbal or written order (25B), then left the building without Plaintiff's wheelchair.

**73.** Sometime after Sgt. Gonzalez left HU-5, Plaintiff contacted his mother via phone call and email. Plaintiff asked his mother to contact a Centurion official at ASPC Tucson, and explain that NP Riley and RN Hodge intended to take Plaintiff's wheelchair in an act of retaliation, and that Plaintiff was at significant risk of further injury.

**74.** Plaintiff's mother contacted ASPC Tucson and spoke with someone in the office of the Facility Health Administrator ("FHA").

75. The FHA told Plaintiff's mother that Plaintiff's wheelchair waiver had expired in September, and that Plaintiff would have to submit an HNR in order to renew the waiver.

76. Plaintiff's mother relayed the message to Plaintiff.

77. Plaintiff immediately submitted two HNR's on 04/10/2020.

78. One HNR requested that the wheelchair waiver be renewed.

79. The second HNR requested an explanation of Plaintiff's current – or new – plan of care regarding his right foot deformity.

80. The second HNR was rejected by Centurion staff.

81. On 04/13/2020, Plaintiff had an HSE with Graybill to address Plaintiff's HNR for renewal of his wheelchair waiver.

82. At the 04/13/2020 HSE, Plaintiff explained to Graybill that his right foot is deformed, and that Dr. Latt, an orthopedic surgeon, intended to perform surgery on the right foot and leg.

83. Plaintiff provided Graybill with a copy of Dr. Latt's reports, due to the fact that Graybill failed to conduct a record review.

84. Graybill skimmed over Dr. Latt's reports, then stated "I don't care about any of this."

85. Plaintiff went on to explain to Graybill that he had increased his standing and walking (with a walker) because RN Hodge intended to take his wheelchair, and the leg and foot had become more painful as a result.

86. Plaintiff explained that he would be unable to make his way around the unit without his wheelchair and requested to be scheduled with a provider for an examination and the treatment of pain.

87. Graybill denied the request.

88. Plaintiff requested that his current plan of care be put in writing and that he be given a copy.

89. Graybill claimed that Centurion would not allow her to put a patient's plan of care in writing.

90. Graybill advised Plaintiff that he would have to walk around the unit despite his pain and foot issues.

91. Plaintiff asked RN Graybill if she was giving him medical instructions.

92. Graybill shouted, "No! Get out!"

93. Graybill refused to renew Plaintiff's waiver

94. Graybill did not physically examine Plaintiff before denying the wheelchair waiver.

95. On 04/13/2020, Plaintiff submitted three emergency Inmate Letters ("IL") to his ADC counselor, CO III Vance. Plaintiff used these IL's to alert Centurion and ADC officials that NP Riley and RN Hodge intended to take Plaintiff's wheelchair in an act of retaliation for free speech, despite the fact that Plaintiff was unable to walk without it.

96. Two of the IL's were addressed to Dr. Salazar, the SMD for ASPC Tucson,

and John P. May, MD, FACP, CMO of Centurion of Arizona. Plaintiff did not receive a response to either of the IL's addressed to Dr. Salazar or Dr. May, contrary to ADC policy.

97. The third IL was addressed to Richard Pratt, ADC Director of Healcare Services.

98. On 04/28/2020, Plaintiff received a response from Vanessa Headstream, from the ADC Health Services Monitoring Bureau. Headstream advised that Plaintiff's concerns had been "elevated" to the ASPC Tucson FHA.

99. On 04/13/2020, Plaintiff submitted an emergency Grievance to CO III Vance. Plaintiff stated that he was at substantial risk of medical harm, personal injury, and irreparable harm because NP Riley and RN Hodge intended to take Plaintiff's wheelchair for "complaining".

100. Plaintiff also stated, 1) he was in intense pain; 2) the provider (NP Riley) cancelled all of his pain medication; and 3) he had been denied access to a provider for the treatment of his pain despite submitting several HNR's, among other things.

101. As part of the "proposed resolution" within the 4/13/2020 emergency Grievance, Plaintiff requested that Centurion "Provide constitutionally adequate healthcare, to include pain management."

102. On 04/14/2020, Plaintiff submitted an IIRC form to CO III Vance, in which Plaintiff stated in part, "I cannot stand or walk with my walker for

long periods of time due to extreme pain."

103.   Plaintiff also complained that Defendant Graybill acted with deliberate indifference by 1) failing to renew Plaintiff's wheelchair waiver; 2) refusing to schedule Plaintiff for an appointment with a provider; and 3) disregarding extreme pain in Plaintiff's body.

