**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Arron Shawn Bossardet,

         Plaintiff,

v.

Unknown Riley, et al.,

         Defendants.

No. CV-21-00179-TUC-RM

**ORDER**

      Pending before the Court is Plaintiff's Motion for Leave to Amend Complaint. (Doc. 7.)[1] Plaintiff, who is confined in the Arizona State Prison Complex-Tucson ("ASPC-Tucson") in Tucson, Arizona filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. (Doc. 1.) On May 13, 2021, the Court issued a Screening Order finding that Plaintiff had stated an Eighth Amendment claim of deliberate indifference to his serious medical needs against Defendants Riley and Hodge, directing Defendants Riley and Hodge to answer Count One of the Complaint, and dismissing the remaining Defendants. (Doc. 6.) Plaintiff filed his Motion for Leave to Amend Complaint and proposed First Amended Complaint ("FAC") (Doc. 8) on July 9, 2021. Defendant Riley was served with the original Complaint on August 11, 2021. (Doc. 9.) The Court finds that Plaintiff has the right to

---

[1] Other pending motions will be resolved separately.

1  amend his Complaint as a matter of course at this stage in the litigation and screens the

2  claims raised in the proposed FAC as follows.

3  **I.      Leave to Amend**

4          A plaintiff may amend his complaint once as a matter of course within 21 days of

5  serving it or within 21 days of service of a responsive pleading or a motion under Rule

6  12(b), (e), or (f). *See* Fed. R. Civ. P. 15(a)(1)(a). The Court finds that Plaintiff is permitted

7  to amend his complaint at this stage, prior to the filing of a responsive pleading, as a matter

8  of course. *See Nolen v. Fitzharris*, 450 F.2d 958, 958–59 (9th Cir. 1971) (reversing

9  dismissal to permit plaintiff to amend as a matter of course where no answer or responsive

10 pleading had been filed).[2] The FAC will supersede the original Complaint. *Rhodes v.*

11 *Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) ("As a general rule, when a plaintiff files

12 an amended complaint, the amended complaint supersedes the original, the latter being

13 treated thereafter as non-existent.") Furthermore, the Court will grant Plaintiff's request to

14 exceed the page limitation for his FAC.

15 **II.     Statutory Screening of Prisoner Complaints**

16         The Court is required to screen complaints brought by prisoners seeking relief

17 against a governmental entity or an officer or an employee of a governmental entity. 28

18 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff has

19 raised claims that are legally frivolous or malicious, that fail to state a claim upon which

20 relief may be granted, or that seek monetary relief from a defendant who is immune from

21 such relief. 28 U.S.C. § 1915A(b)(1)–(2).

22         A pleading must contain a "short and plain statement of the claim showing that the

23 pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does

24 not demand detailed factual allegations, "it demands more than an unadorned, the-

25 defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "Threadbare recitals

26 of the elements of a cause of action, supported by mere conclusory statements, do not

27 suffice." *Id*.

28 _____

[2] Although Defendants Riley and Hodge have since filed an Answer (Doc. 11), no responsive pleading had been filed at the time that Plaintiff moved to amend.

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id*. at 681. But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe pro se filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a pro se prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id*. (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## III.    First Amended Complaint

Plaintiff's proposed FAC adds additional Defendants and Counts to those raised in the original Complaint. Plaintiff specifies that paragraphs 1 through 137 of the proposed FAC are identical to those in the original Complaint apart from minor typographical corrections, while paragraphs 137 onward add new allegations. (Doc. 7.)

In his four-count FAC, Plaintiff names as Defendants Centurion Healthcare ("Centurion"); Nurse Practitioner Jillian Riley ("Riley"), Registered Nurse Carah Hodge ("Hodge"), Registered Nurse Lisa Graybill ("Graybill"), Nurse Practitioner Lara Alanso ("Alanso"), Facility Health Administrator at ASPC-Tucson A. Ferguson ("Ferguson"), Doctor Dorothy Hines ("Hines"), Registered Nurse Angelica Salgado ("Salgado"), Arizona Department of Corrections ("ADOC") Program Evaluation Administrator Vanessa Headstream ("Headstream"), Nurse Practitioner Laura Elliott ("Elliott"), and ADOC Director David Shinn ("Shinn"). (Doc. 8 at 2-5.) Plaintiff seeks monetary damages, his costs and attorney's fees, and an injunction requiring Defendants to (1) provide him

with "needed constitutionally mandated health care," (2) audio and video record all health service encounters, (3) "pay their bills" and (4) allow Plaintiff to pay for health care. (*Id.* at 51.)

