1

2

3

4

5

6                          **IN THE UNITED STATES DISTRICT COURT**

7                                  **FOR THE DISTRICT**

8                                      **OF ARIZONA**

9

10   Arron Shawn Bossardet,                         No. CV-21-00179-TUC-RM

11                     Plaintiff,

12   vs.                                            **ORDER**

13   Centurion Healthcare, et al.,

14                     Defendants.

15

16

17          Plaintiff Arron Shawn Bossardet brought this civil rights action under 42 U.S.C.

18   § 1983 asserting Eighth Amendment medical care claims against the following

19   Defendants: (1) Centurion Healthcare; (2) Nurse Practitioner ("NP") Jillian Riley; (3)

20   Nurse Carol Hodge; (4) Nurse Lisa Graybill; (5) NP Lara Alonso; (6) Facility Health

21   Administrator ("FHA") Alicia Ferguson; (7) Dr. Dorothy Hines; (8) Nurse Angelica

22   Salgado; (9) NP Laura Elliott; (10) Arizona Department of Corrections, Rehabilitation,

23   and Reentry ("ADCRR") Director Ryan Thornell;[1] (11) NP Isabella Waszkiewicz;

24   (12) Nurse J. Hinkley; (13) Dr. Murray Young; and (14) NaphCare, Inc.  (Docs. 211,

25   250.)[2]  Before the Court are Plaintiff's Second Motion for Partial Summary Judgment

26   _____

27          [1] Plaintiff named former ADCRR Director Shinn as a defendant in his official
     capacity.  The current Director, Thornell, is automatically substituted as a party.  Fed. R.
28   Civ. P. 25(d).

          [2] Plaintiff initiated this action pro se and then retained counsel.  (Docs. 1,

JDN

1    (Doc. 281) and twelve separate Motions for Summary Judgment filed by Defendants
2    Alonso, Hinkley, Salgado, Waszkiewicz, Ferguson, Hodge, Graybill, Riley, Elliott,
3    Young, Hines, and Centurion.  (Docs. 283, 285, 287, 289, 291, 294, 296, 298, 300, 302,
4    304, 306.)  Defendant NaphCare filed a Joinder to the twelve Motions for Summary
5    Judgment.  (Doc. 307.)  The Court will deny Plaintiff's Motion; grant the Motions filed
6    by Alonso, Hinkley, Salgado, Hodge (in part), and Graybill; and deny the remaining
7    Defendants' Motions.

8    **I.    Background**

9        In Count One, Plaintiff asserted Eighth Amendment medical care claims against
10   all Defendants based on their alleged deliberate indifference to Plaintiff's serious medical
11   needs; namely, his right foot and ankle deformity and related medical issues, and his
12   gastroesophageal reflux disease ("GERD") condition.  (Doc. 211 at 3–37, 44–49.)  In
13   Count Two, Plaintiff set forth a First Amendment retaliation claim against Defendants
14   Riley and Hodge for allegedly taking away Plaintiff's wheelchair in retaliation for his
15   exercise of free speech, and against Defendant Hines for allegedly falsely reporting to the
16   Deputy Warden that Plaintiff acted aggressively toward her after Plaintiff complained
17   about her conduct.  (*Id.* at 37–40.)  And in Count Three, Plaintiff asserted Eighth
18   Amendment policy claims against Defendants Centurion and Thornell based on the
19   denial of adequate medical care.  (*Id.* at 40–44.)  The Court subsequently added
20   NaphCare as a Defendant for purposes of injunctive relief.  (Doc. 250.)

21   **II.   Summary Judgment Standard**

22       A court must grant summary judgment "if the movant shows that there is no
23   genuine dispute as to any material fact and the movant is entitled to judgment as a matter
24   of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

---

26   102.) On July 10, 2023, the Court granted Plaintiff's counsel's Motion to Withdraw.
27   (Doc. 326.)

(1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

　　　If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

　　　At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  "[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion.  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

1

**III.    Relevant Facts**[3]

2

   **A.    Foot, Ankle, and Knee**

3

   On August 20, 2019, Dr. Michael Feldman, an orthopedic surgeon, performed

4

arthroscopy surgery on Plaintiff's right knee.  (Doc. 282-8 at 8–9.)  Post-surgery, the

5

surgeon recommended Percocet for 10 days.  (*Id.* at 15.)  Upon Plaintiff's return to the

6

prison on August 20, 2019, Defendant Riley ordered Tylenol 3 instead of Percocet and

7

noted in the record, "Percocet is not given here."  (*Id.* at 18.)

8

   On November 4, 2019, Plaintiff had a follow-up appointment with Dr. Feldman,

9

who noted that Plaintiff still had lateral ankle pain.  (*Id.* at 10.)

10

   In December 2019, Plaintiff complained that his right foot was not improving with

11

physical therapy, and he was unable to plant his right foot completely on the ground.

12

(Doc. 282-3 at 11.)  Plaintiff requested that he see a foot and ankle specialist.  (*Id.*)

13

   On December 3, 2019, Defendant Riley submitted a consultation request for

14

Plaintiff to see a foot and ankle specialist for evaluation and treatment.  (*Id.*)

15

   On December 11, 2019, a physical therapist from Simons Physical Therapy noted

16

that Plaintiff was not able to ambulate without an assistive device due to increased ankle

17

pain and fear of his leg collapsing.  (Doc. 282-8 at 24.)

18

   On December 23, 2019, Defendant Riley noted in the medical records that an

19

ankle brace was needed per a prescription from the surgeon and that the brace was

20

previously ordered but could take up to three months to arrive.  (*Id.* at 25.)

21

22

_____

23

   [3] Some of Plaintiff's asserted facts are supported by citations that do not appear to include the correct page number, and, in their respective Statements of Facts, Plaintiff

24

and Defendants often failed to provide any page or paragraph citation for their supporting evidence (e.g., citing "Exhibit B" with no page number despite numerous pages within Exhibit B; citing to an affidavit with no page or paragraph numbers).  At summary

25

judgment, to support any factual assertion, a party must cite to "particular parts of the materials in the record."  Fed. R. Civ. P. 56(c)(1).  "General references without page or

26

line numbers are not sufficiently specific."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).  Because of the parties' deficient citations, ascertaining the

27

relevant facts was an arduous task for the Court.  Where evidence could not readily be found to support a particular asserted fact, the Court did not consider the asserted fact.

28

*See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (a court is "not required to comb the record" to find supporting evidence).

On December 26, 2019, Defendant Riley discontinued Plaintiff's prescription for Gabapentin because Plaintiffs' Gabapentin levels were below the normal range.  (*Id.* at 22.)

On December 31, 2019, Plaintiff had a physical therapy appointment; the therapist noted that Plaintiff still did not have a brace for his right ankle and foot pain and that he reported increased burning in the right ankle and pain in the left knee.  (Doc. 282-8 at 26.)

On January 6, 2020, Plaintiff saw Dr. Leonard Latt, an orthopedic surgeon, for increasing and sharp pain on his right foot and heel.  (Doc. 282-3 at 17.)  Dr. Latt took Plaintiff's history and noted that, in 2017, Plaintiff hyperextended his right knee, and in 2019, Plaintiff had undergone an arthroscopic lysis of adhesions and manipulation.  (*Id.*)  Dr. Latt documented his opinion that when Plaintiff sustained his hyperextension injury, he likely also injured the first tarsometatarsal ("TMT") joint in his foot, and then altered his gait mechanics, which, over time, caused a contracture of his hindfoot.  (*Id.* at 18.)  Dr. Latt assessed posttraumatic arthritis of the right first TMT joint.  (*Id.*)  Dr. Latt prescribed a lateral heel wedge and a corticosteroid injection, and he documented that, if there is no improvement, the surgical option is a lateralizing calcaneus osteotomy.  (*Id.*)  The corticosteroid injection was performed that same day.  (*Id.*)

On February 5, 2020, Plaintiff's Naproxen (Aleve) prescription—which had been issued in November 2019—expired and was not renewed or replaced with another pain medication.  (Doc. 282-2 at 15; Doc. 282-11 at 3, Pl. Aff. ¶ 7.)  Thereafter, Plaintiff did not have a prescription for pain medication.  (Doc. 282-11 at 3, Pl. Aff. ¶ 3.)

On February 17, 2020, Plaintiff saw specialists Drs. Latt and Khwaja for a follow-up appointment.  (Doc. 282-3 at 23.)  Dr. Khwaja documented Plaintiff's report that the previous injection provided tremendous pain relief; however, Plaintiff continued to have lateral column overload pain when he tried to put his foot flat, and trying to put his foot flat also placed stress on his MCL.  (*Id.*)  Upon examination, Dr. Khwaja noted Plaintiff had about 10 degrees of hindfoot varus and 15 degrees of forefoot supination, as well as

tenderness to palpation near the fifth metatarsal.  (*Id.* at 24.)  Dr. Khwaja assessed that Plaintiff was not doing well with nonoperative treatment, but injections were helping his TMT arthritis.  (*Id.*)  Dr. Khwaja's plan was to obtain a CT scan of the right foot and ankle, and, if Plaintiff had septic arthritis, the plan would be surgery.  (*Id.*)

On March 12, 2020, Plaintiff had a CT scan of his right foot.  (Doc. 282-3 at 26.)

On March 17, 2020, Plaintiff submitted a health needs request ("HNR") requesting a copy of the CT results and that he be sent back to Dr. Latt on an urgent basis.  (*Id.*)  Plaintiff also wrote that he had been unable to walk without a walker, was in severe pain for two years, and had suffered significant atrophy.  (*Id.*)

On March 24, 2020, Plaintiff saw Defendant Hodge, who reviewed his CT scan results with him.  (Doc. 295-1 at 2, 5.)  The scan revealed osteopenia in Plaintiff's right foot and ankle, and Defendant Hodge told Plaintiff that he had osteopenia because he had used a wheelchair for too long.  (Doc. 319-1 at 4, Pl. Aff. ¶ 13.)  Plaintiff avers that Defendant Hodge told him that he needed to walk more often to prevent further bone loss, but he explained to her that he used a wheelchair due to his right foot deformity, which required surgery, and that standing and walking caused severe pain for which he received no treatment.  (*Id.* ¶ 14.)

On April 10, 2020, Plaintiff saw Defendants Hodge and Riley in the day room of the housing unit.  (Doc. 319-1 at 5, Pl. Aff. ¶ 16.)  Defendant Riley started the encounter by asking Plaintiff if he was "still complaining," and Plaintiff accused the two Defendants of failing to do their jobs correctly and causing him needless pain and suffering.  (*Id.*)  In the medical record, Defendant Hodge wrote that Plaintiff was seen for a medication review, which related to medications for Plaintiff's GERD.  (Doc. 295-1 at 18.)  At this encounter, Defendant Riley did not examine Plaintiff's right foot or request to examine it.  (Doc. 319-1 at 5, Pl. Aff. ¶ 17.)

Plaintiff avers that about an hour after this encounter with Defendants Riley and Hodge, Officer Pierce approached him and said she received a call from Defendant Hodge, who wanted Plaintiff's wheelchair.  (*Id.* ¶ 19.)  Plaintiff refused to relinquish his

wheelchair.  (*Id.*)

On April 11, 2020, Plaintiff submitted an HNR requesting that his wheelchair waiver be renewed.  (Doc. 297-1 at 6.)

On April 13, 2020, Plaintiff saw Defendant Graybill in response to his HNR.  (*Id.*) In the medical record, Defendant Graybill wrote that Plaintiff used his feet to move his wheelchair into the office, refused to show her his right foot, reported that he walked in pod, and was not wearing the ankle brace and shoe wedge that had been given to him. (*Id.*)   Defendant Graybill wrote that the wheelchair waiver was not renewed.   (*Id.*) Plaintiff avers that he did not use his feet to move his wheelchair, he was wearing the heel wedge in his shoe, and he did not refuse to show Defendant Graybill his foot—she did not ask him to take off his shoe.  (Doc. 319-1 at 6, Pl. Aff. ¶ 20.)  Plaintiff avers that he explained that his right foot was deformed and needed surgery, and he handed Defendant Graybill the orthopedic records, but she stated, "I don't care about any of this."   (*Id.* ¶ 21.)  Plaintiff avers that he told her he would not be able to walk around the unit with a walker because of severe pain, and he requested that he be scheduled with a provider to be treated for pain.  (*Id.*)  Defendant Graybill denied Plaintiff's request, said he would have to walk around the unit despite his pain, and shouted at him to get out. (*Id.*)

On April 13, 2020, Plaintiff submitted an Emergency Grievance complaining that Nurse Hodge had decided to take his wheelchair and impose a new plan of care that was contrary to the treating specialist's plan of care.  (Doc. 282-3 at 28–29.)  Plaintiff also wrote that all his pain medication was cancelled, and he had filed multiple HNRs on the issue, to no avail.  (*Id.* at 29.)

On April 16, 2020, Defendant Riley issued a new Special Needs Order ("SNO") for a walker for Plaintiff.  (Doc. 299-1 at 68, 72.)

On April 29, 2020, Nurse Siler informed Plaintiff that, per medical director Dr. Salazar, Plaintiff may keep and use his wheelchair, but Plaintiff must also use his walker to strengthen his muscles before surgery.  (Doc. 282-7 at 2–3.)

On April 30, 2020, Plaintiff saw Defendant Alonso in response to an HNR Plaintiff submitted in which he complained of chronic pain in his right foot. (Doc. 282-7 at 5.) At this encounter, Plaintiff reported pain in his right foot and right lower leg. (*Id.*) Plaintiff explained that walking with the walker was very painful. (Doc. 282-11 at 3, Pl. Aff. ¶ 9.) Defendant Alonso advised Plaintiff there would be no pain medication at this time, that a follow up with Dr. Latt was scheduled, and that Plaintiff needed to use the right leg extension on the wheelchair to avoid further injury. (Doc. 282-7 at 7.)

On May 1, 2020, Defendant FHA Ferguson responded to Plaintiff's April 13, 2020 Emergency Grievance. (Doc. 282-7 at 17.) Defendant Ferguson informed Plaintiff that the Site Medical Director had approved Plaintiff keeping his wheelchair and that Plaintiff must use both the walker and wheelchair daily. (*Id.*) As to the cancellation of Gabapentin, Ferguson informed Plaintiff that it was discontinued due to low Gabapentin levels on labs. (*Id.*)

On May 23, 2020, Plaintiff submitted an HNR complaining of pain in his right leg, the lack of any pain medication, and tearing to the back of his wheelchair. (Doc. 282-6 at 27.) On May 26, 2023, Nurse Johnson responded to the HNR and informed Plaintiff that she emailed administration and requested a new wheelchair. (*Id.* at 27–28.)

On May 26, 2020, Plaintiff submitted an HNR requesting to see a provider because he "cannot continue POC [plan of care] if pain continues to go untreated." (*Id.* at 29.) Plaintiff wrote that he was told he was scheduled for surgery and inquired into the delay. (*Id.*) He wrote that he was unable to stand on his right leg for very long due to chronic injury and pain. (*Id.*) In an undated response, Nurse Johnson informed Plaintiff that he was scheduled for surgery. (*Id.*)

On May 28, 2020, Dr. Feldman performed a left knee arthroscopy to treat a medial meniscus tear. (Doc. 316-2 at 2; *see* Doc. 299-1 at 83.) After the surgery, Plaintiff was prescribed acetaminophen with codeine three times daily; this prescription expired on May 30, 2020. (Doc. 283-3 at 15.)

On June 1, 2020, Plaintiff saw orthopedic specialists Drs. Seller and Latt. (Doc.

282-12 at 2.)   Plaintiff reported one month relief of TMT arthritis from the steroid injection but that he continued to have pain on the lateral aspect of his foot and calf.  (*Id.*)   Plaintiff also reported that he was not able to walk due to the pain and used a walker or wheelchair for the last year.  (*Id.*)  The specialists diagnosed a cavovarus foot deformity.  (*Id.* at 3.)  The medical record noted that, at this encounter, the specialists only had the CT scan report but not the actual CT scan.  (*Id.*)

On June 10, 2020, Plaintiff submitted an Inmate Grievance complaining that his medical records were falsified; it appeared that staff documented encounters with Plaintiff on dates that Plaintiff never saw medical staff.  (Doc. 282-7 at 36-37.)  Plaintiff also complained that Gabapentin was discontinued without a valid reason with no replacement, and he was not being treated for his pain.  (*Id.* at 37-38.)  There was no response to Plaintiff's grievance, and he received no treatment for his pain.  (Doc. 282-11 at 3, Pl. Aff. ¶ 11.)

On June 10, 2020, Plaintiff submitted an HNR stating that the February 17, 2020 CT scan had not been sent to Dr. Latt; however, later, his power of attorney delivered the CT scan to Dr. Latt's office.  (Doc. 282-12 at 4.)  Plaintiff requested a provider visit to discuss Dr. Latt's subsequent report after seeing the scan and to discuss his untreated pain in his right foot, ankle, and lateral calf.  (*Id.*)

On June 12, 2020, Defendant Riley reviewed the orthopedic specialist's notes from the May 28, 2020 procedure and noted in the medical record, "1. WBAT [weight-bearing status as tolerated] – SNO placed and PT [physical therapy] ref placed[;] 2. NO IMPACT ADL's [activities of daily living] – SNO placed and PT ref placed[;] 3. F/U [follow up] 8 WEEKS – ref placed."  (Doc. 299-1 at 83.)

On June 18, 2020, Plaintiff saw Defendant Hines.  (Doc. 282-12 at 6.)  Plaintiff reported pain in his right foot and that his toes and the ball of his foot do not touch the floor when his leans on his heels.  (*Id.*)  In the "Plan" section of the record, Defendant Hines wrote that Plaintiff was following up with orthopedics for his right foot pain.  (*Id.* at 9.)   At that time, no orthopedic appointment was scheduled, and no consultation

request had been submitted for another orthopedics consult.  (Doc. 282 ¶ 75; Doc. 309 ¶ 75.)  Defendant Hines told Plaintiff that she would prescribe Naproxen and hot packs for pain; however, Plaintiff received neither.  (Doc. 282-11 at 3, Pl. Aff. ¶ 12.)

On June 26, 2020, Plaintiff submitted an HNR complaining of untreated and "significant" pain in his right foot and leg.  (Doc. 282-12 at 26.)

On June 27, 2020, Plaintiff saw Defendant Salgado in response to his HNR.  (Doc. 282-12 at 28.)  Defendant Salgado noted that there was no documentation of a special needs order for hot packs.  (*Id.* at 29.)  Defendant Salgado wrote that she advised Plaintiff "surgeries are scheduled some time soon."  (*Id.*)

On July 2, 2020, Plaintiff started the grievance process to complain that Defendant Hines failed to keep an accurate record at the June 18, 2020 encounter; failed to provide hot packs and pain medications that she said would be provided; failed to review and ensure compliance with Dr. Khan's recommendations (related to GERD); and failed to explain his abnormal blood test results.  (Doc. 316-2 at 7.)