104.   On 04/16/2020, Plaintiff was summoned to the Manzanita Unit Medical Clinic by Nuñez for an HSE. The HSE was pertaining to Plaintiff's need for pain management which Nuñez had previously denied by refusing to schedule Plaintiff to see a provider.

105.   At the 04/16/2020 HSE, Nuñez stated, "I don't know why they had me call you back on this one." The statement was in regards to an HNR that Nuñez had previously processed, and after processing it, decided not to schedule Plaintiff to see the provider.

106.   Correctional officers continued to alert Plaintiff that medical staff were attempting to persuade them to take Plaintiff's wheelchair by force.

107.   Plaintiff witnessed RN Hodge attempt to convince an officer to take Plaintiff's wheelchair while he used his walker.

108.   On 04/22/2020, at approximately 4:30, a plain-clothes officer (white male, tall, lean, bald) appeared in Plaintiff's living area and explained that he was told to take Plaintiff's wheelchair.

109.   Plaintiff explained that he needed surgery on his foot and was unable

to walk with a walker to the chow hall. The officer decided not to take Plaintiff's wheelchair.

110. On 4/23/2020, Plaintiff submitted an HNR in which he requested to speak with a mental health professional due to high levels of anxiety and other symptoms caused by the malicious treatment of Plaintiff by medical staff.

111. On 04/28/2020, at approximately 9am, Plaintiff was summoned to the Manzanita Disciplinary Office where he was found guilty of a 25B offense: Disobeying a Verbal or Written Order for refusing to relinquish his wheelchair on 04/10/2020.

112. On 04/29/2020, Captain Baker and CO IV Wood summoned Plaintiff to the Manzanita Administration building where they intended to take Plaintiff's wheelchair. They explained that they were receiving pressure from the ASPC Tucson Complex Director of Nursing ("DON") Neefe, to take Plaintiff's wheelchair.

113. On 04/29/2020, Plaintiff presented Captain Baker and CO IV Wood with a copy of Dr. Latt's 01/06/2020 and 02/17/2020 reports which referenced Plaintiff's inability to walk, and the need for surgery. Plaintiff also explained that medical staff intended to take his wheelchair in an act of retaliation for free speech.

114. After Captain Baker and CO IV Wood became aware of said facts,

they decided not to take Plaintiff's wheelchair.

115.    On information and belief, Captain Baker and CO IV Wood contacted Dr. Salazar, SMD.

116.    Later that day (04/29/2020), Plaintiff was summoned to the day-room of HU-5 by RN Siler.

117.    RN Siler explained that Dr. Salazar, SMD had just renewed Plaintiff's wheelchair waiver and that Plaintiff could keep his wheelchair.

118.    RN Siler also advised Plaintiff that it was important to stand and use his walker as tolerated, per Dr. Salazar.

119.    On 04/30/2020, Plaintiff had an HSE with NP Alanso regarding ongoing chronic to acute pain in Plaintiff's right foot, ankle, calf, and knee.

120.    NP Alanso examined Plaintiff's right foot and acknowledged the cavovarus foot deformity and the pain it was causing Plaintiff.

121.    Alonso refused to treat Plaintiff for pain because Alanso did not "want to step on [NP] Riley's toes"

122.    Plaintiff asked Alanso to enter the letter titled "Provider Encounter/Pain" into the medical record for the 04/30/2020 HSE. Alanso refused and would not allow Plaintiff to discuss the issues.

123.    On or around 05/01/2020, Plaintiff received a response to his Emergency Grievance dated 04/13/2020. The respondent was FHA Ferguson.

124. FHA Ferguson's response stated in part, "You were educated [that] you must walk using the walker provided to you and in your possession to strengthen you [sic] before the surgery."

125. Ferguson also stated that Plaintiff "may keep and use the wheelchair per the SMD"

126. Ferguson also acknowledged that all of Plaintiff's pain medication had been cancelled, but took no steps to ensure that Plaintiff received treatment for pain.

127. Ferguson falsely claimed in his 05/01/2020 response that "[Plaintiff] declined a discussion (concerning pain medication) with the provider." on 01/03/2020, more than three months prior to the submission of Plaintiff's 04/13/2020 Emergency Grievance, in which Plaintiff complained of untreated pain.

128. On 05/05/2020, Neefe responded to Plaintiff's 04/14/2020 IICR in which Plaintiff complained that he was denied access to a medical provider.

129. Neefe responded in part, "You have been followed closely by Physical Therapy and they along with your provider are recommending that you walk with a walker at this time and do not feel it will be beneficial for you to have your wheelchair order renewed."