### A.    Count One: Eighth Amendment

In Count One, Plaintiff claims Defendants Centurion, Shinn, Riley, Hodge, Graybill, Alanso, Ferguson, Hines, Salgado, Headstream, and Elliott were deliberately indifferent to his serious medical needs and alleges as follows:[3]

In December 2019, Plaintiff explained to Defendant Riley that he could not plant his right foot flat on the floor and that standing on the foot caused him severe pain. Defendant Riley examined Plaintiff's right foot, determined it was deformed, and requested a surgical consultation with an orthopedic surgeon. After meeting with Plaintiff on January 6, 2020, the surgeon prescribed a heel wedge and recommended Plaintiff finish physical therapy and then follow up with the surgeon. Defendant Riley ordered the heel wedge. At a February 17, 2020 follow-up appointment, the surgeon reported that Plaintiff was not "doing well" with non-operative treatment and requested a computerized tomography ("CT") scan of Plaintiff's foot and ankle. Defendant Riley ordered the CT scan; the scan was done on March 12, 2020.

On March 21, 2020, Plaintiff submitted a health needs request alerting Defendant Centurion's staff that his ranitidine prescription had been discontinued and he was suffering with increased heartburn, painful indigestion, and stomach acid in his lungs. He requested an appointment with Defendant Riley, a follow-up appointment with a gastroenterologist, and a bed wedge to elevate his head and keep his stomach acid out of his lungs. On March 23, 2020, Defendant Riley, without having seen Plaintiff, responded to the health needs request by discontinuing another of Plaintiff's prescriptions, Protonix.

---

[3] The allegations set forth in paragraphs 1 through 136 of both Plaintiff's original Complaint and FAC were screened in the Court's May 13, 2021 Screening Order. This Order incorporates the relevant portion of the first Screening Order and goes on to screen the additional allegations set forth in paragraphs 137 through 313 of the proposed FAC. The first Screening Order determined that Plaintiff had stated Eighth Amendment claims against Defendants Riley and Hodge only.

On March 24, 2020, Plaintiff submitted an emergency inmate informal complaint resolution. He requested to speak with the Site Medical Director and complained that he had been denied access to a provider and that all of the medications prescribed by "Dr. Verma" for Plaintiff's gastroesophageal reflux disease ("GERD") had been discontinued. His request to speak to the Site Medical Director was denied, but he was called to the medical clinic by Defendant Hodge, who gave Plaintiff a copy of the CT scan ordered by the surgeon, assured Plaintiff that he would be sent back to the surgeon, and decided Plaintiff would be prescribed sucralfate, a medication that had not been prescribed by Dr. Verma. Defendant Hodge "did not take steps to have Plaintiff's pain treated," although Plaintiff had complained his foot was causing him severe pain. Plaintiff requested to speak to the Site Medical Director because, as a registered nurse, Defendant Hodge lacked the credentials to prescribe medication. His request was denied and he did not see a provider before he was prescribed sucralfate.

On April 5, 2020, Plaintiff submitted a health needs request explaining that sucralfate was ineffective at treating his GERD and complaining of acute symptoms of GERD. Plaintiff requested a bed wedge and for Defendant Centurion to seek guidance from a gastroenterologist. On April 8, 2020, Plaintiff, who had not seen any medical personnel, was prescribed omeprazole. Later that day, Plaintiff submitted a health needs request indicating that omeprazole was not on Dr. Verma's list of recommended medications and that Dr. Verma had advised Plaintiff not to take omeprazole because Plaintiff previously had adverse reactions to it.

On April 10, 2020, Plaintiff met with Defendants Hodge and Riley, who accused him of "complaining." Plaintiff provided them with a copy of Dr. Verma's recommendations, although they had access to that information in Defendant Centurion's electronic database, and told them that his suffering could have been avoided if Dr. Verma's recommendations had been followed. Defendants Riley and Hodge reinstated Plaintiff's Protonix prescription. Plaintiff also requested information as to why he had

advanced osteopenia in his foot. Defendant Riley explained that Plaintiff had advanced osteopenia because his foot was deformed and that the surgeon was addressing the issue.

Plaintiff stated that "a lot of his suffering was due to a pattern of denials of access to a provider – either [nurse practitioner] or [medical doctor] –" to discuss his concerns about osteopenia and to discuss medications for his GERD and his ongoing pain in his foot, leg, and knee. He also stated that it was inappropriate for Defendant Hodge to deny him access to a provider and to prescribe or deny medications "using a provider's license." Defendant Riley told Plaintiff, "don't take it personally," but Plaintiff explained that "he does take needless suffering personally" and that he "was in a wheelchair due to the deliberate indifference of medical staff." Defendant Riley told Plaintiff, "do what you gotta do," but then refused Plaintiff's request to clarify that statement. Neither Defendant Riley nor Defendant Hodge physically examined Plaintiff's foot. Plaintiff believes neither Defendant documented the encounter, which violated an ADOC Department Order.