On July 24, 2020, Plaintiff saw Defendant Hines; Plaintiff reported pain in his right foot and difficulty standing.  (Doc. 282-12 at 42.)  Defendant Hines prescribed Naproxen 500 mg one tablet per day.  (*Id.* at 44.)  Defendant Hines told Plaintiff that a follow-up appointment with Dr. Latt had already been requested.  (Doc. 316-1, Pl. Aff. ¶ 10.)   According to a Centurion Inmate Consultation Request form, which lists all consult request dates, at that time, there was no pending consult request for Plaintiff to see Dr. Latt or orthopedics.  (Doc. 316-3 at 2.)

On August 3, 2020, Plaintiff saw Defendant Hines and reported he was still having right foot pain.  (Doc. 305-1 at 37.)  Defendant Hines told Plaintiff that she had requested a follow up with Dr. Latt for Plaintiff's right foot.  (Doc. 316-1 at 4, Pl. Aff. ¶ 14.)  But Defendant Hines had not, in fact submitted a consult request for Plaintiff to see Dr. Latt, and no appointment was scheduled with Dr. Latt.  (Doc. 282-12 at 10–11, Hines Resp. to Req. for Admis. No. 1.)

On September 1, 2020, Defendant Hines told Plaintiff that Dr. Latt had not

requested a follow-up appointment; Defendant Hines stated she would place a request for Plaintiff to see a podiatrist for his right foot issues.  (Doc. 316-1 at 4, Pl. Aff. ¶ 17.) During this encounter, Plaintiff told Defendant Hines that Naproxen was completely ineffective at treating his pain that resulted from standing and walking with his walker, and Defendant Hines said that she was not allowed to prescribe him anything other than Naproxen.  (*Id.* ¶ 20.)

On October 1, 2020, Plaintiff again told Defendant Hines that he was experiencing significant pain in his right foot, ankle, and calf from standing and walking with his walker and that Naproxen was completely ineffective.  (*Id.* ¶ 21.)

On November 16, 2020, Plaintiff reported to Defendant Hines that he was experiencing uncontrollable pain in his right foot and leg despite taking Naproxen.  (*Id.* ¶ 23.)  Defendant Hines told Plaintiff she would give him an injection of Toradol, but she never did.  (*Id.*)

On November 17, 2020, Plaintiff started the grievance process to complain that he was not being treated adequately for pain.  (Doc. 282-12 at 46–53.)  In a January 2, 2021 response to his grievance, Defendant Ferguson informed Plaintiff that an Interdisciplinary team meeting was scheduled.  (*Id.* at 54.)

On January 19, 2021, Plaintiff's Naproxen prescription expired; it was not renewed, and Plaintiff was provided no other pain medication for his pain.  (Doc. 282-3 at 14; Doc. 282 ¶ 88; Doc. 309 ¶ 88.)

On January 21, 2021, an Interdisciplinary team meeting was held with Centurion Site Medical Director Dr. Salazar, Defendant Elliot, Deputy Warden L. Neil, a Psych Associate, two Nursing Directors, an Assistant FHA, and Plaintiff.  (Doc. 282-12 at 55.) Plaintiff explained his concerns, his pain, and the lack of treatment for his pain; he stated that physical therapy did not work; and he stated he believes he needs surgery.  (*Id.* at 55–56.)  Dr. Salazar stated that Plaintiff did not have a medical diagnosis that would require narcotics and that other alternate treatment would be more beneficial.  (*Id.* at 56– 57.)  Defendant Elliott stated that she would examine Plaintiff the following day to

1    determine whether Plaintiff should receive pain treatment.  (Doc. 316-1 at 7, Pl. Aff.
2    ¶ 25.)  Plaintiff did not see Defendant Elliott the next day.  (*Id.*)

3          From January to May 2021, Defendant Elliot was Plaintiff's primary care
4    provider.  (Doc. 301-1 at 2, Elliott Decl. ¶ 5.)  Following the January 21, 2021 team
5    meeting, Plaintiff was not prescribed any pain medicine for his pain until he underwent
6    surgery on his right foot and calf on February 11, 2021.  (Doc. 282 ¶ 92; Doc. 309 ¶ 92.)

7          On February 11, 2021, Plaintiff had surgery on his right foot and calf.  (*Id.* at 9.)
8    Dr. Latt performed the surgery, which included a right knee cavovarus reconstruction
9    with Dwyer osteotomy, plantar fascial release, and gastric recession.  (Doc. 48-1 at 2.)
10   Following surgery, Dr. Latt prescribed Gabapentin 300 mg 3 times a day for 30 days;
11   Ibuprofen 600 mg every six hours for 14 days; and Oxycodone 5 mg every six hours for 7
12   days.  (*Id.* at 12–13.)  Dr. Latt also ordered that Plaintiff return for a follow-up
13   appointment within 1–2 weeks.  (Doc. 301-1 at 54.)

14         Plaintiff returned to the prison around 3:00 p.m. on February 11, 2021; he was not
15   given any of the medications prescribed by Dr. Latt, nor was he given any other pain
16   medication.  (Doc. 282-9 at 14; Doc. 316-1 at 7, Pl. Aff. ¶ 28; Doc. 282-7 at 33,
17   Centurion's Resp. to Req. for Admis. No. 6.)

18         On the morning of February 12, 2021, Plaintiff was suffering extreme pain, so
19   another prisoner pushed him in his wheelchair to medical where he asked the front desk
20   nurse for pain medication.  (Doc. 316-1 at 7, Pl. Aff. ¶ 29.)  The nurse denied Plaintiff's
21   request and advised him to submit an HNR.  (*Id.*)

22         It turns out that, on February 11, 2021, Defendant Elliott ordered Tylenol 4
23   (acetaminophen-codeine) every 8 hours; however, Plaintiff did not receive his first dose
24   until 1:30 p.m. on February 12, 2021.  (Doc. 282-9 at 20, 39.)

25         On February 13, 2021, Plaintiff informed Defendant Elliott that he still had
26   significant pain, and he asked her for Dr. Latt's prescription of Oxycodone, but she
27   refused.  (Doc. 316-1 at 8, Pl. Aff. ¶ 33.)  Defendant Elliott offered Plaintiff Trileptal
28   (anti-seizure medication) or Duloxetine (anti-depressant) instead of Gabapentin.  (*Id.*

¶ 32.)  Because Defendant Elliott could not explain or present documentation that either of these medications would treat his post-surgical pain, Plaintiff asked Defendant Elliott to contact Dr. Latt to ask him for an equivalent substitute for Gabapentin.  (*Id.*)

On February 19, 2021, Defendant Elliott entered a medical note in response to Plaintiff's HNR seeking a lay-in waiver for meals in his cell and requesting that Dr. Latt be contacted regarding post-surgical treatment and pain medication.  (Doc. 301-1 at 85.)  Defendant Elliott noted that Dr. Latt recommended Lyrica for pain and numbness and elevation of the leg while Plaintiff is in bed and throughout the day.  (*Id.* at 92.)  Defendant Elliott wrote that Lyrica would be obtained from the back-up pharmacy, physical therapy was scheduled for March 2021, a follow up with Dr. Latt was scheduled for March 1, 2021, and Plaintiff will get meals in his cell for 7 days.  (*Id.*)

There is no medical record of the March 1, 2021 follow-up appointment with Dr. Latt.  (*See* Doc. 301.)

On April 7, 2021, Certified Nursing Assistance Oliver told Plaintiff that Defendant Elliott wanted him to turn in his wheelchair on April 9, 2021.  (Doc. 316-1 at 8, Pl. Aff ¶ 34.)  At this time, Plaintiff was struggling while using his walker, and when he went to chow hall or medical, he used his wheelchair to avoid intolerable pain.  (*Id.* ¶ 35.)

On April 9, 2021, Defendant Elliott entered a medical record for a renewal of Lyrica.  (Doc. 301-1 at 98.)  Defendant Elliott noted that Plaintiff "went to see ortho who indicated there was still some mild swelling causing the nerve soreness."  (*Id.* at 99.)  Defendant Elliott wrote that she would continue daily Lyrica to help with soreness for only 14 days; however, she added that "medication was not delivered from the pharmacy and he continues to report severe ankle pain."  (*Id.*)

On April 9, 2021, Defendant Elliott entered another medical note indicting "F/U Post Surgical 7 weeks out/return wheelchair and let rest elevated."  (*Id.* at 101.)  Plaintiff reported continued nerve pain and right leg swelling and that he was ambulating most of the time "but does not ambulate when he has to use his hands."  (*Id.*)  In the record, Defendant Elliott stated that Dr. Latt's follow-up orders stated that Plaintiff was

ambulating with a walking boot and healing well.  (*Id.* at 104.)[4]  Defendant Elliott wrote that Dr. Latt's orders were to follow up in 6 weeks, continue Lyrica for 6 weeks, and to remove walker and walking boot within 1 week.  (*Id.*)  Defendant Elliott added a note that Plaintiff would only need the Lyrica for 2–3 weeks.  (*Id.*)

On April 9, 2021, Defendant Elliott told Plaintiff to turn in his wheelchair by April 16, 2021.  (Doc. 316-1 at 8–9, Pl. Aff ¶ 36.)

On April 16, 2021, Defendant Elliott entered a note in the medical records stating that Plaintiff was allowed to keep his wheelchair for another week with a goal of walking more, and then Plaintiff would bring his wheelchair in and exchange it for a walker with a seat and a cane.  (Doc. 301-1 at 114.)

But Plaintiff avers that on April 16, 2021, Defendant Elliott approached him in the pill line and told him to turn in his wheelchair.  (Doc. 316-1 at 8, Pl. Aff. ¶ 37.)  Plaintiff explained to Defendant Elliott that he still suffered significant pain when using his walker, so he requested to keep his wheelchair and a physical examination; Defendant Elliott denied both requests.  (*Id.*)  Defendant Elliott told Plaintiff she would prescribe him medication for his pain and swelling, but when Plaintiff went to the clinic later that day in his wheelchair, Defendant Elliott took his wheelchair and refused to examine him or treat his pain.  (*Id.* ¶¶ 38, 40.)

On May 14, 2021, Plaintiff had a follow-up visit with Dr. Latt.  (Doc. 301-1 at 121.)  Dr. Latt documented that Plaintiff had pain over the outside of the foot that runs up his calf, and that after walking the pain can rise to 7/10 and cause difficulty ambulating.  (*Id.*)  Plaintiff reported that he had not been allowed to use the cam (controlled ankle movement) boot and his wheelchair was taken away.  (*Id.*)  Dr. Latt noted that Plaintiff had not had any formal physical therapy yet.  (*Id.*)  Dr. Latt assessed right foot pain and peroneal tendonitis.  (*Id.* at 122.)  Dr. Latt documented a plan to (1) perform physical therapy exercises in his cell that were demonstrated that day in the clinic; (2) use the

---

[4]  Defendant Elliott did not submit the medical record from the follow-up appointment with Dr. Latt.  (*See* Doc. 301.)

wheelchair if he has too much pain to walk; (3) take anti-inflammatories or use Voltaren gel locally for pain control; and (4) follow up in 3 months with repeat radiographs.  (*Id.*)

On May 20, 2021, Defendant Elliott entered a medical record documenting that she reviewed the orthopedic consult notes and noted Dr. Latt's recommendation that Plaintiff could use a wheelchair if it is too painful to walk.  (*Id.* at 125, 127.)  Defendant Elliott ordered Voltaren gel that same day.  (*Id.* at 128.)

From May to August 2021, Plaintiff submitted approximately 14 HNRs about post-surgery debilitating pain and related issues.  (Doc. 18, Pl. Decl. ¶ 8.)

On September 10, 2021, Plaintiff had a follow up with Dr. Latt.  (Doc. 282-12 at 62.)  Dr. Latt ordered an MRI of the right foot and knee, recommended Lyrica 50 mg 3 times a day for nerve pain, and ordered a follow-up appointment after the MRI was completed.  (Doc. 48-1 at 2–3.)

After the appointment with Dr. Latt, Plaintiff did not see any medical personnel, nor did he receive the prescribed Lyrica.  (Doc. 18 at 4.)  Therefore, on October 1, 2021, Plaintiff submitted an HNR requesting to be scheduled with a provider to discuss Dr. Latt's findings and recommendations.  (*Id.*)  In this HNR, Plaintiff also reported that he was experiencing excruciating pain, and he requested to be sent to a pain clinic.  (*Id.*)

On October 12, 2021, Plaintiff filed a Motion for Preliminary Injunction to obtain the prescription of Lyrica recommended by Dr. Latt.  (Doc. 18.)

On November 10, 2021, Plaintiff had an MRI.  (*Id.* at 5.)  The results showed tendon, ligament, and cartilage damage to Plaintiff's right knee and foot.  (Doc. 69 at 12–13.)

On December 2, 2021, the day before Defendants filed their Response to Plaintiff's Motion for Preliminary Injunction, Plaintiff was prescribed Lyrica.  (Doc. 282-12 at 65.)

On December 20, 2021, Plaintiff saw Dr. Latt for follow up.  (Doc. 80-1 at 2.)  The medical record from this visit noted that Plaintiff continued to have pain at the lateral aspect of the foot and lateral ankle, which radiates to the midcalf.  (*Id.*)  Plaintiff reported

that he does the instructed peroneal tendon strengthening exercises; however, physical therapy is limited because the prison does not provide elastic bands.  (*Id.*)  Plaintiff also reported that he was taking Lyrica, which aided in management of neuropathic pain in his toes.  (*Id.*)  Upon review of the MRI results, Dr. Latt explained to Plaintiff that he had, among other things, a flap tear at the patella, and that this flap tear was the cause of Plaintiff's anterior right knee pain.  (*Id.*; Doc. 69 at 2.)  Dr. Latt ordered the following: (1) continue with physical therapy for ankle strengthening and that elastic bands should be provided; (2) begin physical therapy for right knee and continue Lyrica 50 mg TID; (3) continue rest, ice/heat, and compression for pain control; (4) recommend acetaminophen and/or ibuprofen; and (5) follow up in 3 months with right knee and right foot radiographs.  (Doc. 80 at 2–3.)  Dr. Latt also recommended a steroid injection in the right knee, and he informed Plaintiff that if the steroid injection was not successful, surgery was the next step.  (Doc. 69 at 2, 8, Pl. Decl. ¶ 4.)  Plaintiff agreed to the steroid injection, and Dr. Latt administered the injection that same day.  (Doc. 69 at 2, 16.)

The injection did not alleviate Plaintiff's pain, and he continued to suffer acute pain and grinding in his right knee.  (Doc. 69 at 2, 16.)  On January 6, 2022, Plaintiff submitted an HNR requesting to be sent back to Dr. Latt for the patella surgery.  (*Id.* at 16.)

On January 7, 2022, Plaintiff had a physical therapy appointment.  (Doc. 69 at 8, Pl. Decl. ¶ 6.)  At this physical therapy session, Plaintiff did not receive the recommended modalities.  (*Id.* ¶ 8.)

On February 4 and 6, 2022, Plaintiff submitted HNRs explaining that he was suffering ongoing and debilitating right knee pain.  (Doc. 86 at 8, Pl. Decl. ¶ 8.)

**B.  GERD**

Plaintiff began suffering symptoms of GERD at age eighteen, and those symptoms have worsened over time.  (Doc. 47 at 12, Pl. Decl. ¶ 2; Doc. 47 at 16.)  He was first diagnosed with a hiatal hernia in 2011, at which time it was small in size.  (Doc. 47 at 16.)  Plaintiff's symptoms included painful heartburn, painful indigestion, and reflux

- 16 -

occasionally seeping into his lungs, which in turn caused acute pain and coughing.  (*Id.*, Pl. Decl. ¶ 3.)  Plaintiff's GERD condition caused him to suffer pain, including intense pain at times, sleep deprivation, hunger, and stress.  (*Id.*)

On March 4, 2020, Plaintiff received a 30-day supply of Protonix (a proton-pump inhibitor or PPI).  (Doc. 299-1 at 40.)

On March 21, 2020, Plaintiff submitted an HNR stating that his chronic GERD symptoms were worsening and that he had been diagnosed with a hiatal hernia.  (Doc. 238-1 at 2.)  Plaintiff wrote that his treating gastroenterologist, Dr. Sanjay Verna, prescribed Protonix AM and Ranitidine PM.  (*Id.*)  Plaintiff wrote that the Ranitidine was discontinued and that he had increasing heartburn and painful indigestion in the evenings.  (*Id.*)  He explained that he regularly awoke with coughing and acid in his lungs.  (*Id.*)  Plaintiff also wrote that PPIs could cause bone density issues, and he had multiple joints with osteopenia.  (*Id.*)  Plaintiff requested to see a provider to review his plan of care, follow up with a doctor, and receive a bed wedge.  (*Id.*)

On March 24, 2020, Plaintiff saw Defendant Hodge.  (Doc. 295-1 at 2.)  Defendant Hodge wrote that she presented Plaintiff with his CT results, informed him that consults were postponed due to COVID-19, and that she would discuss with the provider possible lab work and GERD management.  (*Id.* at 5.)  Plaintiff avers that at this encounter, Defendant Hodge recommended that he take Sucralfate; however, he did not feel comfortable with a nurse deciding what medication he should take, so he requested to speak to the Medical Director, Dr. Salazar.  (Doc. 319-1 at 5, Pl. Aff. ¶ 15.)  Plaintiff's request was denied.  (*Id.*)

On March 25, 2020, Defendant Riley did not see Plaintiff but noted in the medical record that he complained of GERD, he does not qualify for a wedge, and Sucralfate (Carafate) tablets were ordered.  (Doc. 295-1 at 7, 11; Doc. 238 ¶ 2; Doc. 258 ¶ 2.)

On April 5, 2020, Plaintiff submitted an HNR directed to Defendant Hodge regarding "treatment of GERD and Hiatal Hernia."  (Doc. 238-3 at 2.)  Plaintiff wrote that on March 24, 2020, he and Defendant Hodge spoke about the long-term use of PPIs

1   for symptoms of GERD and the correlation with osteopenia.  (*Id.*)  Plaintiff wrote that, on

2   March 25, 2020, he received Sucralfate, but it was ineffective, so he may require PPIs.

3   (*Id.*)  He reported daily symptoms of GERD that included esophagus pain and heartburn

4   at night.  (*Id.*)  The HNR response from Defendant Hodge informed Plaintiff that he

5   could have PPIs if he wanted.  (*Id.*)

6        On April 8, 2020, Plaintiff submitted an HNR stating that he was given

7   Omeprazole for GERD; however, his treating gastroenterologist, Dr. Verma, had

8   informed Plaintiff he should never take Omeprazole again.  (Doc. 238-4 at 2.) Dr. Verma

9   had made a list of medications that Plaintiff should take and made clear that Plaintiff

10  should not take medication not on the list.  (*Id.*)  Plaintiff requested to speak to Dr.