130. On 05/08/2020, Plaintiff submitted an IICR which asserted that Plaintiff's medical records were falsified and Plaintiff was denied needed

16

pain medication as a result.

**131.** On 05/26/2020, Plaintiff submitted an HNR which stated in part, "Requesting encounter with provider. Cannot continue [plan of care] if pain continues to go untreated."

**132.** Plaintiff did not have an encounter with medical staff, and was once again denied access to a provider and treatment of pain.

**133.** On 06/01/2020, Plaintiff was returned to Dr. Latt's office without the CT scan/disk (or report) that Dr. Latt requested on 02/17/2020. Plaintiff did bring his copy of the CT scan report.

**134.** After Plaintiff was returned to the prison on 06/01/2020, he contacted his mother who purchased the CT scan/disk and delivered it to Dr. Latt's office.

**135.** At some point after the 06/01/2020 encounter, Dr. Latt requested an MRI prior to moving forward with the right foot surgery on Plaintiff.

**136.** On 06/02/2020, Plaintiff received a response to his 05/08/2020 IICR. The response revealed further falsification of Plaintiff's medical records. As a result, Plaintiff filed a grievance dated 06/09/2020. Plaintiff did not receive a response.

**137.** On 6/18/2020, Plaintiff saw Hines for the first time. Plaintiff explained his foot deformity to Hines.

**138.** Hines told Plaintiff she would schedule a follow-up with Dr. Latt.

**139.** On 7/22/2020, an MRI of Plaintiff's right foot was obtained.

**140.** On 7/24/2020, Plaintiff saw Hines.

**141.** On 8/3/2020, Plaintiff saw Hines.

**142.** On 9/1/2020, Plaintiff saw Hines.

**143.** On 11/6/2020, Plaintiff saw Dr. Latt.

**144.** The MRI was not sent to Dr. Latt.

**145.** Dr. Latt recommended surgery for Plaintiff's right foot.

**146.** Surgery was scheduled for 12/29/2020.

**147.** On 12/23/2020, Plaintiff tested positive for COVID-19, and the surgery was cancelled as a result.

**148.** On 12/29/2020, Plaintiff sent an email to Defendant Headstream, making her aware that Plaintiff was not able to bear weight on his right foot due to the pain.

**149.** On 12/30/2020, Defendant Headstream responded that there was no evidence that Plaintiff had been issued a wheelchair for movement.

**150.** On 01/04/2021, Plaintiff replied to Defendant Headstream informing her that Dr. Latt had recommended the wheelchair, and asked for an HSE with Dr. Salazar.

**151.** On 02/11/2021, Plaintiff had surgery on his right foot.

**152.** On 04/02/2021, Plaintiff saw Dr. Latt. Dr. Latt advised Plaintiff to use pain as a guide to how much Plaintiff could do each day.

**153.** On 04/06/2021, Plaintiff was summoned to the Manzanita unit medical clinic where a CNA advised him that Elliott intended to take Plaintiff's wheelchair on 04/09/2021. Plaintiff was asked to sign a document stating that he was in agreement with the decision.

**154.** Plaintiff wrote that he <u>disagreed</u>. Plaintiff explained that he was still in too much pain to walk.

**155.** On 04/07/2021, Plaintiff sent a message to Defendant Headstream, asking her to approve a wheelchair.

**156.** On 04/08/2021, Defendant Headstream responded that Plaintiff was not following the established procedures.

**157.** Plaintiff is currently still without a wheelchair and is not able to walk to medical, chow, or legal calls.

### COUNT I – 42 U.S.C. §1983 – Deliberate Indifference to a Serious Medical Need – All Defendants

1. The prior paragraphs are incorporated here by reference.

2. Plaintiff's pain and disabilities are serious medical needs.

3. Defendants were aware that Plaintiff had serious medical needs.

4. Defendants each had an obligation to provide constitutionally adequate pain management and medical equipment, including a wheelchair.

5. Defendants each made a decision not to provide constitutionally adequate pain management and medical care to Plaintiff.

6. Plaintiff has been injured by being denied constitutionally adequate medical care.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally, for the following:

1. An injunction allowing Plaintiff to use a wheelchair

2. An award of compensatory damages to be determined by the trier of fact,

3. An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988(b), and;

4. Any and other further relief this Court may deem just and appropriate.

DATED this 28th day of April, 2021 by

/s/ Arron Bossardet, plaintiff
ARRON BOSSARDET[1]

---

[1] This Complaint was transcribed by limited-scope counsel Stacy Scheff, AZ State Bar No. 028364