Approximately one hour after the meeting, Defendant Riley and/or Defendant Hodge called the control room officer and asked her to take away Plaintiff's wheelchair. Plaintiff refused to relinquish his wheelchair and explained to the officer that without the wheelchair, he risked further injury and would be unable to move around the unit without intense pain. The officer called Defendants Riley and Hodge and told them that Plaintiff refused to relinquish his wheelchair. Plaintiff believes Defendants Riley and Hodge asked the officer to take Plaintiff's wheelchair by force, but the officer refused to do so and called her supervisor. The supervisor arrived, ordered Plaintiff to relinquish his wheelchair, and explained that "according to 'medical,'" his wheelchair waiver had expired in September 2019. Plaintiff explained that a surgeon had determined he needed foot surgery, that he risked further injury and would be unable to move around the unit without the wheelchair, that Defendant Riley was retaliating against him, and that the supervisor should contact the Site Medical Director. The supervisor placed Plaintiff on disciplinary report for disobeying an order but did not take away Plaintiff's wheelchair.

Plaintiff then contacted his mother and requested that she contact a Centurion official at ASPC-Tucson and explain that Defendants Riley and Hodge intended to take away his wheelchair in retaliation and that he faced significant risk of further injury. Plaintiff's mother spoke to someone in the Facility Health Administrator's office, who explained that Plaintiff's wheelchair waiver had expired in September 2019 and Plaintiff needed to submit a health needs request to renew it. Plaintiff submitted one health needs request to renew the wheelchair waiver and another seeking an explanation of the plan of care for his foot deformity. Defendant Centurion's staff denied his request for an explanation about the plan of care.

On April 13, 2020, Plaintiff met with "Graybill" and explained that his foot was deformed, the surgeon intended to perform surgery on it, and his foot and leg had become more painful because he had done more standing and walking with a walker after learning that Defendant Hodge intended to take away his wheelchair. Plaintiff requested a provider examine and treat his pain. Graybill denied Plaintiff's request to see a provider, advised Plaintiff that he would have to walk around the unit despite his pain and foot issues, claimed Defendant Centurion would not allow her to put a patient's plan of care in writing, did not physically examine Plaintiff, and refused to renew the wheelchair waiver.

On April 13, 2020, Plaintiff submitted three emergency inmate letters, alerting ADC officials and Defendant Centurion that Defendants Riley and Hodge intended to take his wheelchair as "retaliation for free speech," despite Plaintiff's inability to walk without it. Plaintiff did not receive a response to the inmate letters addressed to the Site Medical Director and Defendant Centurion's chief medical officer. The third letter was addressed to ADOC's Director of Healthcare Services; Plaintiff received a response from Defendant Headstream indicating that Plaintiff's concerns had been "elevated" to the Facility Health Administrator.

Plaintiff submitted an emergency grievance, claiming he was "at substantial risk of medical harm, personal injury, and irreparable harm" because Defendants Riley and Hodge intended to take his wheelchair because of his "complaining," he was in intense pain,

Defendant Riley had canceled his pain medication, and he had been denied access to a provider for treatment of his pain. On April 14, 2020, Plaintiff submitted an inmate informal complaint resolution stating that he could not "stand or walk with [his] walker for long periods of time due to extreme pain" and claiming that Graybill had acted with deliberate indifference by failing to renew the wheelchair waiver, refusing to schedule an appointment with a provider, and disregarding Plaintiff's extreme pain.

Correctional officers told Plaintiff that the medical staff was attempting to persuade them to take his wheelchair by force, and Plaintiff saw Defendant Hodge try to convince an officer to take Plaintiff's wheelchair while Plaintiff was using his walker. On April 22, 2020, an officer explained that he had been told to take Plaintiff's wheelchair. Plaintiff explained that he needed foot surgery and was unable to walk with a walker to the dining hall. The officer did not take the wheelchair. On April 23, 2020, Plaintiff submitted a health needs request to speak to a mental health professional regarding his high levels of anxiety and other symptoms "caused by the malicious treatment of Plaintiff by medical staff."

On April 28, 2020, Plaintiff was found guilty of disobeying the April 10 order to relinquish his wheelchair. On April 29, 2020, a captain and correctional officer summoned Plaintiff to the administration building to take his wheelchair, explaining that they were receiving pressure from the Director of Nursing to do so. However, they decided not to take Plaintiff's wheelchair after he showed them the surgeon's reports and explained that the medical staff wanted to take his wheelchair as "retaliation for free speech." Plaintiff believes they then contacted the Site Medical Director. Later that day, a nurse informed Plaintiff that the Site Medical Director had renewed the wheelchair waiver but stated that it was important for Plaintiff to stand and use his walker "as tolerated."

On April 30, 2020, Plaintiff saw Alanso regarding the pain in his foot, ankle, calf, and knee. Alanso examined Plaintiff's foot, acknowledged the foot deformity and the pain it was causing, but refused to treat Plaintiff's pain because Alanso "did not 'want to step on [Defendant] Riley's toes.'" Although Plaintiff asked Alanso to "enter the letter titled

'Provider Encounter/Pain' into the medical record," Alanso refused to do so and "would not allow Plaintiff to discuss the issues."