11  Salazar to review his medical records and to have a consult with Dr. Verma.  (*Id.*)

12  Plaintiff's requests were denied, and the HNR response stated that Plaintiff was seen on

13  the Nurse Line.  (*Id.*; Doc. 238 ¶ 4; Doc. 257 ¶ 4.)

14       On April 10, 2020, Plaintiff saw Defendants Riley and Hodge to discuss Plaintiff's

15  medications.  (Doc. 299-1 at 52–54.)  Plaintiff reported that he was not taking his Prilosec

16  and Sucralfate because the Sucralfate was not working, and his GI provider told him in

17  2015 not to take anything other than Protonix.  (*Id.* at 52.)  Plaintiff's medical records

18  documented that the only medications he should take are Protonix 40 mg, Paroxetine 30

19  mg, or Zantac 300.  (*Id.* at 54.)  Defendant Hodge documented that Plaintiff agreed to a

20  plan of care to include labs for vitamin D, Sucralfate, and an alternative for Protonix.  (*Id.*

21  at 54.)

22       On June 3, 2020, Plaintiff saw gastroenterologist Dr. Khan.  (Doc. 238-5 at 2.)  Dr.

23  Khan completed a medical, surgical, family, and social history, and he conducted a

24  physical exam.  (*Id.*)  Dr. Khan diagnosed heartburn, GERD without esophagitis,

25  diaphragmatic hernia without obstruction or gangrene, and family history of malignant

26  neoplasm of digestive organs.  (*Id.*)  Dr. Khan documented that an upper GI endoscopy

27  (EGD) examination would be scheduled, recommended a high fiber diet with fiber

28  supplement, and advised continuing with Protonix 40 MG.  (*Id.*)  Dr. Khan wrote that,

based on the EGD findings, further recommendations would be made, and that Plaintiff would need a colonoscopy later.  (*Id.*)  Plaintiff avers that Dr. Khan advised him that fundoplication surgery could eliminate the hiatal hernia and the need for antacid.  (Doc. 47 at 13, Pl. Decl. ¶ 4.)

On June 10, 2020, Defendant Riley reviewed Dr. Khan's medical record and noted in the prison medical record that Plaintiff was diagnosed with GERD and wrote "1. EGD – previously ordered[;] 2. High fiber diet – not offered in prison[;] 3. Fiber supplement – prescribed[;] 4. Continue Protonix 40 mg daily."  (Doc. 299-1 at 75.)

On June 18, 2020, Plaintiff saw Defendant Hines.  (Doc. 282-12 at 6.)  Defendant Hines noted that Plaintiff was taking a PPI, he would be scheduled for an EGD, and he had an appointment with general surgery for gallstones.  (*Id.* at 6, 9.)

On July 18, 2020, Plaintiff underwent an EGD with Dr. Khan.  (Doc. 238-6 at 2.)  The EGD findings showed a medium-sized hiatal hernia present and an inlet patch in the upper esophagus.  (*Id.* at 2, 4.)  Based on the findings, Dr. Khan recommended that Plaintiff resume his previous diet; refrain from laying down for 3–4 hours after meals; avoid citrus juices, acidic foods, alcohol, fatty and fried foods, chocolate, mints, and caffeinated beverages; raise the head of the bed 4–6 inches; follow an anti-reflux regimen indefinitely; continue present medication, add Famotidine 40 mg at night if GERD symptoms continue; and avoid tobacco.  (*Id.*)  Dr. Khan also advised that Plaintiff would need a colonoscopy and a follow-up appointment in three months.  (*Id.*)

On July 24, 2020, Plaintiff had an encounter with Defendant Hines.  (Doc. 282-12 at 42.)  Dr. Hines documented that for his GERD, Plaintiff wanted a bed wedge.  (*Id.*)  Although Defendant Hines wrote in the record that Plaintiff was given a bed wedge, Plaintiff did not receive a bed wedge at this encounter.  (Doc. 316-1 at 3, Pl. Aff. ¶ 9.)  In that part of the record documenting "Other Actions/Procedures/Referrals," it shows that, on July 24, 2020, a bed wedge was ordered; however, on July 31, 2021, the wedge was discontinued, and there was a comment stating that, "IM was told by GI to elevate head 30 degrees for GERD.  He does not need a bed wedge to do this."  (Doc. 282-12 at 44.)

- 19 -

On July 30, 2020, the medical record documents that an extra pillow was ordered for Plaintiff, with a comment stating, "Please give IM 2 extra pillows.  He has been instructed by GI to elevate his head while sleeping secondary to GERD."  (Doc. 238-7 at 3?)  Plaintiff did not receive the extra pillows.  (Doc. 316-1 at 4, Pl. Aff. ¶ 13.)

On August 4, 2020, Plaintiff submitted an Inmate Informal Complaint stating that he was denied a bed wedge contrary to his treating gastroenterologist's recommendation and his prison provider's request.  (Doc. 238-8 at 2.)  The Informal Complaint Response informed Plaintiff that, despite the recommendation he keep his head up 30 degrees, "a recommendation is taken into consideration by your provider, but [the provider] does not have to comply to their recommendations.  At this time, you have been given medication to help with your gastric reflux, and you do not qualify for a bed wedge."  (*Id.* at 8.)

On August 8, 2020, Plaintiff submitted an HNR regarding painful indigestion, heartburn, and regurgitation.  (*Id.* at 3.)  He wrote that Dr. Khan had recommended that Plaintiff elevate his head at night and start medications for his symptoms but, after a month, these treatments had not been implemented.  (*Id.*)  Plaintiff reported that he continued to suffer needless pain and injury.  (*Id.*)  The HNR response, from Defendant Johnson, informed Plaintiff that "only recommendation from Khan on 7/18 was to add Famotidine 40 mg at night <u>if</u> symptoms are persisting[;] medication ordered."  (*Id.*)

On August 19, 2020, Plaintiff submitted an HNR stating that he was unable to attend physical therapy that day due to upset stomach and severe and very painful indigestion that started the night prior and was still present that morning.  (*Id.* at 4.)  The HNR response, from Defendant Graybill, informed Plaintiff that he was scheduled for follow up with a provider.  (*Id.*)

On August 20, 2020, Plaintiff submitted another HNR stating that he was recently prescribed Famotidine; however, in 2010 Famotidine caused him to become so dizzy he could not stand and caused extreme sensitivity to light, and he was told to never take Famotidine again.  (*Id.* at 5.)  The HNR response, from Defendant Graybill, informed Plaintiff that he was referred to the provider line.  (*Id.*)

1    On August 24, 2020, Plaintiff submitted an Inmate Letter to Vanessa Headstream

2    at the Central Office Health Services Contract Monitoring Bureau.  (*Id.* at 6.)  Plaintiff

3    wrote that his gastroenterologist diagnosed a moderate hiatal hernia and recommended

4    that he elevate his head while at rest, and, although Defendant Hines ordered the wedge,

5    she told Plaintiff that he may not get it due to ADCRR policy.  (*Id.*)  Plaintiff explained

6    that he did not receive the wedge, and his offer to pay for the wedge himself was rejected.

7    (*Id.*)  Headstream's Inmate Letter Response informed Plaintiff that that, according to the

8    Health Services Technical Manual, a bed wedge must be approved by the Regional

9    Medical Director.  (*Id.* at 9.)

10    On August 27, 2020, Plaintiff submitted an Inmate Grievance regarding the denial

11    of a bed wedge or other means to comply with the gastroenterologist's recommendations.

12    (*Id.* at 7.)  Plaintiff wrote that the failure to follow Dr. Khan's recommendations had

13    caused him to suffer unnecessary pain and complications.  (*Id.*)  The Inmate Grievance

14    Response informed Plaintiff that he did not meet the criteria for a bed wedge.  (*Id.* at 10.)

15    Sometime in late September 2020, Plaintiff was mistakenly given a bed wedge by

16    a nurse, even though he did not have an active SNO for a bed wedge.  (Doc. 238 ¶ 20;

17    Doc. 257 ¶ 20 (in part).)

18    On October 14, 2020, Corene Kendrick, an attorney with the Prison Law Office,

19    which represented the plaintiffs in *Parsons v. Ryan*, CV 12-00601-ROS, wrote a letter to

20    ADCRR counsel regarding Plaintiff's need for medical care.  (Doc. 238-9 at 2.)

21    Kendrick wrote that Plaintiff had not received the colonoscopy that was recommended by

22    the treating gastroenterologist on July 18, 2020, and that medical records showed

23    Defendant Hines placed a routine request for a follow-up consult on October 1, 2020,

24    and, to date, no appointment has been scheduled.  Kendrick requested that the request for

25    a follow-up appointment be treated as urgent and scheduled and that Plaintiff be

26    scheduled for a colonoscopy.  (*Id.* at 3.)

27    On November 11, 2020, Dr. Khan conducted a medical, surgical, family, and

28    social history, and performed a physical exam.  (Doc. 238-11 at 2.)  Dr. Khan diagnosed

heartburn, GERD without esophagitis, diaphragmatic hernia without obstruction or gangrene, and family history of malignant neoplasm of digestive organs.  (*Id.*)  Dr. Khan noted that Plaintiff's GERD symptoms were not well controlled on medication.  (*Id.* at 3.) Dr. Khan recommended to continue with a high fiber diet with fiber supplement, continue current medication Protonix 40 mg, and start Tagamet (brand name for cimetidine) 200 mg at night.  (*Id.*)  On the Practitioner Consultation Report form completed by Dr. Khan and sent back to the prison with Plaintiff, Dr. Khan wrote that follow up was needed, continue same medication, start Tagamet, consider surgery consult for hiatal hernia, and schedule colonoscopy.  (*Id.* at 4.)

On November 16, 2020, Defendant Hines submitted a consultation request for an off-site general surgery consultation based on Plaintiff's medium-sized hiatal hernia and potential side-effects of taking PPIs long term.  (*Id.* at 3.)  The consult request was referred to the "UM [Utilization Management] Team" for review.  (*Id.* at 4.)

On December 1, 2020, an alternative treatment plan (ATP) was recommended in lieu of an off-site general surgery consultation because "clinical need not established" for surgery.  (*Id.* at 4, 7.)  The recommended ATP was to discuss PPI side effects with Plaintiff.  (*Id.* at 7.)

Meanwhile, on November 30 and December 10, 2020, Plaintiff submitted HNRs stating that, since he started taking cimetidine (Tagamet), he suffered bouts of dizziness and nausea, and he asked that the cimetidine be discontinued.  (Doc. 238-17 at 2–3.)

On December 10, 2020, Plaintiff saw Physician Assistant (PA) Nick Salyer, who discussed the ATP and treatment options with Plaintiff.  (Doc. 238-12 at 9–10.)  That same day, PA Salyer submitted a second consultation request for an off-site general surgery consult based on the gastroenterologist's recommendation.  (*Id.* at 10.)  NP Salyer noted the specialist's opinion that repair of the hiatal hernia would outweigh the long-term side effects of taking PPIs and osteoporosis from long-term PPI use, and that repair would decrease risk of Barrett's esophagitis and GI cancers.  (*Id.*)  NP Salyer documented that Plaintiff has been taking PPIs for over 5–7 years, and Plaintiff reports

that Tagamet makes him dizzy and nauseous.  (*Id.*)  NP Salyer also wrote that "current literature does suggest that prolonged use of PPIs have a link w/osteopenia, osteoporosis, and increased risk of FXs [fractures]."  (*Id.* at 13.)

On December 27, 2020, the consult request for a general surgery consult was approved.  (*Id.* at 15.)

On January 14, 2021, Plaintiff had a surgical consultation with general surgeon Dr. Wiseman.  (Doc. 47 at 16.)  In the medical note, Dr. Wiseman documented that Plaintiff had a hiatal hernia and chronic GERD, and he was being evaluated for hiatal hernia repair and anti-reflux procedure.  (*Id.*)  After taking a history and performing an examination, Dr. Wiseman assessed long-standing GERD, hiatal hernia, and significant reflux symptoms despite PPI therapy.  (*Id.* at 17.)  Dr. Wiseman wrote that the plan was for an upper GI with barium esophagram and "plan for hiatal hernia repair with fundoplication, degree of fundoplication based on results of the esophagram."  (*Id.*)

On January 21, 2021, Defendant Elliott noted in the medical record that she reviewed the general surgery consult and that the plan was to continue PPI regimen, recommend barium esophagram, and return to the clinic in 2–3 weeks once esophagram is done to review the results.  (Doc. 57-5 at 170.)

On February 1, 2021, Plaintiff submitted an HNR asking whether the esophageal testing recommended by Dr. Wiseman had been ordered.  (Doc. 57-6 at 72.)  Plaintiff was informed that the provider submitted a request for the testing.  (*Id.* at 73.)

On March 5, 2021, Plaintiff had the esophagram procedure.  (*Id.* at 18.)  The medical record noted "1. Gastroesophageal reflux to the level of the upper thoracic esophagus, 2. Small hiatal hernia, 3. No stricture."  (*Id.*)

On March 16, 2021, Plaintiff saw general surgeon Dr. Wiseman, who noted that Plaintiff suffered GERD epigastric acid-reflux symptoms unrelentingly and that he had tried multiple medications without relief.  (Doc. 47 at 20.)  Dr. Wiseman took a medical, social, and family history and performed a physical exam.  (*Id.* at 20–21.)  Dr. Wiseman wrote that laparoscopic Nissen fundoplication surgery would be scheduled.  (*Id.*)

On the one-page Centurion form that is filled out by an offsite provider and returned with the escorting correctional officer, Dr. Wiseman wrote that Plaintiff had severe GERD with recurrent aspiration pneumonias, that he recommends robotic Nissen fundoplication, and that a follow-up appointment was needed and "date of surgery to follow up." (Doc. 57-3 at 8.)

On March 18, 2021, Defendant Elliott submitted a Consultation Request for general surgery pursuant to Dr. Wiseman's recommendation. (Doc. 109 at 13; Doc. 238-16 at 2.) On the consult request form, Defendant Elliott wrote that Dr Wiseman recommended fundoplication surgery due to severe GERD with recurrent aspiration pneumonias; however, she added, "spoke to Dr. Wiseman to advise him that [Plaintiff] has not had aspiration pneumonias and [Dr. Wiseman] indicated that this was self reported and that the driving force for the procedure was [Plaintiff's] severe reflux" as shown on the barium swallow test. (Doc. 109 at 13; Doc. 238-16 at 2.)

On April 6, 2021, Defendant Elliott made a medical note that the consult request for surgery was cancelled, and she documented that, per the Regional Medical Director and UM physician, surgery was not indicated because Plaintiff did not have recurrent aspiration pneumonias and he was receiving medication for GERD. (Doc. 238-16 at 8.)

On April 22, 2021, Defendant Elliott increased Plaintiff's Protonix dosage and added Tagamet (cimetidine), even though Plaintiff had previously complained via HNRs that cimetidine caused dizziness and nausea. (Doc. 57-5 at 23, 25; 57-4 at 60–61; Doc. 238-17 at 2–3.)

On May 15, 2021, Plaintiff submitted an HNR to inquire into the status of the recommended hiatal hernia repair surgery. (Doc. 238-17 at 4.) The next day, Plaintiff was informed that the surgery was denied. (*Id.*)

On May 17, 2021, Plaintiff submitted an Inmate Informal Complaint stating that Centurion and its employees denied him specialist-recommended hiatal hernia repair surgery and then refused to notify him of the denial. (*Id.*) Plaintiff requested that the recommended surgery be provided. (*Id.*)

On May 27, 2021, Plaintiff submitted an HNR stating that Dr. Khan, the gastroenterologist, recommended Plaintiff take Protonix 20 mg twice daily; however, Defendant Elliott changed the dosage to 40 mg once a day.  (Doc. 238-17 at 5.)  Plaintiff reported that he now suffered continuous and painful heartburn and indigestion after breakfast, and his symptoms prevented him from eating lunch.  (*Id.*)  Plaintiff requested that Dr. Khan's recommendation be followed or that he be scheduled for a follow-up appointment with Dr. Khan.  (*Id.*)

On June 6, 2021, Centurion's Director of Nursing responded to Plaintiff's May 17, 2021 Inmate Informal Complaint and informed him that the surgery was not approved because he did not have recurrent aspiration pneumonias and he received medication for GERD.  (*Id.* at 6.)

Upon receipt of this Response, Plaintiff proceeded to the next step in the grievance process by filing an Inmate Grievance on June 10, 2021.  (*Id.* at 7.)  He complained that he was denied surgery recommended by his treating specialist and that he suffered from painful GERD symptoms that affect his quality of life.  (*Id.*)

On June 11, 2021, Plaintiff submitted an HNR repeating his complaint that his Protonix prescription was changed from twice daily to once a day, and he was suffering painful heartburn all day.  (*Id.* at 8.)

On July 6, 2021, Plaintiff filed an Inmate Grievance Appeal regarding the denial of specialist-recommended surgery and his daily, painful heartburn.  (*Id.* at 9.)

On July 29, 2021, Plaintiff submitted an HNR requesting a refill of Bismuth chew tablets, renewal of the SNO for a bed wedge, and he complained that it felt like his stomach was not emptying after meals and he suffered heartburn throughout the night.  (Doc. 238 ¶ 45; Doc. 257 ¶ 45.)  He requested to see a provider.  (*Id.*)  The July 31, 2021 HNR Response informed Plaintiff that the chew tablets were refilled and the SNO request was under review.  (*Id.*)

On August 2, 2021, an SNO for a bed wedge was approved, and Plaintiff was given a waiver for the wedge.  (Doc. 238 ¶ 46; Doc. 257 ¶ 46; Doc. 238-18 at 2.)

On August 6, 2021, Defendant Ferguson issued a Formal Grievance Response, which appears to be the response to Plaintiff's July 6, 2021 Inmate Grievance Appeal. (Doc. 238-17 at 11.)   Defendant Ferguson's Response stated that Plaintiff's complaint was that he did not receive a response to his Formal Grievance and that the "Decision" was "your formal grievance was responded to the week of 7/6/2021.  Please refer to that response under the same case number."  (*Id.*)

On August 31, 2021, Plaintiff's bed wedge SNO was discontinued.  (Doc. 238 ¶ 47; Doc. 238-7 at 2.)   The medical note indicated that Plaintiff was given 2 extra pillows.  (Doc. 238-7 at 2; Doc. 238-18 at 5.)  Plaintiff asserts that he never received 2 extra pillows.  (Doc. 238-18 at 6.)

On September 1, 2021, Plaintiff submitted an Inmate Letter to Headstream complaining that his bed wedge was discontinued; Plaintiff wrote that, according to Centurion, the termination of a wedge was due to ADCRR policy.  (Doc. 238-18 at 6.)