On May 1, 2020, Plaintiff received a response from Facility Health Administrator Ferguson to Plaintiff's April 13, 2020 emergency grievance. Ferguson stated that Plaintiff could keep the wheelchair but needed to use the walker to strengthen himself before surgery. Ferguson acknowledged that all of Plaintiff's pain medication had been canceled, but "took no steps to ensure Plaintiff received treatment for pain," and falsely claimed Plaintiff had "declined a discussion" about pain medication on January 3, 2020.

On May 8, 2020, Plaintiff submitted an inmate informal complaint resolution asserting that his medical records had been falsified and he had been denied needed pain medication because of it. On May 26, 2020, he submitted a health needs request to see a provider, stating that he "[c]annot continue [plan of care] if pain continues to go untreated." Plaintiff did not see any medical staff and was denied access to a provider and treatment for his pain.

On June 1, 2020, Plaintiff was taken to the surgeon's office "without the CT scan/disk (or report)" the surgeon had requested on February 17, 2020. Plaintiff brought his copy of the CT scan report and, after he was returned to prison, contacted his mother, who purchased the CT scan/disk and delivered it to the surgeon. The surgeon requested a magnetic resonance imaging scan ("MRI") before moving forward with surgery.

On June 18, 2020, Plaintiff saw a medical provider named "Hines" and explained his foot deformity to her. Hines physically examined Plaintiff's foot and diagnosed foot pain. Hines stated that she would prescribe Plaintiff the pain medication Naproxen and "hot packs" for the pain, but she failed to do so.

On June 27, 2020, Plaintiff saw a Registered Nurse named "Salgado," explained his foot deformity to this individual, and explained that he had not received the Naproxen or hot packs he was to have been prescribed. Salgado stated that there was no record of his June 18, 2020 appointment with Hines, stated that Plaintiff would soon have surgery, and otherwise failed to treat Plaintiff's pain or schedule him with another provider.

On July 22, 2020, Plaintiff had an MRI of his right foot and ankle. On July 24, 2020, Plaintiff again met with Hines who prescribed him Naproxen and told him he would have a surgical consultation; this consultation was not ordered. Plaintiff again met with Hines on August 3, 2020, and Hines again told him that a surgical consultation, as well as a colonoscopy, had been scheduled. That same day, Plaintiff was summoned to the Deputy Warden's office and informed that Hines had reported that Plaintiff had behaved aggressively at his medical appointment, which was false.

On September 1, 2020, Plaintiff again met with Hines and the Deputy Warden was present at the appointment. At this appointment Plaintiff informed Hines that the Naproxen was not effectively treating his pain and Hines failed to prescribe a different medication that could have effectively treated the pain.

On September 7, 2020, Plaintiff met with Registered Nurse "Johnson" who noted "swelling, clicking, and grinding" in his right extremity. On September 17, 2020, Plaintiff again met with Hines and complained of ongoing pain in his right foot and knee, which Hines failed to treat. On October 8, 2020, Plaintiff again met with Hines, complained of pain and that Naproxen was not working, and Hines failed to treat his pain.

On November 4, 2020, Plaintiff met with Registered Nurse "Dutton" for pain associated with a torn tendon in his left elbow. A steroid injection was ordered for November 5, 2020, but Plaintiff did not receive it.

On November 6, 2020, Plaintiff had a consultation with the surgeon, who recommended that he have (1) a lateralizing calcaneal osteotomy; (2) gastrocnemius recession; and (3) plantar fascia release to correct the foot deformity. On November 16, 2020, Plaintiff discussed these recommendations with Hines and informed her that he continued to experience pain in his foot from standing and walking with a walker. Hines stated that she would order Toradol injections.

On November 30, 2020, Plaintiff submitted a grievance in which he alleged that Centurion employees were acting with deliberate indifferent to his severe pain and requested that he be allowed to pay for treatment at a pain clinic. Plaintiff received a

response from Ferguson that stated that he had a pending surgical consultation that would need to be completed before he could be evaluated for treatment at a pain clinic.

On December 29, 2020, Plaintiff's scheduled foot surgery was cancelled because he tested positive for COVID-19. That same day, Plaintiff sent an email to "Headstream," the Evaluation Administrator at ADOC, informing her of his ongoing pain and lack of treatment thereof. In the email he requested that he be allowed to pay for his own health care and pain treatment.

On January 12, 2021, Plaintiff saw a registered nurse regarding his ongoing pain and a January 6, 2021 request for a urinal so that he could avoid standing. That nurse told him that she could not provide a urinal unless it was prescribed.

On January 21, 2021, Plaintiff had a meeting with several medical providers, including "Elliott," the "new Manzanita Unit provider." At that meeting, Plaintiff told the providers that (1) he continued to experience high levels of pain following use of his walker; (2) he was concerned about bone loss; (3) the "intentional delays" of his foot surgery were causing further injury; and (4) he would prefer to pay for his own health care.