Also on September 1, 2021, Plaintiff was issued an SNO for a bed wedge.  (Doc. 238-7 at 2.)

On September 25, 2021, Plaintiff submitted an HNR requesting a copy of the renewed SNO for a bed wedge, as he had not received a copy of it.  (*Id.* at 8.)

On November 10, 2021, Plaintiff filed a Motion for Preliminary Injunction seeking fundoplication surgery.  (Doc. 47.)

On December 21, 2021, Plaintiff saw NP Natalie Bell via telemedicine.  (Doc. 238-19 at 2.)   Plaintiff requested medication for GERD, and he reported multiple instances of aspirational pneumonia, but NP Bell noted that aspirational pneumonia was not documented in the notes.  (*Id.*)

On December 28, 2021, Plaintiff saw NP Redwine; Plaintiff reported concern over his chronic GERD symptoms.  (*Id.* at 6.)  NP Redwine noted that she would submit a request for a follow up with Dr. Khan.  (*Id.* at 9.)

On February 14, 2022, Plaintiff submitted an HNR inquiring about the status of the follow up with Dr. Khan.  (Doc. 147-1 at 11.)  The March 1, 2022 HNR Response

1    informed Plaintiff that he was scheduled for an appointment and "sent to NP for review."

2    (*Id.*)

3            On March 4, 2022, Plaintiff saw Dr. Khan.  (Doc. 238-19 at 10.)  Dr. Khan

4    completed a medical, surgical, family, and social history, and he performed a physical

5    exam.  (*Id.*)  Dr. Khan assessed heartburn, GERD without esophagitis, diaphragmatic

6    hernia without obstruction or gangrene, family history of malignant neoplasm of

7    digestive organs, and abnormal findings on diagnostic imaging of part of digestive tract.

8    (*Id.* at 11.)  Dr. Khan noted that Plaintiff's GERD symptoms were not well controlled on

9    medication and that the esophagogram revealed significant reflux.  (*Id.*)  Dr. Khan wrote

10   that Plaintiff "will need surgery for his significant GERD symptoms and hiatal hernia

11   despite taking medications for [a] long time.  He needs to refer back to surgeon for repair

12   of his hiatal hernia and Nissen fundoplication."  (*Id.*)  On the one-page "Offsite

13   Consultation Note" ADCRR form filled out by Dr. Khan, he wrote that the recommended

14   follow-up services included a follow up with the surgeon for Nissen fundoplication.

15   (Doc. 147-1 at 5.)

16           On March 11, 2022, Defendant Waszkiewicz submitted a consult request for a

17   surgery consult for possible Nissen fundoplication.  (*Id.* at 15.)  On March 18, 2022, an

18   ATP was recommended in lieu of a surgical consult.  (*Id.* at 16.)  The determination to

19   deny the surgical consult request was made by Defendant Young.  (Doc. 238 ¶ 62; Doc.

20   257 ¶ 62; Doc. 147-1 at 14.)  Defendant Young did not see or examine Plaintiff at the

21   time.  (Doc. 238 ¶ 63; Doc. 257 ¶ 63.)  The recommended ATP was to educate Plaintiff

22   on GERD and to avoid certain foods.  (Doc. 147-1 at 14.)  On March 21, 2022, Defendant

23   Waszkiewicz accepted the ATP.  (*Id.* at 16.)

24           Meanwhile, on March 17, 2022, Plaintiff submitted an HNR stating that he had

25   suffered severe heartburn the last seven days and that the heartburn started as soon as he

26   ate and lasted until the early morning hours.  (*Id.* at 17; Doc. 286-1 at 2.)  Defendant

27   Hinkley's HNR response informed Plaintiff to follow his plan of care.  (*Id.*)

28           On March 21, 2022, Plaintiff had an encounter with Defendant Waszkiewicz, who

informed Plaintiff that the surgery was too dangerous, and he would not have the surgery; instead, he would have an ATP in the form of a change in diet.  (Doc. 153, Pl. Decl. ¶¶ 10–11.)  Thereafter, Plaintiff did not receive a change in diet.  (*Id.*)

On March 24, 2022, Defendant Hodge made a chart note stating that Plaintiff requested to see a provider about acid reflux and his CT scan results.  (Doc. 257-5 at 2, 5.)  Defendant Hodge wrote that Plaintiff was presented with the CT results, and she informed him that scheduled consult appointments were postponed due to COVID-19.  (*Id.* at 5.)

In May 2022, Plaintiff was taking Celebrex, which Defendant Young explained was "an NSAID and prescribed to address his pain complaints, but it can exacerbate GERD symptoms.  We will do a trial of another medication not in that category."  (Doc. 147-1 at 2, Young Decl. ¶ 8.)

From May 25 to June 6, 2022, Plaintiff's prescription of Celebrex was not discontinued, nor was Plaintiff told that Celebrex could exacerbate his GERD symptoms.  (Doc. 238 ¶ 71.)  But Plaintiff returned the medication on May 28, 29, and 30 and on June 1 through 5, 2022.  (Doc. 257 ¶ 71.)

On June 6, 2022, Plaintiff had an encounter with NP Hanson, who discontinued Plaintiff's prescription for Celebrex.  (Doc. 238 ¶ 73.)

On June 17, 2022, the Court granted Plaintiff's Motion for Preliminary Injunction and ordered Defendant Centurion to immediately schedule Plaintiff to see a surgeon for a consultation regarding his GERD symptoms.  (Doc. 157.)

On June 30, 2022, Plaintiff saw Dr. Neal, who recommended that Plaintiff proceed with the Nissen fundoplication surgery recommended by Drs. Khan and Wiseman.  (Doc. 238 ¶ 75; Doc. 257 ¶ 75.)

On August 10, 2022, Plaintiff underwent Nissen fundoplication surgery.  (Doc. 238 ¶ 76; Doc. 257 ¶ 76 (in part).)

. . . .

. . . .

1    **IV.    Counts One and Three—-Eighth Amendment Medical Care Claims**

2         **A.    Governing Standard**

3         To support a medical care claim under the Eighth Amendment, a prisoner must

4    demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d

5    1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are

6    two prongs to the deliberate-indifference analysis: an objective standard and a subjective

7    standard.  First, a prisoner must show a "serious medical need." *Id.* (citations omitted).

8    A "'serious' medical need exists if the failure to treat a prisoner's condition could result

9    in further significant injury or the 'unnecessary and wanton infliction of pain.'"

10   *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds*

11   *by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal

12   citation omitted).  Examples of indications that a prisoner has a serious medical need

13   include "[t]he existence of an injury that a reasonable doctor or patient would find

14   important and worthy of comment or treatment; the presence of a medical condition that

15   significantly affects an individual's daily activities; or the existence of chronic and

16   substantial pain." *Id.* at 1059–60.

17        Second, a prisoner must show that the defendant's response to that need was

18   deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately

19   indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally

20   interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.

21   1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).

22   Deliberate indifference may also be shown where prison officials fail to respond to a

23   prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether

24   there has been deliberate indifference to an inmate's serious medical needs, [courts] need

25   not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763

26   F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th

27   Cir. 1989)).

28        Even if deliberate indifference is shown, to support an Eighth Amendment claim,

the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### B.    Discussion

#### 1.    Serious Medical Need

Plaintiff was diagnosed with chronic right foot pain and a right hind-foot deformity, and he suffered "significant" pain in his right foot and leg.  (Doc. 282-3 at 24; Doc. 282-7 at 6; Doc. 282-12 at 26; *see* Doc. 316-1 at 8, Pl. Aff. ¶ 33, 37.)  The evidence shows that Plaintiff received treatment, a walker, a wheelchair, specialist consultations, and surgery for his foot and leg conditions.  This is sufficient to show that Plaintiff's foot and leg conditions constituted a serious medical need, thereby satisfying the objective prong.  *See McGuckin*, 974 F.3d at 1059–60; *Salazar v. Kokor*, No. 1:14-cv—211-AWI-MJS (PC), 2017 WL 5998203, at *5 (E.D. Cal. Dec. 4, 2017) (allegations that the plaintiff had post-polio pain syndrome, left foot deformity, and chronic low back pain was sufficient to support a serious medical need); *Lalvender v. Lampert*, 242 F. Supp. 2d 821, 842 (D. Or. 2002) (finding no dispute that the plaintiff had a serious medical need where he had a spinal cord injury that resulted in an inverted right foot, a clawing deformity of the right toes, and chronic pain).

The Court previously determined that, based on evidence showing that Plaintiff was treated with medication, medical procedures, and specialist treatment, and that he suffered painful heartburn, painful indigestion, and unrelenting acid-reflux symptoms, Plaintiff's GERD condition constituted a serious medical need.  (Doc. 145 at 12–13.)  *See McGuckin*, 974 F.2d at 1059–60; *von Koenigsberg-Tyrvaldssen v. Kohut*, No. CV 15-00025-H-DLC-JTJ, 2017 WL 1277457, at *6 (D. Mont. Jan. 20, 2017) (the plaintiff's serious medical needs included GERD); *Bell v. Jendell*, 980 F. Supp. 2d 555, 560 (S.D. N.Y. 2013) (the plaintiff's allegations that he suffered acid-reflux symptoms such as vomiting satisfied the Eighth Amendment's objective prong).  There is nothing in the summary judgment record to alter the Court's prior determination; thus, Plaintiff satisfies

the objective prong with respect to his GERD condition.

### 2.    Deliberate Indifference

The Court therefore moves to the subjective prong—whether the response to Plaintiff's serious medical need amounted to deliberate indifference. *See Jett*, 439 F.3d at 1096. In assessing liability for deliberate indifference, the Court must take an individualized approach and consider the duties and discretion of each defendant, and whether a defendant "was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference . . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference." *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988).

#### a.    NP Alonso

The parties cross-move for summary judgment as to the claim against Defendant Alonso. (Docs. 281, 283.) Plaintiff argues that Defendant Alonso was aware that Plaintiff was suffering from pain, had the authority to address his pain, but failed to take any action to relieve his pain, thereby exhibiting deliberate indifference. (Doc. 281 at 17, 19, 20–21.) Defendant Alonso argues that she exercised the appropriate level of care based on Plaintiff's condition and medical necessity and that Plaintiff's position is merely a difference of opinion with the medical provider, which does not establish deliberate indifference. (Doc. 283 at 6–7.)

The first question is whether Defendant Alonso was aware of Plaintiff's serious medical need. *See Jett*, 496 F.3d at 1096. Defendant Alonso saw Plaintiff on April 30, 2020, at which time Plaintiff complained that he had chronic pain in his right foot, that the pain increased to shooting pain with movement, and that walking with a walker was very painful. (Doc. 282-7 at 5; Doc. 282-11 at 3, Pl. Aff. ¶ 9.) Defendant Alonso documented Plaintiff's reports of pain and assessed chronic right foot pain and "R[ight] hindfoot varus, pain, lateral column overload." (Doc. 282-7 at 6.) Further, Plaintiff's medical record, to which Defendant Alonso had access, showed that Plaintiff had previously been prescribed Naproxen, but that prescription expired in February 2020 and

had not been renewed.  (Doc. 282-2 at 15.)  Also, in March 2020, Plaintiff had submitted an HNR stating that he was in severe pain.  (Doc. 282-3 at 26.)  As to Defendant Alonso's Motion for Summary Judgment, the Court infers that she was aware of Plaintiff's HNR.  *See Jett*, 439 F.3d at 1097 (finding that as the party opposing summary judgment, the plaintiff was entitled to an inference that the defendant prison doctor was aware of the medical slips the plaintiff submitted asking to be sent to a specialist for treatment for a fractured thumb).  Finally, Defendant Alonso does not dispute that she was aware of Plaintiff's pain at this encounter.  (*See* Doc. 282-7 at 5; Doc. 284-1 at 7, Alonso Decl. ¶ 6.)   This evidence supports that Defendant Alonso was aware of Plaintiff's serious medical need and his pain.  Thus, the analysis turns on how NP Alonso responded to Plaintiff's pain.

In the medical record, Defendant Alonso documented that she advised Plaintiff there would be no pain medication at this time, that a follow up with Dr. Latt was scheduled, and that Plaintiff needed to use the right leg extension on the wheelchair to avoid further injury.  (Doc. 282-7 at 7.)  The evidence shows that Defendant Alonso had the authority to prescribe pain medication and the authority to schedule Plaintiff with an outside provider or specialist, but she did neither.  (Doc. 282-7 at 14–15, Alonso Resp. to Req. for Admissions Nos. 1, 3.)  In the contemporaneously-made medical record for the April 30, 2020 encounter, Defendant Alonso did not document the reason she refused to prescribe any pain medication or schedule Plaintiff to see a specialist for his pain.  (*See* Doc. 282-7 at 5.)   In her declaration, signed three years after the relevant events, Defendant Alonso averred that she did not prescribe pain medication because she was not Plaintiff's primary provider and was not aware of any recommendation for prescription pain medications, nor did she think it was medically necessary to prescribe pain medication at the time.  (Doc. 284-1 at 7, Alonso Decl. ¶ 7.)  Even though Defendant Alonso claims that she did not prescribe pain medication because she was not Plaintiff's primary provider or aware of a recommendation for pain medication, the record shows that she did not schedule Plaintiff to see his primary provider, nor did she make any effort

1   to contact his primary provider regarding possible treatment for his pain.

2         The record shows that Plaintiff saw specialist Dr. Feldman on May 28, 2020, when

3   Plaintiff underwent the left knee arthroscopy.   (Doc. 316-2 at 2.)   Thus, Plaintiff

4   continued to suffer pain for another month after his encounter with Defendant Alonso.

5         Nonetheless, this was Defendant Alonso's single encounter with Plaintiff.  For an

6   isolated incident to rise to deliberate indifference, it must be egregious in nature.  *See*

7   *McGuckin*, 974 F.2d at 1060–61 (repeated failure to properly treat a prisoner or a single

8   failure that is egregious strongly suggests deliberate indifference); *Wood*, 900 F.2d at

9   1334 ("[i]n determining deliberate indifference, we . . . look for substantial indifference

10  in the individual case, indicating more than mere negligence or isolated occurrences of

11  neglect").  To be sure, pain is serious, especially chronic and severe pain, and Defendant

12  Alonso's conduct supports that she acted unprofessionally and with negligence.  But that

13  is not enough to show deliberate indifference.  *See Wood*, 900 F.2d at 1334 ("mere

14  malpractice, or even gross negligence" does not amount to deliberate indifference).

15  Defendant Alonso's failure to take action in response to a non-life-threatening condition

16  at one encounter does not rise to a violation of the Eighth Amendment.

17        Accordingly, Plaintiff's Motion for Partial Summary Judgment will be denied as

18  to the Eighth Amendment medical care claim in Count One against Defendant Alonso,

19  and Defendant Alonso's Motion for Summary Judgment will be granted.

20               **b.**   **Nurse Hinkley**

21        Defendant Hinkley moves for summary judgment as to the claim against her.

22  (Doc. 285.)  Defendant Hinkley argues that her only involvement in Plaintiff's care was

23  drafting a response to a single HNR filed by Plaintiff, and she contends that she properly

24  responded and was not deliberately indifferent to Plaintiff's legitimate healthcare needs.

25  (Doc. 285 at 6–7.)  Plaintiff argues that Defendant Hinkley was deliberately indifferent to

26  Plaintiff's medical needs when she failed to schedule Plaintiff to be seen by medical staff

27  after he submitted an HNR about new symptoms of ongoing severe heartburn.  (Doc. 321

28  at 5.)

1

Plaintiff's HNR, filed on March 18, 2022, stated:

2

3

4

5

*EXPEDITED CONSIDERATION REQUESTED*   I have had severe heart burn for the last 7 days.  The heart burn starts as soon as I put food in my stomach, and lasts until the early morning hours.  I am request[ing] a blood test for infection – H. Pylorie (not sure of spelling).  If ordered the test can be completed/drawn on Mon. the 21st.  Thank you.

6

(Doc. 286-1 at 2.)  Defendant Hinkley's response, dated March 18, 2022 at 12:12 p.m.

7

stated:

8

9

Please follow your plan of care.  You have been diagnosed with GERD since 2015, and you receive medication per provider's orders.  You also have a bed wedge to elevate at night.

10

(*Id.* at 3.)  Defendant Hinkley's response demonstrates that she was aware of Plaintiff's

11

GERD condition, and Plaintiff's HNR notified her of his severe and ongoing heartburn.

12

Thus, Defendant Hinkley was aware of Plaintiff's serious medical need.

13

Notably, a few hours after Defendant Hinkley responded to Plaintiff's March 18,

14

2022 HNR, she also responded to an HNR that Plaintiff filed on March 8, 2022, in which

15

he complained of more frequent pain from a lump by his lower rib cage.  (*Id.* at 5.)  In her

16

response to this HNR, signed at 4:30 p.m. on March 18, 2022, Defendant Hinkley wrote

17

that Plaintiff was scheduled for the nurses line.  (*Id.* at 6.)

18

This evidence shows that, although Defendant Hinkley did not schedule Plaintiff

19

20

to be seen for his heartburn, she scheduled him to be seen for his lower rib cage pain the

same day Plaintiff filed his March 18, 2022 HNR.  Plaintiff's evidence shows that three

21

days later, on March 21, 2022, he saw Defendant Waszkiewicz about his GERD

22

condition.  (Doc. 153, Pl. Decl. ¶¶ 10–11.)

23

On this record, Defendant Hinkley scheduled Plaintiff to be seen for his GERD

24

condition, and he was seen within days.  Even assuming that Defendant Hinkley's HNR

25

26

response, which appeared to discount Plaintiff's pain and suffering from severe

heartburn, was improper, this single incident does not rise to deliberate indifference.  *See*

27

*McGuckin*, 974 F.2d at 1060–61.  For these reasons, there exists no question of fact as to

28

deliberate indifference by Defendant Hinkley, and her Motion for Summary Judgment

1    will be granted.

2                              **c.    Nurse Salgado**

3         The parties cross-move for summary judgment as to the claim against Defendant

4    Salgado.  (Docs. 281, 287.)  Plaintiff argues that Defendant Salgado was aware that

5    Plaintiff was suffering pain, had the ability to refer him to a provider to address his pain,

6    but did not do so and misrepresented to Plaintiff that surgery was scheduled.  (Doc. 281

7    at 19–20.)   Defendant Salgado argues that, as a registered nurse, she did not have

8    authority to prescribe Plaintiff pain medication, that Plaintiff merely disagreed with her

9    decision not to provide him different or additional pain treatment, and that her single

10   encounter with Plaintiff cannot give rise to deliberate indifference.  (Doc. 287 at 6.)