On February 11, 2021, Plaintiff received surgery on his right foot and calf. He was then prescribed Oxycodone, Gabapentin for nerve pain, and NSAID's for swelling, as well as a laxative. Plaintiff alleges that he did not receive his prescribed pain medication on February 11, 2021. On the morning of February 12, 2021, Plaintiff requested his pain medication, and it was denied. Plaintiff's attorney then contacted Headstream to inform her that a request for a temporary restraining order would be filed. On the afternoon of February 12, 2021, Plaintiff received Tylenol. On the February 13, 2021, Plaintiff received Oxycodone. Later that same day, Plaintiff asked Elliott for the Gabapentin that had been prescribed; Elliott failed to obtain Gabapentin or any other medication to treat Plaintiff's nerve pain.

On February 19, 2021, Plaintiff met with Elliott regarding his ongoing nerve pain. Elliott stated that she would contact the surgeon for recommendation. On February 23, 2021, Plaintiff began taking Lyrica for surgical nerve pain. On April 2, 2021, Plaintiff had

a surgical follow-up appointment where his cast was removed. The surgeon recommended that Plaintiff continue taking Lyrica; however, Elliott refused to renew the Lyrica prescription.

On April 7, 2021, Plaintiff was informed that Elliott intended to take his wheelchair. Plaintiff then submitted a grievance concerning this information and met with Elliott on April 9, 2021 to discuss it. At that meeting, Plaintiff explained that he continued to experience pain. He was then instructed to turn in his wheelchair on April 16, 2021. On that day, Plaintiff met with Elliott and she instructed him to relinquish his wheelchair. Plaintiff told her that he was still in too much pain to walk and that his foot and ankle were still swollen. Elliott refused to examine Plaintiff's right foot and ankle but told him she would give him medication for pain and swelling. Plaintiff then requested that he be allowed to use the wheelchair for a legal call; he was permitted to do so. After the legal call he was "forced to relinquish" the wheelchair and was given a walker with a seat and a cane.

As of April 17, 2021, Plaintiff could no longer use the walker due to pain and was unable to get to the chow hall or medical clinic. On April 20, 2021, he submitted a grievance to this effect. Despite multiple visits to the medical clinic in April and May of 2020, Plaintiff continued to experience pain, an inability to ambulate, and refusals by Centurion staff to help him, "at the direction of [] Elliott." On May 4, 2021, Elliott "was forced" to give Plaintiff a wheelchair.

On May 14, 2021, Plaintiff had a follow-up appointment with the surgeon, who diagnosed him with a peroneal tendon disorder. The surgeon informed Elliott that she should not take Plaintiff's wheelchair if he is unable to walk due to pain.

On June 23, 2021, Plaintiff was informed that his request for an ultrasound for the peroneal tendon disorder had been denied.

. . . .

. . . .

. . . .

- 12 -

1

### B.      Count Two: First Amendment

In Count Two, Plaintiff claims Defendants Riley, Hodge, and Hines took his wheelchair in retaliation for his exercise of his First Amendment rights and alleges as follows:

On March 23, 2020, Plaintiff submitted an emergency inmate informal complaint resolution wherein he complained that his medication for GERD had been discontinued. Later that day, Plaintiff saw Registered Nurse "Hodge," who, using Riley's license, prescribed Plaintiff the medication Sucralfate, which is not intended to treat GERD. Sucralfate did not effectively treat Plaintiff's GERD and he was denied access to a medical provider.

On April 10, 2020, Plaintiff met with Hodge and Riley and stated that his suffering related to GERD and untreated pain was due to his being denied access to a health care provider, which caused the conversation to "deteriorate." That same day, Hodge and Riley asked prison officers to take Plaintiff's wheelchair. He refused to relinquish the wheelchair and as a result received disciplinary sanctions.

On June 18, 2020, Plaintiff met with Hines. Hines diagnosed foot pain and stated that Plaintiff would be prescribed oral pain medication and "hot packs" for pain. Plaintiff did not receive this treatment.

On July 24, 2020, Plaintiff met with Hines and told Hines that she had failed to treat Plaintiff's pain. Hines then stated that she had scheduled a surgical consultation for Plaintiff, but this was false. After a visit with Hines on August 3, 2020, Plaintiff was summoned to the Deputy Warden's office because Hines falsely reported that Plaintiff had behaved aggressively in the medical clinic.

### C.      Count Three: Eighth Amendment

In Count Three, Plaintiff claims that Defendant Centurion was deliberately indifferent to his serious medical needs and alleges as follows:

Plaintiff has suffered with symptoms of GERD for over twenty years and the symptoms have worsened over time. In 2010, Plaintiff was diagnosed with a hiatal hernia, which is the cause of his GERD symptoms.

On June 30, 2020, Plaintiff had a consultation with Dr. Khan, a gastroenterologist. Dr. Khan explained to Plaintiff that (1) chronic heartburn can lead to esophageal cancer and other complications; (2) the long-term use of proton pump inhibitors as a treatment for GERD can cause adverse side effects; and (3) painful GERD symptoms could be eliminated with hiatal hernia repair surgery. Dr. Khan told Plaintiff that he was a perfect candidate for hiatal hernia repair surgery because Plaintiff was relatively healthy. After another appointment with Dr. Khan on July 18, 2020, Plaintiff witnessed Dr. Khan write a report wherein he recommended hiatal hernia repair surgery, nutritional supplements, and a bed wedge for Plaintiff. The July 18, 2020 report was destroyed by Centurion's employees in order to deny Plaintiff health care.