11        Defendant Salgado saw Plaintiff on June 27, 2020, in response to his HNR that

12   complained of untreated and significant pain in his right foot and leg.  (Doc. 282-12 at

13   26, 28.)  Given Plaintiff's explicit complaint of significant pain, and his medical records

14   showing a chronic foot and leg condition, Defendant Salgado was aware of Plaintiff's

15   serious medical need.

16        In response to Plaintiff's medical need, Defendant Salgado did not refer Plaintiff

17   to a provider or document any treatment plan, and she advised Plaintiff that "surgeries are

18   scheduled some time soon," although there is no record that surgery had been scheduled.

19   (*Id.*; *see* Doc. 288.)  It was another month before Plaintiff saw a provider.  (Doc. 282-12

20   at 42.)

21        Defendant Salgado's failure to take any action in response to Plaintiff's medical

22   need, and her misrepresentation of the medical records exhibits unprofessionalism and

23   negligence.  But this was the sole encounter Defendant Salgado had with Plaintiff.  As

24   discussed above, a single failure to properly treat a prisoner that is not egregious does not

25   support a deliberate indifference claim.   *See McGuckin*, 974 F.2d at 1060–61.

26   Accordingly, Plaintiff's request for summary judgment as to the claim against Defendant

27   Salgado will be denied, and Defendant Salgado's Motion for Summary Judgment will be

28   granted.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### d.    NP Waszkiewicz

Defendant Waszkiewicz moves for summary judgment as to the claim against her. (Doc. 289.)   Defendant Waszkiewicz argues that she was consistently and reasonably responsive to Plaintiff's reported GERD and orthopedic issues as evidenced by her renewal of medications and submission of consult requests for specialists.  (*Id.* at 6–7.) Defendant Waszkiewicz notes that she was the provider who initially requested approval for fundoplication surgery.  (*Id.* at 7.)  She concludes that there is no evidence that her course of treatment was medically unacceptable or that Plaintiff suffered any injury that could be attributed to her.  (*Id.* at 8.)  Plaintiff argues that there is a question of fact as to whether Defendant Waszkiewicz was deliberately indifferent when she failed to provide treatment recommended by the treating specialist. (Doc. 321 at 6–7, 10.)

Defendant Waszkiewicz was involved in Plaintiff's medical care as a provider from March to May 2022.  (Doc.  290-1 at 20, Waszkiewicz Decl. ¶¶ 3, 6–8, 10.)  On March 11, 2022, Defendant Waszkiewicz submitted a consult request for Plaintiff to be seen by a gastroenterologist for surgery based on Dr. Khan's recommendation following the March 4, 2022 encounter with Dr. Khan.  (Doc. 147-1 at 11, 15.)  In the March 4, 2022 medical record, Dr. Khan specifically documented that Plaintiff's GERD symptoms were "not well controlled on medication," he had "significant reflux," he was "a good candidate for surgery," and that Plaintiff "will need surgery for his significant GERD symptoms and hiatal hernia despite taking medications for long time.  He needs to refer back to surgeon for repair of his hiatal hernia and Nissen fundoplication." (*Id.*)  Because Defendant Waszkiewicz reviewed the March 4, 2022 medical record from Dr. Khan, Defendant Waszkiewicz was aware of Plaintiff's diagnosis, his serious medical need, and his need for surgery.  (*See* Doc. 238-19 at 10.)

On March 17, 2022, Plaintiff submitted an HNR stating that he had severe heartburn for the prior 7 days and that the heartburn started as soon as food was in his stomach and lasted until the early morning hours.  (*Id.* at 17.)  The Court infers that Defendant Waszkiewicz was aware of Plaintiff's HNR.  *See Jett*, 439 F.3d at 1097.

1    The evidence shows that the March 11, 2022 consult request for Plaintiff to see a

2    gastroenterologist for surgery was denied by Dr. Young, and an ATP was issued for

3    education on GERD, avoidance of certain foods, and a PPI or chewable calcium citrate.

4    (Doc. 147-1 at 14.)   The medical records show that, on March 21, 2022, Defendant

5    Waszkiewicz took action documented in the record as "Alternative Treatment Accepted."

6    (*Id.*)  Defendant Waszkiewicz asserts that she did not "accept" Dr. Young's ATP and that

7    she had no authority to accept or reject the ATP.  (Doc. 290-1 at 20, Waszkiewicz Decl.

8    ¶ 9.)  But Defendant Waszkiewicz does not submit any documentation or policy directive

9    outlining the provider referral and ATP processes or explaining what, if any, options a

10   treating provider may take in response to a denied consult request.  Nor does Defendant

11   Waszkiewicz explain why her action on March 21, 20222 was specifically documented as

12   having "Accepted" the ATP, if, in fact, she did not have authority to deny or accept it.

13   Moreover, evidence in the record shows that, when a surgical consult for

14   Plaintiff's GERD condition was first denied and "ATP-ed" in December 2020, the

15   treating provider did not immediately "Accept" the ATP.  (*See* Doc. 238-12 at 7–9.)  The

16   provider—NP Salyer—saw Plaintiff to discuss the ATP, and, that same day, NP Salyer

17   submitted another surgical consult request with thorough documentation of Plaintiff's

18   unsuccessful treatment and his need for surgery.  (Doc. 238-12 at 9–10, 13.)  This second

19   consult request for general surgery was approved.  (*Id.* at 15.)  The inference from this

20   evidence is that, if a provider disagrees with a consult request denial and ATP, the

21   provider may resubmit a consult request with further information to support the request.

22   In response to the ATP in lieu of surgery for GERD, Defendant Waszkiewicz did

23   not resubmit the surgical consult request, nor did she make any change to Plaintiff's diet

24   as the ATP suggested.  (Doc. 153, Pl. Decl. ¶ 10.)  The evidence shows that, thereafter,

25   the only action Defendant Waszkiewicz took was to renew a prescription for Protonix in

26   April 2022, even though the specialist had specifically documented that Plaintiff's

27   condition was not well controlled with medication.  (Doc. 147-1 at 19.)

28   Failure to follow recommendations of a treating specialist may amount to a course

of treatment that is medially unacceptable.  *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs; *see also Jett*, 439 F.3d at 1097–98 (jury could find deliberate indifference where the prison doctor was aware that the plaintiff needed to see an orthopedist for treatment and the plaintiff was not taken to the orthopedist for 6 months).   Here, a reasonable jury could find that Defendant Waszkiewicz was aware of Plaintiff's serious medical need, aware of his suffering from GERD and severe heartburn that could not be controlled with medication, and aware of the treating specialist's specific recommendation that Plaintiff needed GERD surgery, but that she acted with deliberate indifference when she accepted the denial of surgery and thereafter failed to take any action to address Plaintiff's ongoing suffering.

Summary judgment will be denied as to the claim against Defendant Waszkiewicz, and her Motion for Summary Judgment will be denied.

### e.     FHA Ferguson

The parties cross-move for summary judgment as to the claim against Defendant Ferguson.  (Docs. 281, 291.)  Plaintiff argues Defendant Ferguson was aware of his serious medical needs, supported the decision to deny his Gabapentin, failed to investigate before denying pain management treatment, failed to respond to Plaintiff's Emergency Grievance regarding pain, and lied about discussing a care plan with the Site Medical Director.  (Doc. 281 at 18.)  Plaintiff asserts that in her position as Facility

Health Administrator, Defendant Ferguson was the "safeguard" against unconstitutional care, yet she simply "rubber-stamped" the improper decisions and care by providers. (Doc. 317 at 4-5.)  Defendant Ferguson argues that she did not treat Plaintiff; rather, her only involvement in Plaintiff's care was drafting responses to three of Plaintiff's inmate grievances and, in doing so, she addressed each of Plaintiff's complaints and relied on the providers' medical judgement in responding to the grievances.  (Doc. 291 at 6–7.) Defendant Ferguson contends that her responses did not disregard an excessive risk to Plaintiff's health and did not exhibit deliberate indifference.  (*Id.* at 8.)

The Ninth Circuit has specifically addressed whether responding to a grievance seeking medical help can rise to the level of personal participation required for liability for a § 1983 claim.  In *Snow*, the plaintiff had submitted several grievances about the denial of a recommended hip surgery; there was evidence that the warden and associate warden were aware of the grievances, and that they had reviewed an order stating that the plaintiff needed a hip replacement.  681 F.3d at 989.  The Ninth Circuit rejected the defendants' argument that they could not be liable because they were not personally involved in any medical treatment decisions.  *Id.*  The appellate court held that review of the grievances was sufficient to demonstrate that the warden and associate warden were aware of the plaintiff's serious hip condition and failed to act to prevent further harm; therefore, they were not entitled to summary judgment based on lack of personal participation.  *Id.*

In *Jett*, the plaintiff fractured his thumb and was taken to an emergency room, where the physician gave him a temporary splint and directed him to see a specialist the following week.  439 F.3d at 1094.  Nineteen months passed before the plaintiff finally saw a specialist, despite the fact that he notified medical staff of his pain, filed a formal grievance, and sent letters via institutional mail to the warden and a prison administrator. *Id.* at 1093–95.  The Ninth Circuit held that "[a]s prisoner administrators, [the defendants] are liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help."  *Id.* at 1098.  Thus, there was a triable issue of fact as to

whether the warden and the prison administrator were deliberately indifferent to the plaintiff's serious medical need based on evidence that he sent them letters months before he finally saw a specialist. *Id.*

The Ninth Circuit has since expressly reiterated that "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help.'" *Peralta v. Dillard*, 744 F.3d 1076, 1085–86 (9th Cir. 2014) (quoting *Jett*, 439 F.3d at 1098). Whether an official can be liable for responding to a grievance depends on the specific facts in the case, such as whether the violation is ongoing, or the unconstitutional conduct is completed and whether the defendant responding to the grievance has authority to take action to remedy the alleged violation. *Shaka v. Ryan*, No. CV 10-2253-PHX-SMM (BSB), 2015 WL 926192, at *8 (D. Ariz. Mar. 4, 2015).

On April 13, 2020, Plaintiff filed an "Emergency Grievance" stating that he had already sustained injury and was subject to further significant injury because Nurse Hodge had taken his wheelchair and imposed a new care plan that was contrary to his treating orthopedic surgeon's care plan. (Doc. 282-3 at 28.) Plaintiff described his serious medical needs and explained that the new care plan, which was not based on any new physical examination, caused him extreme pain. (*Id.* at 29.) Plaintiff also wrote that the provider canceled all of Plaintiff's pain medication, Plaintiff did not see a provider for months, and, when he finally did, the provider asked if he was complaining again and simply said "you do what you gotta do." (*Id.*) Plaintiff wrote that he subsequently submitted an HNR stating that he did not understand his plan of care; however, the HNR was return unprocessed. (*Id.*) Plaintiff asked to be given a written description of his plan of care. (*Id.*)

Thereafter, on April 16, 2020, Plaintiff saw Nurse Nunez in response to a March 2020 HNR. (*Id.* at 30.) The medical record documented Plaintiff's report that his foot was crooked, that he had pain in his foot, and that he used a walker and a wheelchair for support. (*Id.*) On April 30, 2020, Plaintiff was seen after submitting an HNR

1   complaining of chronic pain in his right foot.  (Doc. 282-7 at 5.)  At this encounter,

2   Plaintiff reported pain in his right foot and right lower leg that was a dull ache but

3   increased to shooting pain with movement.  (*Id.*)

4          On May 1, 2020, Defendant Ferguson issued her response to Plaintiff's April 13,

5   2020 Emergency Grievance.  (Doc. 282-7 at 17.)  Defendant Ferguson identified two

6   areas of concern: "unknown plan of care regarding wheelchair" and "cancellation of pain

7   medications."  (*Id.*)  With regard to the wheelchair plan of care, Defendant Ferguson

8   informed Plaintiff that, on April 29, 2020, the RN spoke to him and advised that, per the

9   Site Medical Director, Plaintiff was to use both the walker and wheelchair daily.  (*Id.*)

10  As to the cancellation of pain medication, she wrote that, per the provider, Plaintiff's

11  Gabapentin levels were below normal range in December 2019 and that, on January 3,

12  2020, the RN educated Plaintiff on the medication discontinuation and give him a copy of

13  the labs.  (*Id.*)  Defendant Ferguson also wrote that "you declined a discussion with the

14  provider at that time."  (*Id.*)  Defendant Ferguson does not cite to a medical record or

15  other evidence to support that Plaintiff declined a discussion with the provider.  (*See* Doc.

16  293.)  Plaintiff denies that he ever refused a discussion with a provider.  (Doc. 282-7 at

17  26.)

18         On November 30, 2020, Plaintiff filed another Inmate Grievance stating that he

19  had submitted an HNR complaining of ongoing severe pain, he was not seen, he had

20  previously been told he would receive hot packs, and he was then given conflicting

21  reasons for not receiving the hot packs—that he did not qualify, and that Centurion does

22  not provide heating devices.  (Doc. 293-1 at 11.)  Plaintiff requested that, since he

23  received no treatment for pain, that he be allowed to pay for a pain management

24  consultation and any recommended pain treatment.  (*Id.*)  In response to this Grievance,

25  Defendant Ferguson informed Plaintiff that Centurion does not provide hot packs, but

26  stingers were available for purchase through commissary and "would work great for

27  requested hot pack need."  (*Id.* at 12.)

28         Defendant Ferguson stated that when responding to a grievance, she evaluates the

written complaint, reviews the prisoner's medical records, summarizes the current treatment plan, and responds to the grievance. (Doc. 330 at 3.) Thus, Defendant Ferguson does not simply sign off on someone else's review or prepared response; rather, she reviews the grievance and medical records and drafts the grievance response herself. *Cf. Peralta*, 744 F.3d at 1086 (administrator defendant not liable where he simply signed off on an appeal response and did not independently review the plaintiff's chart or investigate the plaintiff's complaint). The evidence supports that, upon receipt of Plaintiff's April 2020 Emergency Grievance and November 2020 Grievance, and having reviewed Plaintiff's HNRs and medical records, Defendant Ferguson was aware of Plaintiff's serious medical need and his ongoing pain.

The record shows that the issue related to Plaintiff's access to a wheelchair was resolved before Defendant Ferguson issued the May 1, 2020 response. (Doc. 282-7 at 17.) But the other alleged violation—failure to provide any pain medication or pain treatment—was ongoing at the time Defendant Ferguson issued her May 1 and November 24, 2020 responses. The Court therefore considers whether Defendant Ferguson had authority to take any action to remedy the alleged violation. *See Leer*, 844 F.2d at 633–34; *Shaka*, 2015 WL 926192, at *8. Defendant Ferguson asserts that she is an administrator who does not render actual medical treatment, and she relies on the assessments and determinations of treating providers. (Doc. 330 at 3–4.) Plaintiff argues that, as FHA, Defendant Ferguson could have, but failed, to address the denial of pain treatment. (Doc. 281 at 20-21; Doc. 317 at 4-5.) Plaintiff submits an excerpt from the ADCRR Medical Services Technical Manual that describes the FHA as the designated "Responsible Health Authority" at the complex "responsible complex-wide for all levels of health care, providing quality accessible health services to all inmates." (Doc. 282-7 at 18–19.) Without any more clarifying evidence from Defendant Ferguson describing her job duties and authority, the ADCRR Manual supports that the FHA is responsible for ensuring that prisoners receive health care.

On this record, there is a question of fact whether Defendant Ferguson had

1    authority as the FHA to take some action in response to Plaintiff's requests for help in

2    dealing with his ongoing severe pain.  *See Peralta*, 744 F.3d at 1085–86.  There is also a

3    question of fact as to whether Defendant Ferguson's failure to take any action in response

4    to Plaintiff's untreated pain amounted to deliberate indifference and caused Plaintiff

5    further suffering.  These material factual disputes preclude summary judgment for both

6    Plaintiff and Defendant Ferguson.

                              **f.    Nurse Hodge**

7

8        Defendant Hodge moves for summary judgment as to the medical care claim

9    against her.  (Doc. 294.)  Plaintiff argues that there are four genuine disputes of material

10   fact that prevent summary judgment in Defendant Hodge's favor.  (Doc. 319 at 2.)

11       First, Plaintiff asserts there is a question of material fact whether Defendant Hodge

12   ordered sucralfate (Carafate) for Plaintiff even though she is not authorized to do so as a

13   nurse.  (*Id.* at 2.)  Plaintiff relies on a March 24, 2020 email that Defendant Hodge sent to

14   Defendant Riley, which states in its entirety, "Talk to me tomorrow about him please.

15   Wedge, Vitamin and electrolyte lab work, Carafate for GERD."  (Doc. 319-2 at 42.)  The

16   medical records indicate that, on March 25, 2020, Defendant Riley—an NP—entered a

17   new order for Carafate; it was not ordered by Defendant Hodge.  (Doc. 295-1 at 7, 11.)

18   Thus, there exists no material factual dispute regarding the order for sucralfate.

19       Next, Plaintiff argues there is a question of material fact whether Plaintiff reported

20   severe pain on March 24, 2020.  (Doc. 319 at 2.)  The Court takes as true Plaintiff's

21   averments that on this date he reported to Defendant Hodge that he suffered severe pain

22   when standing and walking.  (Doc. 319-1 at 4, Pl. Aff. ¶ 14.)  Plaintiff appears to argue

23   that Defendant Hodge exhibited deliberate indifference by failing to document his pain in

24   the March 24, 2020 medical record and by falsely documenting three weeks later, on

25   April 10, 2020, that on March 24, 2020 Plaintiff had asked to be taken off of Protonix and

26   verbally agreed to Defendant Hodge's plan of care, and that, on April 10, 2020, Plaintiff

27   was unwilling to be further assessed.  (*Id.* 17.)

28       Improper comments in a medical record, or falsification of medical records,

standing alone, would not support an independent Eighth Amendment claim. *See Crips v. Wasco State Prison*, No. 1:13-cv-01899-SKO (PC), 2015 WL 3486950, at *5 (E.D. Cal. June 2, 2015). But "falsification or alteration of medical records may supply facts relevant to an Eighth Amendment claim of deliberate indifference to serious medical needs." *Id.* For example, if facts show that false entries in a medical record led to a delay or denial of medical care, those facts support a deliberate indifference claim. *See id.* Here, there is no evidence that Defendant Hodge's documentation in the medical record led to a delay or denial of medical care. Plaintiff's HNRs and numerous other medical records documented Plaintiff's reports of ongoing and severe pain, and the evidence supports that, despite that widespread documentation of pain, Plaintiff was not treated for pain. Thus, a single medical record that failed to document Plaintiff's pain did not alter Plaintiff's course of treatment or lack of treatment. Although Defendant Hodge's documentation may have been dishonest and unprofessional, it does not rise to deliberate indifference in this instance.