On November 11, 2020, Plaintiff had a follow-up appointment with Dr. Khan and Dr. Khan put his recommendations in an official, typed report.

After Hines falsified Plaintiff's medical records,[4] on January 14, 2021, Plaintiff had a surgical consultation with Dr. Wiseman, who ordered esophageal barium imaging. On March 5, 2021, Plaintiff had esophageal barium imaging. Upon reviewing the results of the imaging, Dr. Wiseman informed Plaintiff that the stomach acid in his lungs could lead to lung damage, pneumonia, and nerve damage to the esophagus. Dr. Wiseman recommended hiatal hernia repair surgery, or "fundoplication."

On an unspecified date, a request for the fundoplication surgery was sent to Centurion's Utilization Management and was denied without cause. When Plaintiff offered to pay for the surgery himself his offer was rejected.

### D. Count Four: Fourteenth and Eighth Amendments

In Count Four, Plaintiff alleges that Centurion violated (1) the Eighth Amendment prohibitions against cruel and unusual punishment and excessive fines and (2) the

---

[4] Plaintiff does not explain further what he means by this allegation.

Fourteenth Amendment prohibition against the deprivation of life, liberty, or property without due process of law. He alleges that on April 12, 2020, Plaintiff received a medical bill for $90.00 for a brace he had received from Banner University Medical Center. He then received approximately six more medical bills. On May 12, 2021, Plaintiff received a medical bill for $746.00. Plaintiff partially repeats the allegations set forth in Counts One and Three that he was denied hiatal hernia repair surgery for GERD and an ultrasound for his foot and leg and that his offers to pay for this care were rejected.

## IV.    Discussion

Although pro se pleadings are liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), conclusory and vague allegations will not support a cause of action. *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982). Further, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled. *Id.*

### A.    Count One: Eighth Amendment

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain, and (2) that the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a

1    prison official intentionally denies, delays, or interferes with medical treatment or by the

2    way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S.

3    97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

4         Deliberate indifference is a higher standard than negligence or lack of ordinary due

5    care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross

6    negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F.

7    Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458,

8    460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"

9    do not support a claim under § 1983). "A difference of opinion does not amount to

10   deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d

11   240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to

12   state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of

13   State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be

14   substantial. The action must rise to a level of "unnecessary and wanton infliction of pain."

15   *Estelle*, 429 U.S. at 105.

16        A suit against a defendant in his or her individual capacity seeks to impose personal

17   liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). For a person

18   to be liable in his or her individual capacity, "[a] plaintiff must allege facts, not simply

19   conclusions, that show that an individual was personally involved in the deprivation of his

20   [or her] civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). In

21   contrast, a suit against a defendant in his or her official capacity represents only another

22   way of pleading an action against the entity that employs the defendant. *Graham*, 473 U.S.

23   at 165. That is, the real party in interest is not the named defendant but instead the entity

24   that employs the defendant. *Id*. at 166. To bring a claim against a person in his or her

25   official capacity, a plaintiff must show that the constitutional deprivation resulted from the

26   entity's policy, custom, or practice. *Id*.; *see also Monell v. Dep't of Soc. Servs. of City of

27   New York*, 436 U.S. 658, 694 (1978). "Of course, a state official in his or her official

28   capacity, when sued for injunctive relief, would be a person under § 1983 because "official-

capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, n. 10 (1989).

### 1. Defendants Riley and Hodge

As the Court's previous Screening Order concluded, liberally construed, Plaintiff has stated deliberate indifference claims against Defendants Riley and Hodge. The Court will require these Defendants to answer Count One of the FAC.

### 2. Defendant Shinn

As to Defendant Shinn, Plaintiff alleges that Shinn had an "unwritten policy" prohibiting ADOC employees from providing constitutionally adequate health care to inmates. He further alleges that Shinn's healthcare monitors were aware that Plaintiff was suffering pain and injury and chose to do nothing to address it in accordance with Shinn's unwritten policy. Plaintiff further states that he has named Shinn as a Defendant in this action because he has requested prospective injunctive relief and Shinn is the appropriate party against whom the Court may order such relief.

Liberally construed, Plaintiff has stated a claim against Defendant Shinn in his official capacity only. The Court will require Defendant Shinn to answer Count One of the FAC to the extent that Plaintiff seeks prospective injunctive relief.

### 3. Defendant Graybill

Plaintiff alleges that Defendant Graybill refused to provide health care for Plaintiff, including a wheelchair, treatment for pain, physical examinations, and scheduling him for appointments. Liberally construed, Plaintiff has stated a deliberate indifference claim against Defendant Graybill and the Court will require this Defendant to answer Count One of the FAC.