Relatedly, Plaintiff also asserts that there is a question of fact as to whether he was noncompliant with his GERD medications as documented by Defendant Hodge in the April 10, 2020 record. (Doc. 217 at 2.) There appears to be no dispute that Plaintiff reported he stopped taking the prescribed Sucralfate because it was not working and stopped taking Prilosec because he had been advised not to take anything other than Protonix. (Doc. 299-1 at 52–54.) Viewing the evidence in Plaintiff's favor, Defendant Hodge's documentation sought to construe Plaintiff's failure to take the medications as noncompliance, despite the valid medical reasons for him to stop taking the medications. Although Defendant Hodge's documentation that Plaintiff was noncompliant was misleading and unprofessional, there is no evidence that this single entry itself led to a delay or denial of medical care.

Finally, Plaintiff argues that there is a question of fact as to whether Defendant Hodge asked an officer to remove Plaintiff's wheelchair by force. (Doc. 217 at 2-3.) Even assuming arguendo that, after the April 10, 2020 encounter, Defendant Hodge

asked Officer Pierce to remove Plaintiff's wheelchair by force, Plaintiff's averments show that, at that time, he refused to relinquish his wheelchair. (Doc. 319-1 at 5, Pl. Aff. 19.) Thus, even if Defendant Hodge acted with deliberate indifference by improperly asking an officer to remove Plaintiff's wheelchair by force, the officer did not follow through and remove the wheelchair, so Plaintiff did not suffer harm sufficient to support an Eighth Amendment claim.

In sum, Plaintiff fails to establish that there exists a genuine dispute of material fact as to whether Defendant Hodge was deliberately indifferent. Defendant Hodge's Motion for Summary Judgment will be granted.

### g.     Nurse Graybill

Defendant Graybill moves for summary judgment on the claim against her. (Doc. 296.) Defendant Graybill argues that she responded reasonably to Plaintiff's medical needs when she ordered medication refills and ordered a walker, and there is no evidence she acted with deliberate indifference. (*Id.* at 7–8.) Plaintiff argues that Defendant Graybill falsified records, did not have authority to order medical devices, and prevented Plaintiff from seeing a provider. (Doc. 317 at 3–4, 8.)

The parties dispute what transpired on April 13, 2020, when Plaintiff saw Defendant Graybill and she determined that Plaintiff's wheelchair waiver would not be renewed. (Doc. 296 at 2–3; Doc. 317 at 3–4.) Although Defendant Graybill documented in the record that Plaintiff was using his feet to move his wheelchair, refused to show her his right foot, was able to walk, and was not wearing his ankle brace and shoe wedge, the Court takes as true Plaintiff's averments that these statements were false. (Doc. 297-1 at 6; Doc. 319-1 at 6, Pl. Aff. ¶ 20.) Plaintiff told Defendant Graybill that he suffered severe pain when he walked, that his right foot was deformed and needed surgery, and he gave her the orthopedic specialist's reports. (Doc. 319-1 at 6, Pl. Aff. ¶ 21.) Defendant Graybill responded, "I don't care about any of this," refused Plaintiff's request to see a provider, and said he would have to walk around the unit despite his pain. (*Id.* ¶ 21.)

In this instance, Defendant Graybill's alleged falsification of medical records may

- 45 -

support facts relevant to a deliberate indifference claim.  *See Crips*, 2015 WL 3486950, at *5.   Defendant Graybill's false documentation would support a cancelation of a medically necessary wheelchair waiver.  It appears that, as a nurse, Defendant Graybill would not have authority to order medical devices or to cancel orders for a wheelchair.  Further, Defendant Graybill's refusal to schedule Plaintiff to see a provider, and her statements to Plaintiff—including that he would have to walk despite his pain—exhibit knowledge of, and deliberate disregard of, Plaintiff's serious medical need.  *See Mata v. Saiz*, 427 F.3d 745, 756 (10th Cir. 2005) (holding nurse's failure to perform "gatekeeper" role by referring patient to a practitioner for symptoms of cardiac emergency could be deliberate indifference); *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000) ("[if] the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care").

Nonetheless, the record shows that Plaintiff did not lose his wheelchair because of Defendant Graybill's actions.  Plaintiff does not allege that his wheelchair was taken away on April 13, 2020; he states only that he was denied a wheelchair SNO.  (*See* Doc. 317 at 8.)   On April 29, 2020, the medical director ordered that Plaintiff's may keep his wheelchair, and the next day, when Plaintiff saw a provider, he was given a printed wheelchair SNO. (Doc. 282-7 at 2–3; Doc. 282-7 at 7.)  Plaintiff fails to present evidence to show that he suffered harm following Defendant Graybill's actions where he was able to keep his wheelchair and he saw a provider two weeks after their encounter.

Accordingly, while there is question of fact as to whether Graybill exhibited deliberate indifference to Plaintiff's serious medical need, Plaintiff cannot show that he suffered harm as a result.  Defendant Graybill's Motion for Summary Judgment will therefore be granted.

. . . .

- 46 -

1          h.      NP Riley

2          The parties cross-move for summary judgment on the claim against Defendant

3   Riley.   (Docs. 281, 298.)   Plaintiff argues that Defendant Riley was deliberately

4   indifferent because she was aware of his serious medical needs but intentionally denied

5   Plaintiff prescribed Percocet after his August 20, 2019 surgery, refused to expedite an

6   ankle brace, improperly discontinued his prescription of Gabapentin, and misrepresented

7   that she saw Plaintiff in medical records. (Doc. 281 at 17–18; Doc. 317 at 3.)  Defendant

8   Riley argues that she responded reasonably to Plaintiff's medical needs by placing

9   multiple consult requests, prescribing medications, and issuing an SNO for a walker

10  based on specialists' recommendations. (Doc. 298 at 8.)  Defendant Riley asserts that at

11  no time did she falsify or omit facts from Plaintiff's medical records, nor was she

12  deliberately indifferent to any medical issue of which she was aware. (*Id.* at 8–9.)

13         The evidence shows that Defendant Riley was Plaintiff's provider from August

14  2019 to June 2020, and that during this time, Defendant Riley had access to Plaintiff's

15  medical records and was aware of his serious medicals needs and pain related to his knee

16  and foot and his GERD condition.

17         Following Plaintiff's surgery in August 2019, Defendant Riley did not provide

18  Plaintiff the narcotic medication prescribed by the treating surgeon; instead, she provided

19  Plaintiff with Tylenol 3, which includes the narcotic codeine. (Doc. 282-8 at 15, 18.)  If

20  Defendant had not provided Plaintiff with any pain medication following surgery, that

21  would have been contrary to the treating specialist's recommendation.  But in substituting

22  one narcotic for another that was available at the prison pharmacy, Defendant Riley did

23  not exhibit deliberate indifference to Plaintiff's serious medical need.

24         With respect to discontinuation of Plaintiff's Gabapentin, which he took for pain

25  relief, Defendant Riley entered a medical note on December 26, 2019 that Plaintiff's

26  Gabapentin level was below the normal range and would be discontinued. (Doc. 282-8 at

27  22.)   Plaintiff disputes Defendant Riley's implication that Plaintiff was not taking

28  Gabapentin as prescribed.  Plaintiff notes that Gabapentin was administered as a "Direct

Observed Therapy" under "Watch Swallow" protocols," and the medical records document that Plaintiff was properly administered the Gabapentin by medical staff under this protocol. (Doc. 282-3 at 2–4.)  Plaintiff's blood was drawn in the early morning, and he had taken his last Gabapentin dose the night before.  (*Id.* at 5; Doc. 282-3 at 3, 5.)  Plaintiff's Gabapentin level was 1.4; the normal Gabapentin therapeutic range is 2.0–12.0.  (Doc. 282- 3 at 5.)

Regardless of the dispute over discontinuation of Gabapentin, the record shows that, at the time, Plaintiff was still prescribed Naproxen.  (*See* Doc. 282-2 at 15.)  Further, on January 6, 2020, orthopedic specialist Dr. Latt administered a corticosteroid injection to treat Plaintiff's increasing and sharp pain on his right foot and heel.  (Doc. 282-3 at 17.)  Thus, Plaintiff continued to receive some pain treatment after the discontinuation of Gabapentin.

But on February 5, 2020, Plaintiff's Naproxen prescription expired, and it was not renewed or replaced with another pain medication.  (Doc. 282-2 at 15; Doc. 282-11 at 3, Pl. Aff. ¶¶ 3, 7.)  Relief from the January 6, 2020 steroid injection wore off after about a month, and thereafter Plaintiff reported "continued," "severe," and "increased" pain at medical encounters and via HNRs on February 17, March 17, March 24, April 13, April 30, May 23, May 26, and June 1, 2020.  (Doc. 282- 3 at 23, 26, 28–29; Doc. 282-6 at 27, 29; Doc. 282-7 at 5; Doc. 282-11 at 3, Pl. Aff. ¶ 9; Doc. 319-1 at 4–5, Pl. Aff. 14, 16.)  Plaintiff also requested to discuss his untreated foot and leg pain in a June 20, 2020 HNR.  (Doc. 282-12 at 4.)

Failure to respond to a prisoner's severe pain for months may amount to deliberate indifference.  *See Jett*, 439 F.3d at 1096; *cf. DeGeorge v. Mindoro*, No. 17-CV-06069-LHK, 2019 WL 2123590, at *7 (N.D. Cal. May 15, 2019) ("[b]ecause Defendants attempted to treat Plaintiff's pain, they cannot be said to have been 'indifferent' to it," much less deliberately so"). Here, from February to June 2020, Plaintiff repeatedly complained of severe and increasing pain in his foot and leg, his pain was documented in the medical records, Defendant Riley was Plaintiff's treating provider during this time,

and she regularly reviewed Plaintiff's records and was aware of Plaintiff's HNRs.  (Doc. 299-1 at 31, 83; Doc. 299-1 at 64, Riley Decl. 4.)  *See Jett*, 439 F.3d at 1097.  The record shows that Defendant Riley did not prescribe any pain medication after the Naproxen expired, nor did she make any attempt to provide any other pain treatment.  A reasonable jury could find that Defendant Riley's failure to treat Plaintiff's pain during this time amounted to deliberate indifference.  A reasonable jury could further find that Plaintiff was harmed by Defendant Riley's deliberate indifference because he continued to suffer ongoing and severe pain.  Accordingly, Defendant Riley's Motion for Summary Judgment will be denied as to the Eighth Amendment claim against her.

If a reasonable jury believes Defendant Riley's claims that she acted reasonably in response to Plaintiff's serious medical need and that Plaintiff did not suffer any harm as a result of Defendant Riley's actions or failure to act, it could find that she is not liable for deliberate indifference.  Plaintiff's request for summary judgment as to the Eighth Amendment claim against Defendant Riley will therefore be denied.

### i.    NP Elliott

The parties cross-move for summary judgment as to the claim against Defendant Elliott.  (Docs. 281, 300.)  Plaintiff argues that, except for immediately after his February 11, 2021 surgery, Defendant Elliott was deliberately indifferent when she failed to prescribe any pain medication for Plaintiff's ongoing chronic pain despite her knowledge of his serious medical need.  (Doc. 281 at 18–19.)  Defendant Elliott argues that she reasonably responded to Plaintiff's requests for care, including prompt orders for post-surgical pain medications, her offers to prescribe alternative neuropathic pain medication, and her communication with Dr. Latt following Plaintiff's surgery.  (Doc. 300 at 8.)  Defendant Elliott maintains that any delay in the provision of post-surgical medications due to the pharmacy vendor does not, without more, support a claim for deliberate indifference.  (*Id.* at 9.)

Defendant Elliott was Plaintiff's primary care provider from January 2021 to May 2021.  (Doc. 301-1 at 2, Elliott Decl. ¶ 5.)  As mentioned, on January 21, 2021, an

Interdisciplinary team meeting was held to discuss Plaintiff's care, particularly his pain and the lack of treatment for his pain, and Defendant Elliott was part of this meeting. (Doc. 282-12 at 55.)   Defendant Elliott indicated she would examine Plaintiff the following day to determine whether he should receive pain treatment, but she did not see him the next day or prescribe any pain medication.  (Doc. 316-1 at 7, Pl. Aff. ¶ 25; Doc. 282 ¶ 92; Doc. 309 ¶ 92.)   Plaintiff continued to go with his pain untreated until he underwent surgery on February 11, 2021.

After the surgery on Plaintiff's right foot and calf, Dr. Latt prescribed Gabapentin 300 mg 3 times a day for 30 days; Ibuprofen 600 mg every six hours for 14 days; and Oxycodone 5 mg every six hours for 7 days.  (*Id.* at 12–13; Doc. 282-9 at 5, 12–13.) Plaintiff did not receive any of the prescribed medications, or any other pain medication, upon his return to the prison on February 11, 2021.   (*Id.* at 14; Doc. 316-1 at 7, Pl. Aff. ¶ 28; Doc. 282-7 at 33, Centurion's Resp. to Req. for Ad. No. 6.) The following day, Defendant Elliott ordered Tylenol 4 (acetaminophen-codeine) every 8 hours for 14 days, and Plaintiff received his first dose at 1:30 p.m. on February 12, 2021.  (Doc. 282-9 at 20, 39.)  Evidence in the record supports that, as a provider, Defendant Elliott was allowed to order that medication be administered "stat," or immediately.  (Doc. 282-9 at 27, Salazar Dep. 28:25–29:16.)  Defendant Elliott asserts that, despite an order for pain medication, it may not be available from the pharmacy.  (Doc. 282-9 at 26, Elliott Resp. to Req. for Admis. 8.)  The Medical Director confirmed, however, that Ibuprofen was kept in stock in Plaintiff's Unit.  (*Id.* at 31, Salazar Dep. 27:12–14.)   Thus, even assuming that Oxycodone was not initially available at the pharmacy, Ibuprofen—which was also ordered by the surgeon—was available but not provided to Plaintiff.  Thus, Plaintiff went almost 24 hours without any pain medication following surgery.

Further, although Dr. Latt prescribed Gabapentin following surgery, Defendant Elliott determined that Plaintiff would not be given Gabapentin because of past issues with labs.  (Doc. 300 at 4; Doc. 301-1 at 3, Elliott Decl. ¶ 10.)  But there is no documentation that Defendant Elliott considered the consequences of denying a

- 50 -

medication prescribed by the surgeon or that she initially sought to provide an alternative medication. *See Sullivant v. Spectrum Med. Servs.*, No. CV 11-00119-M-JCL, 2013 WL 265992, at \*7 (D. Mont. Jan. 23, 2013) (genuine issue of material fact whether the defendants acted with deliberate indifference where the only explanation for discontinuing the plaintiff's medications was that he was hoarding the medications; "[d]enial of medical care as a form of punishment is acting in deliberate indifference of medical needs if there is not some evidence that medical consequences were considered"); *Jacoby v. Cnty. of Oneida N.Y.*, No. 9:05-CV-1254 (FJS/GJD), 2009 WL 2971537, at \*3–4, 12 (N.D. N.Y. Sept. 11, 2009) (the medical defendants' proffered reason for withholding the plaintiff's medications—that he was in possession of another prisoner's medication—was not a solid basis for withholding medication, particularly given the defendants' knowledge of the plaintiff's mental health history).

Also, in April 2021, when the specialist—Dr. Latt—ordered to continue Plaintiff on Lyrica for another 6 weeks, Defendant Elliott decided that Plaintiff only needed to be on Lyrica for another 2–3 weeks. (Doc. 301-1 at 104.) This decision came without any thorough physical examination of Plaintiff. (*Id.* at 101–104.) Indeed, the medical record documenting Defendant Elliott's decision that Plaintiff would only need Lyrica for another 2–3 weeks shows that the encounter lasted approximately 1 minute. (*Id.* at 101.)

Defendant Elliott suggests that Plaintiff's disagreement with her medication decisions is merely a difference of opinion, which does not rise to deliberate indifference. (Doc. 300 at 9.) The difference of opinion was between Dr. Latt and Defendant Elliott, which was not a difference of opinion between doctors because Dr. Latt is an orthopedic specialist and Defendant Elliott is not a physician. As stated, failure to follow a treating specialist's recommendations may amount to a course of treatment that is medically unacceptable. *See Colwell*, 763 F.3d at 1069.

Finally, on April 16, 2021, Defendant Elliott took away Plaintiff's wheelchair without conducting any physical examination and despite his continued, significant pain when ambulating with his walker. (Doc. 316-1 at 8, Pl. Aff. ¶¶ 37, 40.) Plaintiff went

1    without his wheelchair until May 14, 2021, when Dr. Latt ordered that he be permitted to
2    use it.  (Doc. 301-1 at 122.)

3        This record supports that Defendant Elliott was fully aware of Plaintiff's serious
4    medical need and ongoing significant pain but that, over the 5-month period she was his
5    primary care provider, she denied any pain medication to Plaintiff prior to surgery, she
6    denied any pain medication in the 24 hours after surgery, she refused to provide the
7    specialist-prescribed Gabapentin, she terminated the specialist's prescription of Lyrica,
8    and she confiscated Plaintiff's wheelchair.  A reasonable jury could find that Defendant
9    Elliott's actions exhibited deliberate indifference, and that Plaintiff suffered continued
10   pain and harm as a result.  Defendant Elliott's Motion for Summary Judgment will be
11   denied.

12       If a jury believes Defendant Elliott's averments, it could find that she acted
13   reasonably by prescribing some medication following surgery and communicating with
14   the specialist to get his recommendations during Plaintiff's post-surgical course of
15   treatment.  Accordingly, Plaintiff's request for summary judgment as to the claim against
16   Defendant Elliott will be denied.

17                               **j.    Dr. Young**

18       Defendant Young moves for summary judgment as to the claim against him.
19   (Doc. 302.)  Defendant Young argues that his decision to deny fundoplication surgery for
20   Plaintiff constitutes a difference of opinion with the outside provider, which does not
21   amount to deliberate indifference.  (*Id.* at 9–10.)

22       In June 2020, Plaintiff saw gastroenterologist Dr. Khan, who completed a
23   thorough exam, diagnosed heartburn, GERD, and diaphragmatic hernia.  (Doc. 238-5 at
24   2–3.) Dr. Khan advised Plaintiff that fundoplication surgery was a treatment option.
25   (Doc. 47 at 13, Pl. Decl. ¶ 4.)

26       Plaintiff continued to suffer from the effects of GERD, and, on November 11,
27   2020, Plaintiff saw Dr. Khan again.  (Doc. 238-11 at 2.)  After another thorough exam,
28   Dr. Khan determined that Plaintiff's GERD symptoms were not well controlled on

medication, discussed the surgical option with Plaintiff, and noted in the record to consider a surgery consult for hiatal hernia.  (*Id.* at 2–4.)