### 4. Defendant Alanso

Plaintiff alleges that Defendant Alanso chose not to treat Plaintiff's serious pain, despite her awareness of it, in order to stay on good terms with Defendant Riley. Plaintiff further alleges that Alanso omitted notes from his medical records in order to deny him health care. Liberally construed, Plaintiff has stated a deliberate indifference claim against

Defendant Alanso and the Court will require this Defendant to answer Count One of the FAC.

### 5. Defendant Ferguson

Plaintiff alleges that Defendant Ferguson failed to fulfill her duty to provide him with "timely access to needed surgery" and "treatment for ongoing serious pain." Plaintiff further alleges that Ferguson was aware that Plaintiff was experiencing pain and responded to at least three of his grievances regarding his untreated pain but failed to ensure that Plaintiff received pain treatment. Liberally construed, Plaintiff has stated a deliberate indifference claim against Defendant Ferguson and the Court will require this Defendant to answer Count One of the FAC.

### 6. Defendant Hines

Plaintiff alleges that Defendant Hines failed to provide Plaintiff with health care, including access to surgery, pain treatment, and appointments with health care providers. Plaintiff further alleges that Hines understood that her denials of health care to Plaintiff caused him unnecessary pain and further injury. Liberally construed, Plaintiff has stated a deliberate indifferent claim against Defendant Hines. The Court will require Defendant Hines to answer Count One of the FAC.

### 7. Defendant Salgado

Plaintiff alleges that Defendant Salgado failed to provide him with health care, including treatment for pain and scheduling appointments with health care providers. Plaintiff further alleges that Salgado was aware of Plaintiff's foot deformity and resulting pain. Liberally construed, Plaintiff has stated a deliberate indifference claim against Defendant Salgado. The Court will require this Defendant to answer Count One of the FAC.

### 8. Defendant Headstream

Plaintiff alleges that Defendant Headstream was aware of Plaintiff's ongoing pain and suffering and failed in her duty to provide him with constitutionally adequate health care. Specifically, he alleges that he made Headstream aware, via an email from his

attorney, that he was experiencing severe pain that was making it difficult for him to walk and that he was being denied effective treatment for it. In that email, he requested that Headstream allow Plaintiff's attorney to pay for his health care. Headstream responded by "falsely claiming that no one told Plaintiff to stand or walk." Plaintiff then alleges that he sent Headstream a second email that included the grievance response he received directing him to walk using the walker. Headstream responded that Plaintiff should submit an inmate letter and that Centurion would be notified. Plaintiff then alleges that Headstream responded to an inmate letter that was addressed to an individual named Richard Pratt, informing him that Centurion officials were "pretending" that Plaintiff had already received surgery.

These allegations do not rise to the level of deliberate indifference. Thus, the Court will dismiss without prejudice Plaintiff's Count One claims against this Defendant.

### 9. Defendant Elliot

Plaintiff alleges that Defendant Elliott knew that he would need opiate-strength pain medication following his foot surgery but denied Plaintiff any pain medication for approximately 24 hours after his surgery. Plaintiff further alleges that Elliott denied Plaintiff neuropathic pain medication (Gabapentin and Lyrica) for twelve days after his surgery. Plaintiff further alleges that, despite Elliott's knowledge that Plaintiff could not walk following surgery, Elliott took Plaintiff's wheelchair. Liberally construed, Plaintiff has stated a deliberate indifference claim against Defendant Elliott and the Court will order this Defendant to answer Count One of the FAC.

### 10. Centurion

To state a claim under § 1983 against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam). A plaintiff must allege the specific policy or custom and how it violated his

constitutional rights. A private entity is not liable merely because it employs persons who allegedly violated a plaintiff's constitutional rights. *See Tsao*, 698 F.3d at 1139; *Buckner*, 116 F.3d at 452.

Plaintiff alleges that the conduct described in Count One of the FAC was the result of a policy, custom or practice by Centurion of denying constitutionally adequate medical care to inmates. Thus, liberally construed, Plaintiff has stated an Eighth Amendment claim against Centurion in Count One and Centurion will be required to answer Count One of the FAC.

**B.      Count Two: First Amendment**

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

In Count Two, Plaintiff claims Defendants Riley, Hodge, and Hines took his wheelchair in retaliation for his exercise of his First Amendment rights. Liberally construed, Plaintiff has stated a First Amendment retaliation claim against Defendants Riley, Hodge, and Hines and those Defendants will be required to answer Count Two of the FAC.

. . . .

. . . .

C.     **Count Three: Eighth Amendment**

1.     **Defendant Centurion**

To state a claim under § 1983 against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (per curiam). A plaintiff must allege the specific policy or custom and how it violated his constitutional rights. A private entity is not liable merely because it employs persons who allegedly violated a plaintiff's constitutional rights. *See Tsao*, 698 F.3d at 1139; *Buckner*, 116 F.3d at 452.