On November 16, 2020, Defendant Hines, Plaintiff's treating provider at the prison, submitted a consultation request for an off-site general surgery consultation.  (*Id.* at 3.)  This consult request was denied.  (*Id.* at 7.)  Thereafter, another treating provider, PA Salyer, submitted a second consultation request for an off-site general surgery consult based on the gastroenterologist's recommended repair of the hiatal hernia, minimal relief with PPIs, and the showing of osteopenia on x-rays.  (*Id.* at 10.)  This request was approved, and in January 2021, Plaintiff saw surgeon Dr. Wiseman.  (*Id.* at 15; Doc. 47 at 16.)  Dr. Wiseman examined Plaintiff; assessed long-standing GERD, hiatal hernia, and significant reflux symptoms despite PPI therapy; and recommended hiatal hernia repair with fundoplication.  (Doc. 47 at 17.)  Plaintiff saw Dr. Wiseman for follow up in March 2021, at which time Dr. Wiseman took another thorough history and performed an exam and concluded that they would schedule Plaintiff for the fundoplication surgery.  (*Id.* at 20–21.)

Defendant Elliott then submitted a Consultation Request for general surgery pursuant to Dr. Wiseman's recommendation; however, on the request form, she questioned Dr. Wiseman's assessment that Plaintiff suffered aspiration pneumonias. (Doc. 109 at 13; Doc. 238-16 at 2.)  On March 18, 2021, the consult request for surgery was denied pursuant to Dr. Young's determination that the surgery was not necessary because Plaintiff had not had recurrent aspiration pneumonia and "treatment is consistent with medication to treat his GERD which he is already on."  (Doc. 302 at 4; Doc. 335, Young Decl. ¶ 13; Doc. 238-16 at 8.)

Plaintiff continued to suffer from significant heartburn and GERD symptoms, and on March 4, 2022, Plaintiff saw Dr. Khan again.  (Doc. 238-19 at 10.)  Dr. Khan completed a thorough history and exam and assessed heartburn, GERD without esophagitis, diaphragmatic hernia without obstruction or gangrene, family history of malignant neoplasm of digestive organs, and abnormal findings on diagnostic imaging of

part of digestive tract.  (*Id.* at 11.)   Dr. Khan documented that Plaintiff's GERD symptoms were not well controlled on medication, the esophagogram revealed significant reflux, and Plaintiff was a good candidate for surgery based on his age and no significant comorbid conditions.  (*Id.*)   Dr. Khan wrote that Plaintiff "will need surgery for his significant GERD symptoms and hiatal hernia despite taking medications for long time. He needs to refer back to surgeon for repair of his hiatal hernia and Nissen fundoplication."  (*Id.*)

Defendant Waszkiewicz then submitted a consult request for a surgeon to evaluate for fundoplication surgery, and the request was denied based on Dr. Young's determination that Plaintiff only needed education on GERD and to avoid certain foods. (*Id.* at 15; Doc. 238 ¶ 62; Doc. 257 ¶ 62; Doc. 147-1 at 14.)

In June 2022, the Court ordered Defendant Centurion to immediately schedule Plaintiff to see a surgeon, and, after another surgeon—Dr. Neal—recommended surgery, Plaintiff underwent Nissen fundoplication surgery in August 2022.  (Doc. 157; Doc. 238 ¶ 75–76; Doc. 257 ¶ 75–76.)

In *Snow*, two orthopedic specialists and the prisoner's treating prison physician recommended that the prisoner undergo hip surgery; however, the physicians on the review board—all board-certified in family medicine or similar disciplines—ignored the outside expert advice and decided to treat the prisoner with medications, which was not effective.  681 F.3d at 988.  When the prisoner filed a lawsuit, the physicians on the review board argued there was merely a difference of opinion that cannot amount to deliberate indifference, but the Ninth Circuit rejected that argument.  *Id.*  The appellate court held that "a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances."  *Id.*

This case presents a very similar scenario.  Two treating specialists who thoroughly examined Plaintiff repeatedly recommended fundoplication surgery, and two treating prison providers recommended surgical consults.  The medical records document

- 54 -

the specialists' findings that Plaintiff's GERD condition was not relieved by medications and that he would be a good candidate for surgery, and without surgery, Plaintiff continued to suffer severe heartburn and GERD symptoms.  Defendant Young is not a specialist or certified in gastroenterology, nor did he ever examine Plaintiff.  Nonetheless, he ignored the outside expert advice and decided to deny surgery twice.  Following *Snow*, the Court rejects the argument that this was merely a difference of opinion and concludes that a reasonable jury could find the decision of Defendant Young, a non-treating and non-specialist physician, to repeatedly deny the fundoplication surgery recommended by treating specialists was medically unacceptable and constituted deliberate indifference.

Defendant Young's evidence that Plaintiff ordered some commissary food items in June, July, and August 2022 that he was told to avoid does not change this conclusion. (Doc. 303-1 at 26–41.)  These purchases were made after Defendant Young made his determinations to deny surgery; thus, they did not affect his decision-making.  Further, a patient's failure to strictly adhere to a diet or treatment regimen does not necessarily support denial of such specialist-recommended treatment.

Likewise, Defendant Young's reliance on NP Redwine's medical opinion and an outside expert's opinion do not alter the Court's conclusion.  (Doc. 303 ¶¶ 9, 11.)  NP Redwine is not a physician, and the record shows that she referred Plaintiff to a gastroenterologist, thereby acknowledging that Plaintiff's condition required specialist care.  (Doc. 238-19 at 6, 9.)  Defendant Young's outside expert, Dr. Thomas D. Fowlkes, is board certified in emergency medicine and addiction medicine—not gastroenterology. And he never examined Plaintiff.   (Doc. 303-1 at 90–91.)   Notably, Dr. Fowlkes's conclusions refer to Plaintiff's "self-reported persistent GERD," and state that Plaintiff mis-reported symptoms and used "esoteric medical language" and terms that "would likely confuse and confound specialist providers," thus allowing Plaintiff to manipulate providers to get the treatment he desired.  (*Id.* at 84–86.)  To the extent Defendant Young argues that Plaintiff was malingering, that is a question of fact for the jury.  *See Egberto v. Nev. Dep't of Corrs.*, 678 F. App'x 500, 503 (9th Cir. Feb. 6, 2017) (the doctor's

challenge as to the source and extent of the prisoner's pain and the doctor's opinion that the prisoner was malingering "only creates a factual question for the jury to resolve"); *George v. Sonoma Cnty. Sheriff's Dep't*, 732 F. Supp. 2d 922, 937–38 (N.D. Cal. 2010) ("[s]uspicions of malingering may . . . be considered an indication of an ulterior motive whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in failing to provide proper care").

Dr. Wiseman first recommended scheduling fundoplication surgery in March 2021; however, due to Defendant Young's determinations, Plaintiff did not receive the recommended surgery until August 2022. During that 17-month period, Plaintiff continued to suffer severe and painful GERD and hiatal hernia symptoms, which supports the final "harm" element in the deliberate indifference analysis.

For the above reasons, Defendant Young's Motion for Summary Judgment will be denied.

### k.    Dr. Hines

The parties cross-move for summary judgment as to the claim against Defendant Hines. (Doc. 281; Doc. 304.) Plaintiff argues that Defendant Hines was aware of his right foot pain but failed to provide any treatment for his pain. (Doc. 281 at 20.) Plaintiff further argues that Defendant Hines delayed submitting a consult request to return to Dr. Latt and consequently delayed his surgery. (Doc. 315 at 7.) Defendant Hines argues that she consistently and reasonably evaluated Plaintiff's medical needs, requested multiple offsite consult requests, prescribed medications, and issued a bed wedge SNO. (Doc. 304 at 8.) Defendant Hines contends that her actions did not rise to deliberate indifference and Plaintiff simply disagreed with her medication determinations. (*Id.* at 8–9.)

On May 28, 2020, Plaintiff underwent a left knee arthroscopy with Dr. Feldman. (Doc. 316-2 at 2.) Dr. Feldman's medical notes included that Plaintiff should follow up in 8 weeks. (Doc. 299-1 at 83.) On June 12, 2020, Defendant Riley noted her review of Dr. Feldman's notes and documented in the medical record that a referral for a follow-up

1   visit was placed.  (*Id.* at 83, 87.)

2          Plaintiff saw Defendant Hines on June 18, 2020 for right foot pain.  (Doc. 305-1 at
3   21.)   At this time, Plaintiff was not prescribed any pain medication.  (*Id.* at 25.)   In
4   response to Plaintiff's reports of pain, Defendant Hines informed Plaintiff that he was
5   scheduled to see orthopedics for a follow up.  (*Id.* at 26.)   The parties dispute whether a
6   follow-up orthopedic appointment had been scheduled at that time.   The June 12, 2020
7   medical record documented that an orthopedic referral was submitted; however, there is
8   no documentation showing whether or when the follow-up consult request was approved.
9   (Doc. 299-1 at 87.)   On July 24, 2020, Defendant Hines noted that an orthopedic consult
10  was pending.  (Doc. 305-1 at 34.)   Then, on August 3, 2020, Defendant Hines told
11  Plaintiff that she had submitted a request for Plaintiff to see the orthopedic specialist for
12  his right foot.  (Doc. 316-1 at 4, Pl. Aff. ¶ 14.)   The inference from the medical records is
13  that, at the time Plaintiff saw Defendant Hines on June 18, 2020, there was no orthopedic
14  appointment scheduled.

15         When Plaintiff saw Defendant Hines on July 24, 2020, he told her he had right
16  foot pain and difficulty standing.   (Doc. 305-1 at 29.)   Defendant Hines issued a
17  prescription for Naproxen.  (*Id.* at 33.)  Plaintiff saw Defendant Hines again on August 3,
18  2020, at which time he reported that he still had right foot pain; Defendant Hines
19  documented that Naproxen would be continued.  (*Id.* at 37, 42.)  Plaintiff saw Defendant
20  Hines again on September 1, 2020.  (*Id.* at 45.)  Although the May 28, 2020 orthopedic
21  medical note recommended an 8-week follow up, which would have been late July 2020,
22  by this September 1, 2020 appointment, Plaintiff had still not seen the orthopedist for
23  follow up.  (*Id.*)  Defendant Hines stated she would place a request for Plaintiff to see a
24  podiatrist for his right foot issues.  (*Id.* at 50; Doc. 316-1 at 4, Pl. Aff. ¶ 17.)   At this
25  encounter, Plaintiff told Defendant Hines that Naproxen was completely ineffective at
26  treating his pain, but Defendant Hines said that she was not allowed to prescribe him
27  anything other than Naproxen.  (Doc. 316-1 at 4, Pl. Aff. ¶ 20.)

28         On September 17, 2020, Plaintiff saw Defendant Hines, and Plaintiff reported

continued right foot pain and right knee pain; Defendant Hines noted that consult requests for orthopedic follow up for both the knee and foot had been approved. (Doc. 305-1 at 66, 71.) On October 1, 2020, Plaintiff again told Defendant Hines that he was experiencing significant pain in his right foot, ankle, and calf from standing and walking with his walker and that Naproxen was completely ineffective. (Doc. 316-1 at 4, Pl. Aff. ¶ 21.) On October 8, 2020, Plaintiff saw Defendant Hines and expressed that he wanted to see an orthopedist for his right foot pain; Defendant Hines noted that the orthopedics consult had been approved, and that Plaintiff was taking Naproxen for pain. (Doc. 305-1 at 82, 87.)

The medical records show that Defendant Hines submitted an urgent orthopedic consult request on October 29, 2020. (*Id.* at 90, 94.) On November 16, 2020, Plaintiff saw Defendant Hines and reported that he was experiencing uncontrollable pain in his right foot and leg despite taking Naproxen. (*Id.* at 101; Doc. 316-1 at 4, Pl. Decl. ¶ 23.) Defendant Hines told Plaintiff she would give him an injection of Toradol, but she never did. (Doc. 316-1 at 4, Pl. Decl. ¶23.) November 16, 2020, appears to be the last encounter with Defendant Hines.

As Plaintiff's primary care provider from June to November 2020, there can be no dispute that Defendant Hines was aware of Plaintiff serious medical need related to his foot and leg issues and his resulting pain.

In response to Plaintiff's pain, Defendant Hines initially provided no treatment, and after a month, she prescribed Naproxen. But Plaintiff continued to report ongoing significant pain, and starting on September 1, 2020, he repeatedly informed Defendant Hines that Naproxen was ineffective. Nonetheless, Defendant Hines continued Plaintiff on the ineffective Naproxen and did not provide any alternative pain medication. This situation does not represent a difference of opinion over Plaintiff's course of treatment because Defendant Hines's treatment with a known ineffective medication amounts to no treatment at all. Further, the medical records are somewhat confusing and appear to be incomplete as to the status of the orthopedic consult requests, but, at the least, the

1    evidence shows that Defendant Hines appeared to make no effort to ensure that Plaintiff

2    returned for the 8-week orthopedic follow up as recommended by the surgeon.

3         On this record, there are disputed questions of fact as to whether Defendant Hines,

4    in failing to treat Plaintiff's right foot pain, acted with deliberate indifference to

5    Plaintiff's serious medical need and whether he suffered unnecessary pain as a result.

6    The material factual disputes preclude summary judgment for either party as to the claim

7    against Defendant Hines.

8              **l.      Centurion and Defendant Thornell**

9         Centurion and Defendant Thornell, in his official capacity, move for summary

10   judgment as to the policy claim against them in Count Three.  (Doc. 306.)

11        To support a § 1983 claim against Defendant Thornell in his official capacity and

12   against Centurion, a private entity performing a traditional public function, a plaintiff

13   must allege facts to support that his constitutional rights were violated as a result of a

14   policy, decision, or custom promulgated or endorsed by Defendants Thornell and/or

15   Centurion.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012)

16   (extending the "official policy" requirement for municipal liability under *Monell v. Dep't*

17   *of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law).

18   Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity

19   had a policy or custom; (3) the policy or custom amounted to deliberate indifference to

20   the plaintiff's constitutional right; and (4) the policy or custom was the moving force

21   behind the constitutional injury.  *See Monell*, 436 U.S. at 691–94; *Mabe v. San*

22   *Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

23        The Court has already determined there are material factual disputes as to whether

24   Plaintiff suffered a constitutional injury as a result of the actions by Defendants

25   Waszkiewicz, Ferguson, Riley, Elliott, Young, and Hines.

26        The Court therefore proceeds to the second *Monell* element—whether Centurion

27   had a policy or custom.  A policy is "a deliberate choice to follow a course of action"

28   made by the officials or entity "responsible for establishing final policy with respect to

the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law."  *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy.  *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual."  *Id.*  Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct."  *Mi Pueblo San Jose, Inc. v. City of Oakland*, No. C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

Defendants Centurion and Thornell argue that Plaintiff cannot establish that any Centurion policy, practice or custom existed and led to the denial of adequate medical care.  (Doc. 306 at 7.)  Defendants Centurion and Thornell insist that, because the medical records show that Plaintiff was provided timely, responsive, and appropriate medical care for his serious medical need, Plaintiff cannot possibly prove that Centurion had a policy or practice of not providing constitutionally adequate medical treatment or

1   that any such policy was the moving force behind an alleged constitutional violation.
2   (*Id.*)

3          Again, the Court has already found a question of fact as to whether Plaintiff was
4   denied constitutionally adequate healthcare.   The medical evidence shows multiple
5   refusals by providers to provide Plaintiff pain medication or pain treatment in response to
6   his documented ongoing severe pain.   The record shows multiple failures by nurses to
7   refer Plaintiff to a provider in response to his reports of significant pain.   Even the FHA
8   refused to take any action in response to Plaintiff's grievances complaining about the lack
9   of treatment for his pain.   There were also numerous instances where Centurion medical
10  staff failed to follow the treating specialists' recommendations for medications, follow
11  ups, and surgeries.   A reasonable jury could find that these repeated failures to treat
12  Plaintiff's pain and follow treating specialists' recommendations over a 2-year period
13  amount to a custom or practice of deliberate indifference.   *See Oyenik*, 2017 WL
14  2628901, at *2.

15         Further, the record supports that these failures to adequately address Plaintiff's
16  pain and follow specialists' recommendations did not result from the actions of one or
17  two rogue employees; rather, they occurred over time and involved numerous Centurion
18  employees.   *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a
19  policy more likely where multiple employees were involved in the constitutional
20  violation).   On this record, a reasonable jury could conclude that medical staff were
21  acting pursuant to Centurion policy or custom.   *See Gibson v. Cnty. of Washoe*, 290 F.3d
22  1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury
23  question).

24         Because deliberate indifference is exhibited where prison officials deny or delay
25  medical treatment and harm results, *see Wood*, 900 F.2d at 1334, an ongoing policy or
26  practice that denies or delays specialist-recommended treatment for a serious medical
27  need and thereby causes harm would constitute a deliberately indifferent policy.

28         To establish that a policy or custom is the "moving force" behind a constitutional

violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Court has already found a genuine issue of material fact whether there existed a policy or custom of failing to treat Plaintiff's pain and follow specialists' recommendations. An obvious consequence of such policies or customs may be the denial and delay of constitutionally adequate medical care. On this basis alone, the moving-force element is satisfied. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Accordingly, there exists a question of fact as to whether Defendant Centurion had a deliberately indifferent policy that deprived Plaintiff of his constitutional rights, and Defendant Centurion and Thornell's Motion for Summary Judgment will be denied.

### m.    NaphCare Joinder

In his Amended Complaint, Plaintiff sought injunctive relief in the form of necessary medical care. (Doc. 211 at 49.) Because NaphCare took over as the contracted health care provider in October 2022, it was added as a Defendant for purposes of providing injunctive relief. (Doc. 250.)

Defendant NaphCare filed a Joinder to all Defendants' pending Motions to the extent that those Motions "demonstrate there is no basis for Plaintiff's request for injunctive relief in this case," which would warrant dismissal of NaphCare. (Doc. 307 at 2.) Some of Defendants' Motions are herein denied. Because a party may rely on developments that postdate the pleadings and pretrial motions when seeking injunctive relief, NaphCare remains a necessary party for potential injunctive relief. *See Farmer*, 511 U.S. at 846.

### V.    Count Two—First Amendment Retaliation Claims

Plaintiff alleges a First Amendment retaliation claim against Defendants Riley, and Hodge for allegedly taking away Plaintiff's wheelchair in retaliation for his exercise

of free speech.  (Doc. 211 at 37–40.)  Plaintiff alleges that Defendant Hines retaliated against him by falsely reporting that he acted aggressively towards her.  (*Id.* at 39.)

### A.     Governing Standard

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an prisoner (2) because of (3) that prisoner's protected conduct and that such action (4) chilled the prisoner's exercise of his First Amendment rights (or that the prisoner suffered more than minimal harm) and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567–58 (9th Cir. 2005).  A variety of conduct can be actionable as retaliatory if undertaken for an improper purpose.  *See, e.g., Rizzo v. Dawson*, 778 F.2d 527, 531–32 (9th Cir. 1985).  And the resulting injury need not be tangible to support a claim.  *See Hines v. Gomez*, 108 F.3d 265, 267, 269 (9th Cir. 1997). Retaliation claims must be evaluated in light of the concerns of excessive judicial involvement in day-to-day prison management, and courts must therefore "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995).