Plaintiff alleges that his hiatal hernia is a serious medical need and that Centurion, by deciding not to provide the surgery, has followed a medically unacceptable course of treatment with "conscious disregard of an excessive risk" to his health. Plaintiff further alleges that Centurion's Utilization Management is engaged in a "pattern, practice, and custom" of deliberate indifference to inmates' serious medical needs, including rejecting necessary surgeries as a means to save costs.

Liberally construed, Plaintiff has stated an Eighth Amendment claim against Centurion in Count Three and Centurion will be required to answer Count Three of the FAC.

2.     **Defendant Shinn**

Plaintiff names Defendant Shinn in Count Three, as Plaintiff is seeking injunctive relief to obtain the surgery. Liberally construed, Plaintiff has stated a claim for injunctive relief against Defendant Shinn in his official capacity. Thus, the Court will require Defendant Shinn to answer Count Three to the extent that Plaintiff seeks prospective injunctive relief.

. . . .

. . . .

**D.      Count Four: Fourteenth and Eighth Amendments**

Count Four alleges that (1) Plaintiff received medical bills for medical treatment that he received and (2) he was denied hiatal hernia repair surgery for GERD and an ultrasound for his foot and leg.

The Eighth Amendment prohibition against the imposition of excessive fines is inapplicable here.  As the Supreme Court has explained:

> The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."   This Court has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause. We have, however, explained that at the time the Constitution was adopted, "the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense."   The Excessive Fines Clause thus "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"

*United States v. Bajakajian*, 524 U.S. 321, 327-328 (1998) (internal citations omitted). Furthermore, where an inmate plaintiff does not allege how a fee for medical services affected him, the Ninth Circuit has held that claims of excessive medical fees do not constitute deliberate indifference in violation of the Eighth Amendment. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (where inmate plaintiff did not allege that he was denied medical treatment for inability to pay a fee, he had not alleged facts to support a claim of deliberate indifference).

Plaintiff's Count Four claim of cruel and unusual punishment pursuant to the Eighth Amendment is duplicative of his claims alleged in Counts One and Three and thus will be dismissed. *See supra*. The remaining Count Four allegations are insufficient to state a claim against Centurion under either the Eighth or Fourteenth Amendment. Plaintiff has not stated facts that could show that Centurion's conduct with respect to his medical conditions was deliberately indifferent, nor has he alleged that Centurion caused his injuries. Thus, the Court will dismiss without prejudice Plaintiff's Count Four claims against Defendant Centurion.

**V.    Warnings**

   **A.    Address Changes**

   If Plaintiff's address changes, Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure. Plaintiff must not include a motion for other relief with a notice of change of address. Failure to comply may result in dismissal of this action.

   **B.    Copies**

   Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files. Fed. R. Civ. P. 5(a). Each filing must include a certificate stating that a copy of the filing was served. Fed. R. Civ. P. 5(d). Also, Plaintiff must submit an additional copy of every filing for use by the Court. *See* LRCiv 5.4. Failure to comply may result in the filing being stricken without further notice to Plaintiff.

   **C.    Possible Dismissal**

   If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

   **IT IS ORDERED:**

   (1) Plaintiff's Motion for Leave to File an Amended Complaint and Request for Page Limit Extension (Doc. 7) is **granted**. The Clerk of Court shall file Plaintiff's First Amended Complaint (lodged at Doc. 8).

   (2) Defendant Headstream is **dismissed without prejudice**.

   (3) The remaining Defendants shall answer the First Amended Complaint as follows:

      a.   Defendant Centurion shall answer Counts One and Three.

      b.   Defendant Riley shall answer Counts One and Two.

      c.   Defendant Hodge shall answer Counts One and Two.

      d.   Defendant Graybill shall answer Count One.

e.  Defendant Alanso shall answer Count One.

f.  Defendant Ferguson shall answer Count One.

g.  Defendant Hines shall answer Counts One and Two.

h.  Defendant Salgado shall answer Count One.

i.  Defendant Elliott shall answer Count One.

j.  Defendant Shinn shall answer Counts One and Three in his official capacity to the extent that Plaintiff seeks injunctive relief.

(4)  The Clerk of Court must send Plaintiff a service packet including the First Amended Complaint, this Order, and both summons and request for waiver forms for Defendants Centurion, Graybill, Alanso, Furguson, Hines, Salgado, Elliott, and Shinn.

(5)  Plaintiff must complete and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order. The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(6)  If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served. Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(7)  The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(8)  The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure. The notice to Defendants must include a copy of this Order.

(9)  A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service**

- 24 -

pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

(10)   The Marshal must immediately file signed waivers of service of the summons. If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

    a.   personally serve copies of the Summons, Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

    b.   within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant. The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required. Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

(11)   Defendants Centurion, Riley, Hodge, Graybill, Alanso, Ferguson, Hines, Salgado, Elliott, and Shinn must answer the relevant portion of the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

Dated this 12th day of October, 2021.


Honorable Rosemary Márquez
United States District Judge