### B.     Discussion

#### 1.     Protected Conduct

Plaintiff asserts that he engaged in protected conduct on April 10, 2020, when he met with Defendants Hodge and Riley, was accused of complaining, argued with Defendants about his medical care and the lack of access to a provider, and accused Defendants of not properly doing their jobs.  (Doc. 211 at 38; Doc. 317 at 7; Doc. 319-1 at 5, Pl. Aff. ¶ 16.)

Numerous courts, including within this Circuit, have found that a prisoner's verbal complaints constitute protected conduct.  *See, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (noting that "the form of the complaints—even if verbal," is of no constitutional significance; thus, verbal threats to sue would fall within the purview of

protected conduct); *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (declining to hold that "legitimate complaints by a prisoner lose their protected status simply because they are spoken"); *Merrick v. Ellis*, 2015 WL 9999194, at *6 (C.D. Cal. Nov. 30, 2015) ("So [the defendant's] contention relies solely on the distinction between an oral grievance and a written one.  The First Amendment facially makes no such distinction").

In light of this case law, and the fact that neither Defendant Hodge nor Defendant Riley dispute that Plaintiff engaged in protected conduct, Plaintiff satisfies the first element for his claim against these Defendants.  (*See* Doc. 294 at 5–6; Doc. 298 at 8.)

With respect to the claim against Defendant Hines, the record shows that, on July 2, 2020, Plaintiff started the grievance process to complain about Defendant Hines's inaccurate record keeping, inaccurate statements, and lack of treatment at the June 18, 2020 encounter.  (Doc. 316-2 at 7.)  Then, during the July 24, 2020 encounter, Plaintiff informed Defendant Hines that he would sue her if he did not receive pain treatment and a bed wedge pursuant to the specialist's recommendation.  (Doc. 316-1 at 6, Pl. Aff. ¶ 39.)  Plaintiff's grievances and his verbal threat to sue Defendant Hines constitute protected conduct.  *See Entler*, 872 F.3d at 1039; *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (prisoners have First Amendment right to file prison grievances).

## 2.      Adverse Action

The adverse action need not be so serious as to amount to a constitutional violation.  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  Indeed, even "the mere threat of harm can be an adverse action."  *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009).  The threat does not have to be explicit or specific to constitute an adverse action; it suffices if the factfinder could interpret the threat as intimating that some form of punishment or adverse action would follow.  *Id.*

Numerous courts have held that confiscating a prisoner's mobility device constitutes an adverse action.  *See, e.g.*, *Rhodes*, 408 F.3d at 568 (arbitrary confiscation and destruction of property is an adverse action); *Martin v. Stainer,* No. CV-16-8581 GW (AS), 2017 WL 11466201, at *5 (C.D. Cal. Jan. 18, 2017) (on screening, finding that the

1   defendant's denial of a wheelchair to the plaintiff supported an adverse action); *Camp v.*
2   *Overton*, No. 10-281 Erie, 2012 WL 2872459, at *3 (W.D. Penn. June 21, 2012) (taking
3   the prisoner's cane constituted an adverse action); *Coldiron v. Farley*, No. 2:07-CV-
4   1077, 2008 WL 4593908, at *6 (S.D. Ohio Oct. 14, 2008) (taking away someone's
5   medically necessary cane constitutes an adverse action).

6          Here, Hodge and Riley did not actually confiscate Plaintiff's wheelchair; however,
7   taking Plaintiff's facts as true, they threatened to do so when, on April 10, 2020, they
8   ordered an officer to take the wheelchair.  A medical record entered three days later, on
9   April 13, 2020 by Defendant Graybill, documents that Plaintiff was seen regarding his
10   request for a new wheelchair waiver, and Defendant Graybill noted that Plaintiff "refused
11   to have WC taken last Friday."  (Doc. 297-1 at 6.)  The inference from this evidence is
12   that there was an order to take the wheelchair.  Because a threat of harm may constitute
13   an adverse action, this is sufficient to support the second element on the claim against
14   Defendants Hodge and Riley.

15          Moreover, Defendants Hodge and Riley fail to show that their attempt to remove
16   Plaintiff's wheelchair was supported by a medical basis.  *See Alvarez v. Hashemi*, No.
17   1:16-cv-00203-AWI-JLT (PC), 2019 WL 1099838, at 14 (E.D. Cal. March 8, 2019) (the
18   defendant provider's removal of the plaintiff's wheelchair did not constitute adverse
19   action because the record showed a medical basis for the removal—the wheelchair had
20   not been prescribed by medical staff  (it was given to the plaintiff by security), the
21   provider examined the plaintiff and conducted testing showing that his extremity and
22   muscle strength were within normal limits, the provider prescribed pain medication and a
23   walker for acute pain, and the plaintiff was given a back brace, a ground floor cell, and a
24   bottom bunk).  There is no documentation in the April 10, 2020 medical record that
25   Defendants Riley and Hodge examined Plaintiff's foot or leg or tested his strength, no
26   documentation regarding his mobility issues, and no opinion noted as to Plaintiff's need
27   for a wheelchair.  (*See* Doc. 295-1 at 18–28.)  Plaintiff specifically avers that Defendants
28   did not examine his foot at this encounter.  (Doc. 319-1 at 5, Pl. Aff. ¶ 17.)  Defendant

Riley avers that, on April 16, 2020, she issued an SNO for a walker based on Dr. Latt's recommendation that Plaintiff be weight bearing as tolerated.  (Doc. 299-1 at 66, Riley Decl. ¶ 13.)  But Defendant Riley does not address the April 10, 2020 incident when an officer tried to confiscate Plaintiff's wheelchair.  (*See id.*)  Defendant Hodge avers that she "never asked a correctional officer to remove [Plaintiff's] wheelchair 'by force.'" (Doc. 295-1 at 15, Hodge Decl. ¶ 9.)  But Defendant Hodge does not refute that she asked a correctional officer to remove Plaintiff's wheelchair.  (*See id.*)

Consequently, there is a question of fact whether Defendants Riley and Hodge threatened to remove Plaintiff's wheelchair, and, if they did, a reasonable jury could find that it constituted an adverse action.

As to the claim against Defendant Hines, the evidence includes a copy of an email sent on July 24, 2020, from Defendant Hines to the Deputy Warden, stating that she saw Plaintiff that day about his request for a bed wedge.  (Doc. 316-2 at 11.)  Defendant Hines wrote that she told Plaintiff he did not qualify for a bed wedge, to which Plaintiff responded that he would contact his attorney if he did not get it.  (*Id.*)  Defendant Hines wrote that Plaintiff cited sections from the ADCRR manual and legal books and that he "was very intimidating and situated himself between me and the door.  There was no one at the front desk and I thought the radio would be too slow a response." (*Id.*)  Defendant Hines wrote that she issued a bed wedge under duress.  (*Id.*)  Plaintiff avers, however, that he had never been allowed inside of the medical clinic unless an officer was inside, and the officers' station is at the front desk.  (Doc. 316-1 at 4, Pl. Aff. ¶ 12.)  Plaintiff further avers that he did not situate himself between Defendant Hines and the door, and that she told him she would prescribe Naproxen and a bed wedge after he mentioned litigation "because of my legitimate medical needs." (*Id.*)

Thus, the parties dispute whether Defendant Hines's email report to the Deputy Warden was truthful.  If a reasonable jury believes Plaintiff, it could find that the email falsely accused Plaintiff of improper behavior and intimidating a medical staff member. Plaintiff could have faced disciplinary charges because of Defendant Hines's email.  (*Id.*

¶ 15.)  But when Plaintiff was called in to see the Deputy Warden about the email, the Deputy Warden stated he did not believe Plaintiff was in the medical clinic without an officer present; therefore, Plaintiff would not face disciplinary charges.  (*Id.*) "Authorizing false reports against [a prisoner] for the purpose of subjecting him to disciplinary measures is sufficient to constitute adverse action." *Hines*, 108 F.3d at 269; *see Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir.2 004) (an adverse action may be found where a defendant officer files a false report in retaliation for a prison grievance). Accordingly, Plaintiff satisfies the second element as to the claim against Defendant Hines.

### 3.   Adverse Action "Because of" Protected Conduct

A plaintiff must show that the protected conduct "was a substantial or motivating factor behind the defendant's decision." *Soranno's Gasco v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (internal citations omitted).  At the summary judgment stage, a plaintiff need only "put forth evidence of retaliatory motive, that taken in the light most favorable to him, presents a genuine issue of material fact as to intent." *Brodheim*, 584 F.3d at 1271 (citing *Bruce*, 351 F.3d at 1289).  A genuine issue of material fact as to retaliatory motive exists where there is evidence that a defendant knew of the protected conduct and evidence that (1) there was proximity in time between the protected conduct and the allegedly retaliatory action, (2) the defendant expressed opposition to the speech, or (3) the defendant's proffered reason for the adverse action was false or pretextual. *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (citation and emphasis omitted); *see Pratt*, 65 F.3d at 808 (timing can be considered as circumstantial evidence of retaliatory event).  A variety of conduct can be actionable as retaliatory if undertaken for an improper purpose. *See, e.g., Rizzo*, 778 F.2d at 531–32.

The initial inquiry is whether Defendants were aware of Plaintiff's protected conduct.  The record supports that Defendant Riley and Hodge were aware of Plaintiff's complaints about his health care presented at the April 10, 2020 encounter with them. The record also supports that, even if Defendant Hines was not aware of Plaintiff's

grievance about her course of treatment, she was aware of his verbal threat to sue her made at the July 24, 2020 encounter.

The Court must take as true Plaintiff's averment that Defendants Riley and Hodge's allegedly retaliatory action—the attempt to remove Plaintiff's wheelchair via a correctional officer—occurred just an hour after their encounter with Plaintiff on April 10, 2020, at which he engaged in protected speech. (Doc. 319-1 at 5, Pl. Aff. ¶ 19.) This immediate proximity in time supports a retaliatory motive. In addition, Plaintiff avers that Defendant Riley said to him, "are you still complaining?" (*Id.* 16.) This evidence supports that Defendant Riley expressed opposition to Plaintiff's speech. The record is therefore sufficient to show a question of fact as to a retaliatory motive and causation.

Defendant Hines's allegedly retaliatory action—the email accusing Plaintiff of threatening behavior—occurred just hours after the July 24, 2020 encounter. (*See* Doc. 282-12 at 42 (July 24, 2020 encounter starting at 9:43 a.m.; Doc. 316-2 at 11 (Def. Hines's email sent on July 24, 2020 at 2:43 p.m.). This proximity in time supports a retaliatory motive and satisfies the third element.

### 4.   Chilling Effect

A plaintiff need not demonstrate a total chilling of his rights to support his retaliation claim. *Rhodes,* 408 F.3d at 568-69. Nor does the resulting injury have to be tangible to support the claim. *Hines*, 108 F.3d at 267, 269 (an injury asserted to be the chilling effect of an officer's false accusation on the prisoner's First Amendment right to file prison grievances is sufficient to support a retaliation claim). That a plaintiff's First Amendment rights were chilled, though not necessarily silenced, is enough. *Rhodes*, 408 F.3d at 569.

Defendant Riley argues that Plaintiff cannot show that their actions chilled his exercise of his First Amendment rights because he continued to file grievances and this lawsuit. (Doc. 298 at 8.) Plaintiff maintains that Riley's and Hodge's actions on April 10, 2020 "would chill or silence a person of ordinary firmness from future First

Amendment activities." (Doc. 317 at 8, citing *Mendocino Envtl. Center v. Mendocino Co.*, 192 F.3d 1283, 1300 (9th Cir. 1999).)

In *Mendocino*, the Ninth Circuit explained that this element does not require a plaintiff to show that his speech was actually inhibited or suppressed; rather, a plaintiff need only demonstrate "that defendants intended to interfere with [the plaintiff's] First Amendment rights." 192 F.3d at 1300 (internal quotation omitted). The appellate court opined that it would be "unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity," so therefore that the inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (internal quotations omitted). Circumstantial evidence of intent to inhibit speech is sufficient to survive a summary judgment motion. *Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1448 (9th Cir. 1997).

The record shows that Plaintiff was pretty determined in exercising his free speech rights; he filed numerous HNRs and grievances, and prior to this case, he brought another civil rights lawsuit in 2017. (*See* Doc. 211 at 3.) Thus, the fact that Defendants Riley and Hodge's threat to take away Plaintiff's wheelchair did not actually stop him from continuing to file grievances and complaints does not undermine his First Amendment claim. The fact that Plaintiff was known to file HNRs and grievances about his medical care, combined with the lack of any medical documentation for the decision to order Plaintiff's wheelchair to be removed immediately after the confrontational encounter on April 10, 2020, could lead a reasonable jury to conclude that Defendants Riley and Hodge acted with intent to inhibit Plaintiff's speech, thereby meeting the "chilling effect" element.

Defendant Hines argues that Plaintiff presents no evidence his exercise of free speech was chilled as a result of her conduct. (Doc. 304 at 6.) Defendant Hines's email to the Deputy Warden reporting threatening and intimidating behavior by Plaintiff would likely chill a person of ordinary firmness from continuing to engage in certain speech

because there are potential repercussions in the form of disciplinary charges.  *See Hines*, 108 F.3d at 269 (allegation that "false charge infringed [the plaintiff's] First Amendment right to file prison grievances" was sufficient to constitute injury in the form of a chilling effect); *Millare v. Stratton*, No. 16cv1633-BAS-MDD, 2017 WL 9604609, at *5 (S.D. Cal. Feb. 28, 2017) (finding chilling-effect element met when the plaintiff alleged that the defendants filed false rules violations reports against him).  Consequently, Plaintiff satisfies the fourth element as to his claim against Defendant Hines.

### 5.   Legitimate Penological Purpose

Defendant Riley does not present any specific argument regarding this element. (*See* Doc. 298 at 8.)  Defendant Hodge argues that Defendant Riley attempted to replace Plaintiff's wheelchair with a walker based on specialist recommendations that he weight-bear as much as possible.   (Doc. 294 at 5.)   But as discussed, there is no contemporaneously-made documentation in the April 2020 medical records explaining the decision to remove Plaintiff's wheelchair.  Further, the medical records show that Defendant Riley issued the order for a walker days after the April 10, 2020 attempt to remove Plaintiff's wheelchair.   Thus, had Plaintiff not refused to relinquish his wheelchair to Officer Pierce on April 10, 2020, he would have gone days without any mobility assistant device.  Defendants Riley and Hodge do not present any evidence of a legitimate penological purpose for this action.  *See Pratt*, 65 F.3d at 808–10; *Bruce*, 351 F.3d at 1289 (prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right).   Therefore, a question of fact remains as to whether there was a legitimate penological purpose for Defendants Riley and Hodge's actions.

There also remains unresolved the issue of whether Defendant Hines's alleged retaliatory action served any legitimate penological purpose.  "[T]here is no legitimate penological purpose in filing false reports."  *Johnson v. Sandy*, 2017 WL 1519328, at *19 (E.D. Cal. April 27, 2017).  If a reasonable jury believes Plaintiff's claim that Defendant

Hines's accusations in the email were false, there can be no legitimate purpose for her action.

For the above reasons, the Court will deny summary judgment to Defendants Riley, Hodge, and Hines on the retaliation claims alleged against them in Count Two.

## VI. Punitive Damages

The remaining Defendants—Waszkiewicz, Ferguson, Hodge, Riley, Elliott, Young, Hines, and Centurion—argue that punitive damages are not warranted. (*See* Docs. 289, 291, 294, 298, 300, 302, 304, 306.)

A request for punitive damages is not a separate claim, but rather a request for a particular relief as to Plaintiff's claims. Further, whether punitive damages are warranted is an issue reserved for the jury. *See Pacific Mut. Life Ins. Co. v. Haslip*, 111 U.S. 1, 16 (1991) (noting that, with respect to punitive damages, "[t]his has been always left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend on the peculiar circumstances of each case") (quotation omitted); *Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion"). A jury may assess punitive damages in a § 1983 action when a defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

A reasonable jury could conclude that Defendants' conduct was motivated by a "reckless or callous indifference to the federally protected rights of" Plaintiff, thereby warranting punitive damages. *Id.* The request for summary judgment as to punitive damages will therefore be denied.

**IT IS ORDERED**:

(1)    Pursuant to Federal Rule of Civil Procedure 25(d), Ryan Thornell is substituted for David Shinn in his official capacity only. The Clerk of the Court must update the docket accordingly.

(2)    Plaintiff's Second Motion for Partial Summary Judgment (Doc. 281) is **denied**.

(3)     Defendant Alonso's Motion for Summary Judgment (Doc. 283) is **granted**.

(4)     Defendant Hinkley's Motion for Summary Judgment (Doc. 285) is **granted**.

(5)     Defendant Salgado's Motion for Summary Judgment (Doc. 287) is **granted**.

(6)     Defendants Waszkiewicz's Motion for Summary Judgment (Doc. 289) is **denied**.

(7)     Defendant Ferguson's Motion for Summary Judgment (Doc. 291) is **denied**.

(8)     Defendant Hodge's Motion for Summary Judgment (Doc. 294) is **granted** as to the Count One medical care claim and **denied** as to the Count Two retaliation claim.

(9)     Defendant Graybill's Motion for Summary Judgment (Doc. 296) is **granted**.

(10)    Defendant Riley's Motion for Summary Judgment (Doc. 298) is **denied**.

(11)    Defendant Elliott's Motion for Summary Judgment (Doc. 300) is **denied**.

(12)    Defendant Young's Motion for Summary Judgment (Doc. 302) is **denied**.

(13)    Defendant Hines's Motion for Summary Judgment (Doc. 304) is **denied**.

(14)    Defendant Centurion and Thornell's Motion for Summary Judgment (Doc. 306) is **denied**.

(15)    Alonso, Hinkley, Salgado, and Graybill are **dismissed** as Defendants.

(16)    The remaining claims are:

(a)     the Eighth Amendment medical care claims in Count One against Waszkiewicz, Ferguson, Riley, Elliott, Young, and Hines;

(b)     the First Amendment retaliation claims against Riley, Hodge, and Hines in Count Two; and

(c)     the Eighth Amendment policy claims against Centurion, Thornell, and NaphCare in Count Three.

(17)    This action is referred by random lot to Magistrate Judge Jacqueline M.

Rateau to conduct a settlement conference.

(18)   Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Rateau's chambers at (520) 205-4640 within **fourteen (14) days** to schedule a date for the settlement conference.

Dated this 27th day of March, 2024.

_____
Honorable Rosemary Márquez
United States District Judge